James I. Stang (CA Bar No. 94435)
Brittany M. Michael *(Pro Hac Vice)*
Gail Greenwood (CA Bar No. 169939)
PACHULSKI STANG ZIEHL & JONES LLP
One Sansome Street, 34th Floor, Suite 3430
San Francisco, California 94104-4436
Telephone: 415-263-7000
Email:  jstang@pszjlaw.com
      bmichael@pszjlaw.com
      ggreenwood@pszjlaw.com

Attorneys for the Official Committee of
Unsecured Creditors

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case No. 23-30564<br>Chapter 11 |
| THE ROMAN CATHOLIC ARCHBISHOP<br>OF SAN FRANCISCO, | |
| Debtor. | |
| | Adv. Proc. 25-03021 |
| THE OFFICIAL COMMITTEE OF<br>UNSECURED CREDITORS, | **DECLARATION OF BRITTANY M.<br>MICHAEL IN SUPPORT OF THE<br>OFFICIAL COMMITTEE OF<br>UNSECURED CREDITORS' MOTION<br>FOR PARTIAL SUMMARY JUDGMENT<br>ON AFFIRMATIVE DEFENSES BASED<br>ON CANON LAW** |
| Plaintiff, | |
| vs. | |
| THE ROMAN CATHOLIC ARCHBISHOP<br>OF SAN FRANCISCO; PARISHES LISTED<br>IN **EXHIBIT A** TO THE COMPLAINT;<br>HOLY CROSS CATHOLIC CEMETERIES;<br>SAINT MARY MAGDALENE CATHOLIC<br>CEMETERY; MT. OLIVET CEMETERY;<br>OUR LADY OF PILLAR CEMETERY;<br>TOMALES CATHOLIC CEMETERY;<br>ARCHBISHOP RIORDAN HIGH SCHOOL;<br>SACRED HEART CATHEDRAL<br>PREPARATORY; MARIN CATHOLIC<br>HIGH SCHOOL; JUNIPERO SERRA HIGH<br>SCHOOL; VALLOMBROSA RETREAT<br>CENTER; AND SERRA CLERGY HOUSE, | Date: January 15, 2026<br>Time: 1:30 p.m.<br>Place: Via Zoom Teleconference<br>Hon. Dennis Montali |
| Defendants. | |

I, Brittany M. Michael, declare under penalty of perjury as follows:

1. I am a partner at the law firm of Pachulski Stang Ziehl & Jones LLP, counsel to the Official Committee of Unsecured Creditors of The Roman Catholic Archbishop of San Francisco (the "Committee"). I am duly admitted to practice law in the United States District Courts for the Southern and Western Districts of New York and the District of Minnesota, and admitted to practice *pro hac vice* in this case. I submit this declaration in support of *The Committee's Motion for Partial Summary Judgment on Affirmative Defenses Based on Canon Law* (the "Motion"), filed herewith. I have personal knowledge of the facts set forth herein.

2. Attached hereto as Exhibit A is a true and correct copy of the Articles of Incorporation of The Roman Catholic Archbishop of San Francisco (the "Archdiocese"), that was produced to the Committee by counsel for the Archdiocese.

3. Attached hereto as Exhibit B is a true and correct copy of the *Declaration of Deacon Joe Oberting in Support of Chapter 11 Petition and First Day Motions,* filed March 13, 2023 at Docket No. 13 in *The Roman Catholic Bishop of Santa Rosa,* U.S. Bankruptcy Court, Northern District of California, Santa Rosa Div., Case No. 23-10113.

4. Attached hereto as Exhibit C is a true and correct excerpt of the *Third Amended Disclosure Statement for Debtor's Third Amended Plan of Reorganization,* filed April 3, 2025 at Docket No. 1874 in *The Roman Catholic Bishop of Oakland,* U.S. Bankruptcy Court, Northern District of California, Oakland Div., Case No. 23-40523.

5. Attached hereto as Exhibit D is a true and correct copy of the *Decision and Order Granting the Committee's Motion for Partial Summary Judgment Under Bankruptcy Rule 7056* entered on July 16, 2021 at Docket No. 164 in *Off. Committee of Unsecured Creditors v. Archbishop of Agana,* Dist. Court of Guam, Adv. No. 19-00010.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on November 18, 2025 at Minneapolis, Minnesota.


By: /s/ *Brittany M. Michael*
Brittany M. Michael

4898-4979-8777.1 05068.002

# EXHIBIT A



# State of California

### OFFICE OF THE SECRETARY OF STATE

A419923

## CORPORATION DIVISION

I, *MARCH FONG EU*, Secretary of State of the State of California, hereby certify:

That the annexed transcript has been compared with the corporate record on file in this office, of which it purports to be a copy, and that same is full, true and correct.

*IN WITNESS WHEREOF*, I execute this certificate and affix the Great Seal of the State of California this

JUN 2 9 1992



*March Fong Eu*

Secretary of State

SEC/STATE FORM CE-107
DEBTOR_010072

A .9923

ENDORSED
FILED
In the office of the Secretary of State
of the State of California

JUN 2 5 1992

MARCH FONG EU, Secretary of State

## CERTIFICATE OF AMENDMENT
### OF
## ARTICLES OF INCORPORATION
### OF
## THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO,
### A (California) Corporation Sole

KNOW ALL MEN BY THESE PRESENTS, that I, JOHN R. QUINN, Archbishop of the Roman Catholic Archdiocese of San Francisco, in the State of California, and Incumbent of The Roman Catholic Archbishop of San Francisco, a (California) Corporation Sole, do hereby certify and declare as follows:

FIRST: The Roman Catholic Archbishop of San Francisco, a Corporation Sole, was duly organized as such by the authority of and in accordance with the laws of the State of California, on February 24, 1854, by Joseph S. Alemany, the then Archbishop of the Roman Catholic Archdiocese of San Francisco, for the purpose of administering and managing the affairs, property and temporalities of the Roman Catholic Church in said Archdiocese of San Francisco, and has ever since continued to be and to act as a corporation sole for such purpose.

SECOND: I am, and continuously since April 21, 1977 have been, the Archbishop of the Roman Catholic Archdiocese of San Francisco, in the State of California, and am, and continuously since that date have been, the Incumbent of The Roman Catholic Archbishop of San Francisco, a Corporation Sole, duly organized and existing under and by virtue of the laws of the State of California.

THIRD: The following additions are hereby made to the Articles of Incorporation of said corporation sole, viz:

1. This corporation is organized and operated exclusively for religious purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

2. Notwithstanding any other provision of these articles, the corporation shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code or (b) by a corporation contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code.

3. No substantial part of the activities of this corporation shall consist of carrying on propaganda, or otherwise attempting to influence

legislation, and the corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf of any candidate for public office.

4. The property of this corporation is irrevocably dedicated to religious purposes and no part of the net income or assets of this corporation shall ever inure to the benefit of any private persons. Upon the dissolution or winding up of the corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of this corporation, shall be distributed to a nonprofit fund, foundation, or corporation which is organized and operated exclusively for religious purposes and which has established its tax exempt status under Section 501(c)(3) of the Internal Revenue Code.

FOURTH: The aforesaid amendment of the Articles of Incorporation of said corporation sole has been duly authorized by the religious organization governed by said corporation sole, to wit: the Roman Catholic Archdiocese of San Francisco.

IN WITNESS WHEREOF, I, the undersigned, JOHN R. QUINN, as Incumbent of said corporation sole, have executed this Certificate of Amendment of the Articles of Incorporation of said corporation sole at San Francisco, California, this _29_ day of _May_ 1992, and do hereby affix hereto the seal of said corporation sole.

        + John R. Quinn
          John R. Quinn
      Incumbent of The Roman Catholic
      Archbishop of San Francisco, a
      (California) Corporation Sole

I, John R. Quinn, Archbishop of the Roman Catholic Archdiocese of San Francisco, in the State of California, and Incumbent of The Roman Catholic Archbishop of San Francisco, a (California) Corporation Sole declare under penalty of perjury under the laws of the State of California that the matters set forth in the foregoing certificate are true and correct of my own knowledge.

Executed at San Francisco, California on this _29_ day of _May_, 1992.

        + John R. Quinn
          John R. Quinn

2

DEBTOR_010074    CONFIDENTIAL



# State of California

## OFFICE OF THE SECRETARY OF STATE

I, *MARCH FONG EU*, Secretary of State of the State of California, hereby certify:

That the annexed transcript has been compared with the record on file in this office, of which it purports to be a copy, and that same is full, true and correct.

*IN WITNESS WHEREOF*, I execute this certificate and affix the Great Seal of the State of California this

**JUL 2 4 1981**



*March Fong Eu*

Secretary of State

SEC/STATE FORM CE-107
OSP

ENDORSED
FILED
In the office of the Secretary of State
of the State of California

JUL 15 1981

MARCH FONG EU, Secretary of State
By JAMES E. HARRIS
Deputy

STATEMENT OF AMENDMENT

OF

ARTICLES OF INCORPORATION

OF

THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO,
a (California) corporation sole

KNOW ALL MEN BY THESE PRESENTS, that I, JOHN R. QUINN, Archbishop of the Roman Catholic Archdiocese of San Francisco, in the State of California, and Incumbent of The Roman Catholic Archbishop of San Francisco, a (California) corporation sole, do hereby certify and declare as follows:

FIRST: The Roman Catholic Archbishop of San Francisco, a corporation sole, was duly organized as such by the authority of and in accordance with the laws of the State of California, on February 24, 1854, by Joseph S. Alemany, the then Archbishop of the Roman Catholic Archdiocese of San Francisco, for the purpose of administering and managing the affairs, property and temporalities of the Roman Catholic Church in said Archdiocese of San Francisco, and has ever since continued to be and to act as a corporation sole for such purpose.

SECOND: I am, and continuously since April 21, 1977 have been, the Archbishop of the Roman Catholic Archdiocese of San Francisco, in the State of California, and am, and continuously since that date have been, the Incumbent of The Roman Catholic Archbishop of San Francisco, a corporation sole, duly organized and existing under and by virtue of the laws of the State of California.

THIRD: So much of the Articles of Incorporation of said corporation sole, as amended by the Statement of Amendment filed on May 3, 1962 with the Secretary of State of the State of California, as now reads: "The territory comprising said Archdiocese of San Francisco, and in which the jurisdiction of said corporation sole shall be exercised, and to which it shall extend, are the City and County of San Francisco, and the Counties of Marin, San Mateo and Santa Clara in said State of California;" is further amended to read as follows:

> "The territory comprising said Archdiocese of San Francisco, and in which the jurisdiction of said corporation sole shall be exercised, and to which it shall extend, is the City and County of San Francisco and the Counties of Marin and San Mateo in said State of California;"

- 1 -

COPY

**FOURTH:** The aforesaid amendment of the Articles of Incorporation of said corporation sole has been duly authorized by the religious organization governed by said corporation sole, to wit: the Roman Catholic Archdiocese of San Francisco.

IN WITNESS WHEREOF, I, the undersigned, JOHN R. QUINN, as Incumbent of said corporation sole, do hereby execute this statement of amendment of the Articles of Incorporation of said corporation sole at San Francisco, California, this _13_ day of July, 1981, and do hereby affix hereto the seal of said corporation sole.

+ *John R. Quinn*
John R. Quinn
Incumbent of The Roman Catholic
Archbishop of San Francisco, a
(California) corporation sole

STATE OF CALIFORNIA          } SS.
CITY AND COUNTY OF SAN FRANCISCO }

I, JOHN R. QUINN, being first duly sworn, depose as follows: I am the Archbishop of the Roman Catholic Archdiocese of San Francisco, in the State of California, and am the Incumbent of The Roman Catholic Archbishop of San Francisco, a (California) corporation sole. I have read the foregoing statement of amendment of the Articles of Incorporation of said corporation sole, and know the contents thereof. The same is true of my own knowledge.

+ *John R. Quinn*
John R. Quinn

Subscribed and sworn to
before me this _13th_ day
of July, 1981.

*James E. Durney*
Notary Public in and for
the State of California

JAMES E. DURNEY
NOTARY PUBLIC-CALIFORNIA
CITY & COUNTY OF
SAN FRANCISCO
My Commission Expires November 25, 1983

- 2 -



# STATE OF CALIFORNIA

## DEPARTMENT OF STATE

*To all whom these presents shall come,* Greetings:

I, FRANK M. JORDAN, *Secretary of State of the State of California, hereby certify:*

That the annexed transcript has been compared with the RECORD on file in my office, of which it purports to be a copy, and that the same is full, true and correct.

In testimony whereof, *I,* **FRANK M. JORDAN,** *Secretary of State, have hereunto caused the Great Seal of the State of California to be affixed and my name subscribed, at the City of Sacramento, in the State of California,*

*this* MAY 3 - 1962

*Secretary of State*

By

*Assistant Secretary of State*

STATEMENT OF AMENDMENT
OF ARTICLES OF INCORPORATION
OF
THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO,
A (CALIFORNIA) CORPORATION SOLE

KNOW ALL MEN BY THESE PRESENTS, that I, JOSEPH T. McGUCKEN, the Roman Catholic Archbishop of the Archdiocese of San Francisco, in the State of California, and Incumbent of The Roman Catholic Archbishop of San Francisco, a corporation sole, duly organized and existing under and by virtue of the laws of the State of California, do hereby certify and state as follows:

FIRST: I am, and continuously since April 2, 1962, have been, the Roman Catholic Archbishop of the Archdiocese of San Francisco, in the State of California, and am, and continuously since said date have been, the Incumbent of The Roman Catholic Archbishop of San Francisco, a corporation sole, duly organized and existing under and by virtue of the laws of the State of California.

SECOND: The following amendments are hereby made to the Articles of Incorporation of said corporation sole, viz:

1. The territory comprising said Archdiocese of San Francisco, and in which the jurisdiction of said corporation sole shall be exercised, and to which it shall extend, are the City and County of San Francisco and the Counties of Marin, San Mateo and Santa Clara in said State of California;

2. Said corporation sole shall have perpetual existence; and

25244
X FILED
In the office of the Secretary of State
of the State of California
MAY 3 1962
FRANK M. JORDAN, Secretary of State
By _____ Deputy.

1.

Case: 25-03021    Doc# 105    Filed: 11/18/25    Entered: 11/18/25 15:29:59    Page 11 of 75
DEBTOR_010079                                    CONFIDENTIAL

3. The manner in which any vacancy in said office of Roman Catholic Archbishop of said Archdiocese of San Francisco, and in the incumbency of said corporation sole is required to be filled, in accordance with the laws, rules and regulations of said Roman Catholic Church, is by appointment by the Pope of Rome, who is the head of said Church.

THIRD: The aforesaid amendments of the Articles of Incorporation of said corporation sole have been duly authorizedby the religious organization governed by said corporation sole, to wit, The Roman Catholic Archbishop of the Archdiocese of San Francisco.

IN WITNESS WHEREOF, I, the undersigned, said JOSEPH T. McGUCKEN, as Incumbent of said corporation sole, do hereby execute this statement of amendment of the Articles of Incorporation of said corporation sole at San Francisco, California, this _19th_ day of April, 1962, and do hereby affix hereto the seal of said corporation sole.

Incumbent of The Roman Catholic Archbishop of San Francisco, a (California) corporation sole.

2.

DEBTOR_010080                          CONFIDENTIAL

STATE OF CALIFORNIA )
                    ) ss.
CITY AND COUNTY OF SAN FRANCISCO )

I, JOSEPH T. McGUCKEN, being first duly sworn, depose as follows:

I am the Roman Catholic Archbishop of the Archdiocese of San Francisco, in the State of California, and am the Incumbent of The Roman Catholic Archbishop of San Francisco, a (California) corporation sole. I have read the foregoing statement of amendment of the Articles of Incorporation of said corporation sole, and know the contents thereof. The same is true of my own knowledge.

_____

Subscribed and sworn to before me
this _19th_ day of April, 1962.

_____
NOTARY PUBLIC
in and for the State of California,
with principal office in the
City and County of San Francisco
JAMES E. DURNEY
My Commission Expires Nov. 11, 1963

3.

DEBTOR_010081                                      CONFIDENTIAL

STATE OF CALIFORNIA                )
                                   ( ss.
CITY AND COUNTY OF SAN FRANCISCO )

On this ___19th___ day of April, in the year One Thousand
Nine Hundred Sixty-two, before me, JAMES E. DURNEY, a
Notary Public in and for the City and County of San Fran-
cisco, State of California, residing therein, duly
commissioned and sworn, personally appeared JOSEPH T.
McGUCKEN, known to me to be the Roman Catholic Archbishop
of the Archdiocese of San Francisco, and to be the Incumbent
of The Roman Catholic Archbishop of San Francisco, a (Cali-
fornia) corporation sole, and to be the person whose name is
subscribed to the foregoing statement of amendment of the
Articles of Incorporation of said corporation sole, and
acknowledged to me that he executed the same as such Incumbent
of said corporation sole.

IN WITNESS WHEREOF, I hereunto set my hand, and affix
my official seal in the City and County of San Francisco,
the day and year in this certificate first above written.

_James E Durney_
NOTARY PUBLIC
in and for the State of California
with principal office in the
City and County of San Francisco

JAMES E. DURNEY
My Commission Expires Nov. 11, 1963

4.

DEBTOR_010082                    CONFIDENTIAL


ENDORSED
FILED
In the office of the Secretary of State
of the State of California
MAY 3 - 1962
FRANK M. JORDAN, Secretary of State
By F. C. VOGEL
Deputy

STATEMENT OF AMENDMENT
OF ARTICLES OF INCORPORATION
OF
THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO,
A (CALIFORNIA) CORPORATION SOLE

KNOW ALL MEN BY THESE PRESENTS, that I, JOSEPH T.
McGUCKEN, the Roman Catholic Archbishop of the Archdiocese
of San Francisco, in the State of California, and Incumbent
of The Roman Catholic Archbishop of San Francisco, a
corporation sole, duly organized and existing under and by
virtue of the laws of the State of California, do hereby
certify and state as follows:

FIRST: I am, and continuously since April 2, 1962,
have been, the Roman Catholic Archbishop of the Arch-
diocese of San Francisco, in the State of California, and
am, and continuously since said date have been, the
Incumbent of The Roman Catholic Archbishop of San Francisco,
a corporation sole, duly organized and existing under and by
virtue of the laws of the State of California.

SECOND: The following amendments are hereby made to the
Articles of Incorporation of said corporation sole, viz:

1. The territory comprising said Archdiocese of San
Francisco, and in which the jurisdiction of said corporation
sole shall be exercised, and to which it shall extend, are
the City and County of San Francisco and the Counties of Marin,
San Mateo and Santa Clara in said State of California;

2. Said corporation sole shall have perpetual existence;
and

1.

3. The manner in which any vacancy in said office of Roman Catholic Archbishop of said Archdiocese of San Francisco, and in the incumbency of said corporation sole is required to be filled, in accordance with the laws, rules and regulations of said Roman Catholic Church, is by appointment by the Pope of Rome, who is the head of said Church.

THIRD: The aforesaid amendments of the Articles of Incorporation of said corporation sole have been duly authorised by the religious organization governed by said corporation sole, to wit, The Roman Catholic Archbishop of the Archdiocese of San Francisco.

IN WITNESS WHEREOF, I, the undersigned, said JOSEPH T. McGUCKEN, as Incumbent of said corporation sole, do hereby execute this statement of amendment of the Articles of Incorporation of said corporation sole at San Francisco, California, this _19th_ day of April, 1962, and do hereby affix hereto the seal of said corporation sole.

(SEAL)  /s/ Joseph T. McGucken
Incumbent of The Roman Catholic
Archbishop of San Francisco, a
(California) corporation sole.

2.

DEBTOR_010084                                              CONFIDENTIAL

STATE OF CALIFORNIA          )
                            ) ss.
CITY AND COUNTY OF SAN FRANCISCO )

I, JOSEPH T. McGUCKEN, being first duly sworn, depose as follows:

I am the Roman Catholic Archbishop of the Archdiocese of San Francisco, in the State of California, and am the Incumbent of The Roman Catholic Archbishop of San Francisco, a (California) corporation sole. I have read the foregoing statement of amendment of the Articles of Incorporation of said corporation sole, and know the contents thereof. The same is true of my own knowledge.

_____ Joseph T. McGucken _____

Subscribed and sworn to before me
this __19th__ day of April, 1962.

(SEAL)   James E. Durney

_____
        NOTARY PUBLIC
in and for the State of California,
    with principal office in the
City and County of San Francisco

      JAMES E. DURNEY
My Commission Expires Nov. 11, 1963

3.

Case: 25-03021   Doc# 105   Filed: 11/18/25   Entered: 11/18/25 15:29:59   Page 17 of 75

DEBTOR_010085                    CONFIDENTIAL

STATE OF CALIFORNIA )
) ss.
CITY AND COUNTY OF SAN FRANCISCO )

On this 19th day of April, in the year One Thousand Nine Hundred Sixty-two, before me, JAMES E. DURNEY, a Notary Public in and for the City and County of San Francisco, State of California, residing therein, duly commissioned and sworn, personally appeared JOSEPH T. McGUCKEN, known to me to be the Roman Catholic Archbishop of the Archdiocese of San Francisco, and to be the Incumbent of The Roman Catholic Archbishop of San Francisco, a (California) corporation sole, and to be the person whose name is subscribed to the foregoing statement of amendment of the Articles of Incorporation of said corporation sole, and acknowledged to me that he executed the same as such Incumbent of said corporation sole.

IN WITNESS WHEREOF, I hereunto set my hand, and affix my official seal in the City and County of San Francisco, the day and year in this certificate first above written.

(SEAL)   James E. Durney
_____
NOTARY PUBLIC
in and for the State of California
with principal office in the
City and County of San Francisco

JAMES E. DURNEY
My Commission Expires Nov. 11, 1963

4.

DEBTOR_010086   CONFIDENTIAL

Know all men by these presents, That Whereas
I Joseph S. Alemany am duly constituted the
Archbishop of the Roman Catholic Church in the
Archiepiscopal Diocese of San Francisco in the State
of California. And whereas the rules regulations
and discipline of the Roman Catholic Church in
the United States of America require it for the
administration of the temporalities of the said Roman
Catholic Church in the said Diocese of San Fran-
cisco, and the management of the estate and prop-
erty of said Church.

Now therefore — for the purpose of the administra-
tion of said temporalities of the said Roman Catho-
lic Church in the said Diocese of San Francisco
and the management of the estate and property
of said Church. I the said Joseph S. Alemany
Archbishop, as aforesaid, as, for and on behalf
of the said Roman Catholic Church of the Diocese
of San Francisco as aforesaid have become by
virtue of the statute in such case made, and
incorporated as a Religious Corporation sole — at the
City of San Francisco in the state of California
by the title of " The Roman Catholic Archbishop
of San Francisco" with all the powers and duties
and for the uses and purposes by law provided
for Religious Incorporations, and subject to all
the conditions, provisions and limitations enacted
by the Statute in such case made. And all
property held by me as such corporation, is held
by me in trust for the sole use purpose and
behoof of the said Roman Catholic Church in the
said Diocese of San Francisco — The Territorial
limits of said Diocese being on the North the
Forty Second degree of North Latitude, on the south
the Thirty seventh degree, thirteen minutes North Lat-

itude – on to "East the River Colorado" its source,
and on the west the Pacific Ocean –

And in proof of my appointment
and election as such Archbishop as aforesaid;
I have this day recorded a copy of my Bull
or Letter of Commission, constituting me such arch-
bishop in the office of and with the Clerk of the County
of New Francisco, my residence being in the said
City of New Francisco, duly attested –

In witness where
of I have hereunto set my hand and seal, this
twenty fourth day of February, in the year One
thousand eight hundred and fifty four.

In presence of witness        † Joseph S. Alemany
On 1st line "Whereas" interlined        Abp. S. Francisco
before executing
                Geo R. Rofster

State of California
County of New Francisco.    On this 24th day of
February A.D. 1854, personally appeared before
me, a Notary Public in and for said County,
George R. Rofster, subscribing witness to the foregoing
instrument, and to me known to be the person, whose
name is subscribed to such instrument as a witness
thereto, who being by me duly sworn deposes and
says, that he knew Joseph E. Alemany, the person
described in and who executed the foregoing instru-
ment, that he was present and saw the said Joseph
Alemany sign, seal and deliver the same as and
for his voluntary act & deed, whereupon the said
George R. Rofster became a subscribing witness thereto.
In testimony whereof I have hereto set my hand
            and affixed my notarial seal

~~the day and year first above~~
~~written at the office~~

L.S.

on the day and year first above

Case: 25-03021    Doc# 105    Filed: 11/18/25    Entered: 11/18/25 15:29:59    Page 20 of
75
DEBTOR_010088                              CONFIDENTIAL

L.S.

on the day and year first above
in this certificate written.

Samuel H. Dwinelle
Notary Public.

Recorded February 14th 1854 at 5 P.M. at request
of Eugene Casserly Esq.

# State of California,

CITY AND COUNTY OF SAN FRANCISCO, } ss.

I, WILLIAM DUER, County Clerk of the City and County of San Francisco,
State of California, and ex officio Clerk of the ___ County Court ___
___ thereof, do hereby certify the foregoing to be a true copy of
the original certificate of incorporation on file and of record ___
in my office.

WITNESS my hand and the Seal of said Court, this 27th
day of January A. D., 185 9

WILLIAM DUER, CLERK.

By

D. T. ___

DEPUTY CLERK.



The image is a rotated/sideways handwritten historical document that is too faded and rotated to read reliably.

FILED in the Office of the
SECRETARY OF STATE

of the _____

th _____ day of _____

_____ A. D. 189__

_____

_____

_____ DEPUTY.

Recorded Book _____ Page _____

DEBTOR_010090                                CONFIDENTIAL

The following is a copy of Archbishop Alemany's
handwritten declaration dated February 24, 1854.


Know all men by these presents, That Whereas I Joseph S.
Alemany am duly constituted the Archbishop of the Roman Catholic
Church in the Archepiscopal Diocese of San Francisco in the State
of California. And whereas the rules regulations and discipline
of the Roman Catholic Church in the United States of America
require it for the administration of the temporalities of the said
Roman Catholic Church in the said Diocese of San Francisco, and
the management of the estate and property of said Church.
Now therefore - for the purpose of the administration of said
temporalities of the said Roman Catholic Church in the said Diocese
of San Francisco and the management of the estate and property of
said Church, I the said Joseph S. Alemany Archbishop, as afore-
said, as, for and on behalf of the said Roman Catholic Church of
the Diocese of San Francisco as aforesaid have become by virtue
of the statute in such case made, and incoperated [sic] as a
Religious Corporation sole - at the City of San Francisco in the
state of California by the title of "The Roman Catholic Archbishop
of San Francisco" with all the powers and duties and for the uses
and purposes by law provided for Religious Incorporations, and sub-
ject to all the conditions, provisions and limitations, enacted by
the Statute in such case made. And all property held by me as such
corporation, is held by me in trust for the sole use purpose and

behoof of the said Roman Catholic Church in the said Diocese of San Francisco - The Territorial limits of said Diocese being on the North the Forty second degree of North Latitude, on the south the Thirty seventh degree, thirteen minutes north Latitude - on the East the River Colorado to its source, and on the west the Pacific Ocean.

1-25244

And in proof of my appointment and election as such Archbishop as aforesaid, I have this day recorded a copy of my <u>Bull</u> or Letter of Commission, constituting me such arch-bishop in the office of and with the Clerk of the County of San Francisco, my residence being in the said City of San Francisco, duly attested. -

In witness where of I have hereunto set my hand and seal, this twenty fourth day of February, in the year One thousand eight hundred and fifty four.

In presence of witness          /s/ - Joseph S. Alemany     L.S.
                                        ABp. S. Francisco
On 1st line "Whereas" interlined
before executing

    Geo. R. Ropeter


State of California
County of San Francisco   . ss   On this 24th day of February A.D. 1854, personally appeared before me, a Notary Public in and for said County, George R. Ropeter, subscribing witness to the foregoing

instrument, and to me known to be the person, whose name is subscribed to such instrument as a witness thereto, who being by me duly sworn deposes and say, [sic] that he knew Joseph S. Alemany, the person described in and who executed the fore-going instrument, that he was present and saw the said Joseph Alemany sign, seal and deliver the same as and for his voluntary act & deed, whereupon the said George R. Ropiter [sic] became a subscribing witness thereto.  In testimony whereof I have hereto set my hand

and affixed my notarial seal,

2-25244 on the day and year first above

in this certificate written.

Samuel H. Dwinelle
L. S. Notary Public.

Recorded February 4th 1854 at 3 P. M. at request of Eugene Cassidy

State of California, )
) SS.
City and County of San Francisco, )

I. WILLIAM DUER, County Clerk of the City and County of San Francisco, State of California, and Clerk of the County Court thereof, do hereby certify the foregoing to be a true copy of the original certificate of incorporation on file and of record in my office.

DEBTOR_010093   CONFIDENTIAL

WITNESS my hand and the Seal of said

Court, this 27th day of January A.D., 1859.

WILLIAM DUER, Clerk


By

/s/ D. P. Belknap


Deputy Clerk


3- 24244 [sic]


RECORDED

In the Office of the County Recorder of the City and County of

San Francisco Mar 25th 1885 at 58 min. past 3 o'clock ___ M.

in Liber 53 of Miscellaneous page 181

/s/ D. M. Cashin
County Recorder


FILED in the Office of the
SECRETARY OF STATE
the 9th day of March A.D. 1896
/s/ L. H. Brown
Secretary of State
By W. T. Sesum
Deputy
Record Book 97 Page 195

Jan'y. 27/69 [sic]
25244
The Roman Catholic
Archbishop
Certificate of
Incorporation
San Francisco
Jos. S. Alemany
------
Certified copy of
Certificate of Incorporation


RECORDED AT THE REQUEST OF
A. H. Loughborough
Mar 25, 1895
at 58 min. past 3 P.M.
Liber 53 Miscell.
Page 181

DEBTOR_010094   CONFIDENTIAL

# EXHIBIT B

1  PAUL J. PASCUZZI, State Bar No. 148810
   JASON E. RIOS, State Bar No. 190086
2  THOMAS R. PHINNEY, State Bar No. 159435
   FELDERSTEIN FITZGERALD
3  WILLOUGHBY PASCUZZI & RIOS LLP
   500 Capitol Mall, Suite 2250
4  Sacramento, CA 95814
   Telephone: (916) 329-7400
5  Facsimile: (916) 329-7435
   ppascuzzi@ffwplaw.com
6  jrios@ffwplaw.com
   tphinney@ffwplaw.com
7
   Proposed Attorneys for
8  The Roman Catholic Bishop of Santa Rosa

9                    UNITED STATES BANKRUPTCY COURT

10                   NORTHERN DISTRICT OF CALIFORNIA

11                         SANTA ROSA DIVISION

12

13  In re:                              CASE NO. 23-10113

14  THE ROMAN CATHOLIC BISHOP OF
    SANTA ROSA,                         Chapter 11

15
              Debtor In Possession.     Date:      March 16, 2023
16                                      Time:      1:00 p.m.
                                        Location:  1300 Clay Street, Ctrm. 215
17                                                 Oakland, CA 94612
                                                   [In person or via Zoom]
18                                      Judge:     Hon. Charles Novack

19                                      Order Shortening Time

20

21        **DECLARATION OF DEACON JOE OBERTING IN SUPPORT OF CHAPTER 11
                         PETITON AND FIRST DAY MOTIONS**
22

23        I, Deacon Joe Oberting, hereby declare under penalty of perjury as follows:

24        1.     I am the Chief Financial Officer ("CFO") of The Roman Catholic Bishop of Santa

25  Rosa, the Debtor and Debtor in Possession herein (the "Debtor in Possession"). I have been the

26  CFO since January 18, 2021. I was ordained a Deacon on September 3, 2016. I served as Principal

27  of St. John the Baptist Catholic School from July 1, 2018, to September 30, 2020. I have been

28  affiliated with the Diocese as a parishioner for over 20 years. I am authorized to provide this

Case: 23-10113   Doc# 135   Filed: 03/13/25   Entered: 03/13/25 15:29:59   Page 28 of
75

declaration setting forth the general structure and history of The Roman Catholic Bishop of Santa Rosa ("RCBSR"). In the course and scope of my duties as CFO, I am familiar with the record keeping practices and policies of the RCBSR and how it regularly maintains its business records.

2. All facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by people who report to me, upon information supplied to me by the RCBSR's professionals and consultants, upon my review of relevant documents, or upon my opinion based on my experience and knowledge with respect to the RCBSR's operations, financial condition, and related business issues. The documents submitted herewith, referenced herein or otherwise relied upon by me for purposes of this Declaration are the business records of the RCBSR, prepared and kept in ordinary and regularly conducted business activity of the RCBSR, and used by me for those purposes. If I were called upon to testify, I could and would testify competently to the facts set forth herein, and I am authorized to submit this Declaration on behalf of the RCBSR.

3. On March 13, 2023, the RCBSR initiated this case by filing a voluntary Chapter 11 Petition ("Petition Date").

A. Description of the Diocese of Santa Rosa

4. The current Bishop of the RCBSR is Bishop Robert F. Vasa who was appointed June 30, 2011.

5. The Diocese of Santa Rosa (the "Diocese")[1] was created from portions of the Sacramento Diocese and San Francisco Archdiocese in 1962, and now includes 42 parishes some of which have missions associated with them ("Parishes"). The Diocese consists of approximately 178,443 Catholics in the counties of Sonoma, Napa, Mendocino, Lake, Humboldt, and Del Norte covering approximately 11,711 square miles. While the Diocese is geographically large and very diverse, demographically it remains the smallest of California's dioceses. Diocesan priests and permanent deacons, along with priests, brothers and nuns from multiple religious orders serve parishes, schools, Catholic hospitals and do other outreach within the Santa Rosa Diocese.

---

[1] The term "Diocese" is used herein exclusively to refer to geographic territory under the jurisdiction of the RCBSR, and the terms RCBSR, Debtor, or Debtor in Possession are used herein exclusively to refer to the secular legal embodiment of the Diocese.

6. The primary role of the RCBSR is to provide resources, spiritual leadership, direction, support, planning, programming, leadership development and other services to individuals of the Roman Catholic faith, the 42 Parishes, two Catholic high schools (Cardinal Newman High School in Santa Rosa and parish school St. Vincent de Paul High School in Petaluma), numerous elementary schools, private schools, cemeteries and various other Catholic-based social and community service organizations that operate in the Diocese. The RCBSR has 20 lay employees and 2 clergy employees, not counting priests or religious.

7. As a religious organization, the RCBSR has no significant ongoing for-profit business activities or business income. The RCBSR's receipts principally come from the annual ministry appeal (held in trust for named ministries only), fees for services provided to the Non-Debtor Catholic Entities (defined below), donations, grants, and RCBSR ministry revenue. The RCBSR's fiscal 2023 operating budget is approximately $12.5 million. The RCBSR operates on a fiscal year ending June 30.

8. The Debtor in Possession will file its schedules shortly after the Petition Date. The petition indicates assets exceeding $10 million and liabilities ranging $10 million to $50 million.

B. Legal Structure of the RCBSR and Parishes and other Non-Debtor Catholic Entities

9. Since its inception and incorporation in 1962, the RCBSR has been and continues to be a California corporation sole. When the Diocese was created, most, if not all, of the real property of the Parishes was conveyed to the RCBSR for the benefit of each parish. From that time until late 2016 and during 2017, the Parishes operated as separate juridic persons under Canon law. Currently, the RCBSR holds legal title to most of the parish real property in resulting trust for the parishes' benefit. The Roman Catholic Welfare Corporation of Santa Rosa (the "RCWC") also was created in 1962 as a California nonprofit corporation. The RCWC holds title to most, if not all, of the real property of the Catholic elementary and high schools in the Diocese for the benefit of those entities.

10. Beginning in late 2016 and during 2017, the Diocese reorganized into its current structure. The Parishes in existence at that time were each organized and currently operate as separate corporations sole pursuant to California corporate law, applicable Canon Law and Statutes

for Parish Corporations of the Diocese. Thus, each Pastor of a parish is the person in charge of the parish under California and Canon law. However, with one exception, there were no transfers of real or personal property to the Parishes at this time.[2] Each of the Parishes pays all of the expenses of operation and maintenance of their real property, including any applicable property taxes. If a parcel of real property of a parish is sold, the sale proceeds go to that parish. Generally, each Parish is run by the Pastor assisted by a parish finance council who for certain decisions needs finance council consent. *See* Parish Finance Management Handbook Section 2.11 at pg. 4. Each Parish, parish school and parish cemetery keeps track of and manages its own finances.

11.     Several other separate and independent Catholic entities operate within the territory of the Diocese along with the RCWC and Parishes. The Catholic Community Foundation of the Diocese of Santa Rosa ("CCF") was incorporated in 1995 under California law as a nonprofit public benefit corporation. In 2003, the CCF filed restated articles of incorporation changing its form to a California non-profit religious corporation. The restated articles of incorporation state that the purpose of the CCF is the financial support of the various religious, charitable, and educational activities carried on from time to time by the Diocese, and its parishes and affiliated organizations. The CCF's bylaws provide that the CCF is intended to exist as a support source and a single receptacle for gifts which donors choose to make for the charitable, religious, and educational activities carried on by the RCBSR and its affiliated institutions. The CCF is governed by a Board of Trustees. The CCF also serves as an investment platform for the parishes and other institutions in the Diocese. As of January 31, 2023, the CCF holds approximately $15.21 million in restricted or trust funds of others and approximately $838,000 in unrestricted funds.

12.     Catholic Charities of the Diocese of Santa Rosa ("Catholic Charities") was incorporated in 1979 under California law as a public benefit corporation. Catholic Charities engages in charitable activities in the Diocese, including, but not limited to, providing counselling services, education and training services for the handicapped and other persons, services designed to promote the physical, social and psychological needs of the aged, the aging, and the youth of the

---

[2] The one exception is that the real property belonging to Pastor of Holy Family Catholic Church of American Canyon, a corporation sole, was transferred to it by deed recorded in June 2018, which was a requirement of the bank for that parish to secure a loan to construct its own church building.

various communities within the Diocese, the furnishing of food, clothing, shelter and financial aid to the needy, participating in narcotic rehabilitation and drug abuse programs, participating in community planning in the field of social welfare, and coordinating the activities of the various charitable and welfare agencies of the Diocese. Catholic Charities is governed by a Board of Directors.

13. Cardinal Newman High School ("CNHS") opened in 1964 and is an unincorporated association with its own operations separate from the RCBSR. CNHS has its own Constitution, Board of Regents, bylaws, financial systems and controls, and employer identification number. CNHS processes its own payroll. There is no commingling of funds, nor any financial oversight or control by the RCBSR, other than annual financial reports to the RCBSR. CNHS is responsible for maintaining accreditation under the Western Association of Schools and Colleges (WASC) and the Western Catholic Education Association (WCEA).

14. Most of the campus of CNHS was destroyed in the 2017 wildfires. Since then, CNHS has organized and run its own capital campaign to raise funds to rebuild the campus. These funds and insurance have allowed CNHS to rebuild portions of the campus, including repairing existing classrooms and facilities, building a new 2-story classroom building (already opened), and a student life center (to open in May of this year). CNHS is committed to rebuilding the destroyed administration building and updating other facilities impacted by the fire.

15. The CNHS is supported by a separately incorporated foundation named the Angela Merici and John Henry Newman Foundation, Inc. ("AMJHN"). The AMJHN is a California non-profit religious corporation formed in 2005. The bylaws state the specific purpose for the AMJHN is religious, charitable and educational activities exclusively to support the CNHS and shall include, but not be limited to, holding and managing assets and property for educational purposes in furtherance of the objectives and priorities established jointly by the Board of Trustees of the AMJHN Foundation and the Board of Trustees of the CNHS.

16. Several of the separately incorporated parishes operate schools, such as St. Vincent de Paul of Petaluma and several other elementary schools. Each of the schools is affiliated with a parish or order and are not operated by the RCBSR. Each of these schools is controlled by the

parish affiliated with the school. The RCBSR Superintendent of Schools oversees the curriculum for the elementary schools and provides support for the principals, but otherwise they are autonomous and do not receive financial support from the RCBSR.

17. There are four cemeteries within the Diocese of Santa Rosa that are operated as a separate unincorporated association through the RCBSR's Department of Cemeteries. These are Calvary Catholic Cemetery in Santa Rosa and in Petaluma, Holy Cross Catholic Cemetery in St. Helena, and Saint Francis Solano Catholic Cemetery in Sonoma (collectively, the "Cemeteries"). The Cemeteries are run by an Associate Director with their own funding, separate employer identification numbers, and report to the RCBSR. As of December 31, 2022, the Cemeteries held approximately $6.4 million in funds in a separate account dedicated to pre-need and cemetery operations and maintenance. Title to the real property for the Cemeteries is held in resulting trust by the RCBSR. Some Parishes operate their own cemeteries as well.

18. The Parishes, RCWC, CCF, Catholic Charities, CNHS, and Cemeteries are hereafter referred to collectively as the "Non-Debtor Catholic Entities."

19. The RCBSR is a party to a Services Agreement with each Parish, and with an affiliated separate corporation Marian Sisters of Santa Rosa, pursuant to which the RCBSR provides certain services to obtain efficiency via pooled resources. The RCBSR provides services including appointment of priests and permanent deacons, maintains the remuneration policy for priests (including retirement plans and health insurance plan), while the parishes pay for these items organized and administered by the RCBSR. The RCBSR provides a defined contribution retirement plan and health and life insurance plans for lay personnel for which the parishes pay. Insurance coverage packages for buildings, liability, workers compensation, and earthquakes are also provided from a pooled insurance plan. Parishes are provided with retained legal services and human resources management as well as financial guidance in the form of human resource and financial management handbooks, backed by personnel in the chancery office to assist as questions arise. In addition, the services agreement ensures compliance with Canon Law and promotes consistent policies and procedures within the Diocese of Santa Rosa. Each Parish pays the RCBSR a service fee as compensation for the services provided currently set at approximately 9.1% of the

Parishes' annual total revenue from the prior year.

20.     Except as otherwise stated herein, each of the Non-Debtor Catholic Entities owns its own property, finances its own activities, manages its own assets and is responsible for its own business and corporate activities. The Non-Debtor Catholic Entities have not sought bankruptcy relief and are not debtors in this bankruptcy case. However, certain of the Parishes and other Non-Debtor Catholic Entities are named in many of the approximately 207 pending abuse cases, for alleged abuse which generally is alleged to have occurred before they were separately incorporated. Because liability for alleged abuses which occurred before incorporation are in effect diocesan liabilities and they are all covered under the same insurance policies, the RCBSR has been defending those Non-Debtor Catholic Entities against those claims. In addition, I am informed and believe that it is the Debtor in Possession's position that the automatic stay halts those lawsuits including those against the Non-Debtor Catholic Entities that are covered by the same insurance as the RCBSR.

C.  The Clergy Sex Abuse Crisis and the RCBSR Response

21.     A tragedy that runs contrary to every teaching and tradition of the Church[3] has unfolded in the Church as a whole and in the RCBSR as well; certain clergy and others took advantage of their positions of trust and respect in the community to abuse children (the "Abuse"). The Church as a whole, and the RCBSR in particular, is committed to providing for all survivors of Abuse, known and yet to be known, in a fair, just and equitable manner with the available resources of the RCBSR.

22.     Prior to 2002, the Diocese had protocols in place to respond to reports of sexual abuse. Among other things, the RCBSR established a written policy for its existing policies and practices to address issues of sexual abuse of minors. The RCBSR also published updated requirements for child abuse prevention and reporting requirements to clergy, principals and administrators. Under the protocols, survivors were offered assistance in the form of counseling and pastoral assistance. Such assistance has been provided to survivors for up to as long as twenty

---

[3] References to the term "Church" refer to the universal church of Roman Catholic belief, seated in the Vatican and currently headed by Pope Francis.

years and continues to this date.  Although there was one instance in 2008 of delayed reporting, the RCBSR continues to follow all reporting laws and does regular education of clergy and staff on those reporting laws.

23. In the spring of 2002, the U.S. Bishops adopted the *Charter for the Protection of Children and Young People* (the "Charter"), which adopted a "one strike" policy regarding clergy serving in any active, public ministry, and also included:

- permanent removal from active ministry of any priest or deacon with a substantiated allegation of sexual abuse of a minor;
- requirement of criminal background checks for adults, including clergy, who work with children and youth;
- implementation of educational programs for the prevention of child sexual abuse for both adults and children;
- provision of behavioral guidelines/ethical standards for ministry;
- establishment of outreach for survivors; and
- creation of a review board to make recommendations to the diocesan bishop about substantiation of accusations against clergy and to oversee policy implementation.

Not only has the RCBSR continuously satisfied the Charter, but it has taken additional steps not required by the Charter to protect children from abuse and to provide healing for those who have been harmed.  Examples of the measures taken by the RCBSR include:

- established a Safe Environment Coordinator in each parish and school to monitor and assure compliance with the Charter;
- hiring a safe environment coordinator to oversee implementation of all requirements to promote the safety of children and youth;
- responding as needed to assist people who have been abused or affected by abuse;
- in some instances, offering counseling for claimants whose cases have been dismissed or settled;
- implementing a Diocesan Review Committee comprised of lay people and clergy, to review claims of sexual abuse and advise the Bishop;[4]
- requiring fingerprinting of employees and clerics;
- requiring Safe Environment education for priests, deacons, staff and volunteers in all parishes and schools;
- providing age-appropriate education for school and religious education children to equip them with the skill to help them protect themselves from abuse; and
- participating in annual compliance audits, conducted by independent auditors, to review the implementation of policies and procedures regarding the protection of

---

[4] The Diocesan Review Committee also reviewed all claims that had been made historically to determine if anything else needed to be done with respect to those claims.

Case: 25-03023   Doc# 135   Filed: 03/13/25   Entered: 03/13/25 15:29:59   Page 35 of
75

children.

24.     In 2019, the RCBSR published the names of clergy against whom previous credible claims had been made. The list was published in the Diocesan Newspaper, as well as secular press and is maintained on the Diocese of Santa Rosa website.

25.     The Diocesan Review Committee ("Committee") meets regularly to discuss any matters of concern, and as needed, to give the Bishop advice regarding claims brought forward which involve priests not previously identified or claims which seem to be more unusual. Further, the Committee is active in reviewing, at least annually, the Diocesan Policy for the Protection of Children and Youth. For instance, we recognized that the issue of pornography was not adequately included in our Policy and so work is currently underway to assure a strong statement regarding pornography. This will involve not only child pornography but also that pornography which depicts adults as children. Another revision involves clarifying the understanding of "vulnerable persons," a category of persons broader than children and youth.

26.     The Diocese of Santa Rosa has actively worked with survivors (with or without attorneys) to provide some compensation for the harm which they suffered.

27.     The Diocesan resources for Child Protection are available on its website at https://srdiocese.org/child-and-youth-protection. These resources include the Diocesan Policy for the Protection of Children and Young People, the Charter, Code of Conduct, Survivor Assistance resources, Fingerprint Policy, Safe Environment policy, How to Report Child Abuse, contact information for the Diocesan Director of Child and Youth Protection, Circle of Grace, and other resources.

28.     As noted above, the RCBR and its insurers have paid more than $35 million over the past 20 years. This comes from prior global settlements when California previously revised the statute of limitations in 2003 of approximately $31 million ($12 million from the RCBSR and $19 million from insurance) and approximately $4 million over the years 2018 to 2022 ($3,169,301 from the RCBSR and $865,000 from insurance).

D.     Events Leading to the Commencement of the Chapter 11 Case

29.     Until recently, the RCBSR has maintained financial viability while funding

compensation for Abuse survivors and continued litigation regarding claims of sexual abuse. In the past 20 years, the RCBSR and its insurers have paid more than $35 million in legal settlements in an effort to fulfill the RCBSR's responsibility for abuse of minors by a diocesan clergy.

30.    The RCBSR with its counsel Shapiro Galvin Shapiro & Moran have investigated and taken action as to any credible allegation of abuse. We are reviewing all of the information currently available regarding the approximately 207 lawsuits under existing protocols to determine what action must be taken with respect to any allegations involving living clergy in service at this time.

31.    Based on our experience in past situations, the RCBSR expects the initial demands to be more than $2 million per claim. Based on these demands, I am informed and believe that the RCBSR's total exposure is likely to exceed its assets. The RCBSR is a not-for-profit religious organization with limited resources, including very limited or no insurance coverage for many of the 207 lawsuits pending against it. Thus, this avalanche of lawsuits puts the RCBSR in immediate and dire financial distress and in need of a forum to resolve these claims while continuing to serve the faithful and those in need.

32.    Although there has been no claim of abuse having occurred within the past 12 years approximately, that does not diminish the pain and horrific acts which occurred before then, and which have affected far too many. The RCBSR is committed to preventing abuse from ever occurring again in the Diocese. Rebuilding the confidence of our congregants and society is a paramount goal for everyone in the Diocese.

E.    The Reorganization Case

33.    The RCBSR does not seek chapter 11 relief to avoid responsibility for past misconduct by clergy, nor to hide the truth or to deny claimants their day in court. The RCBSR is committed to pursuing the truth on all allegations of abuse. As noted, the RCBSR has made and requires criminal referrals to be made for all credible allegations of sexual abuse. Bishop Vasa has apologized for the past misconduct of the personnel of the Diocese and meets with survivors whenever requested to bring comfort to such individuals, as did his predecessor. The Diocese has established stringent standards for the training and background assessment of all employees, clerics

and volunteers who will likely interact with children and young people.

34. The RCBSR has filed this bankruptcy case as a further step toward fulfilling its moral obligation to try to compensate all Abuse survivors fairly and within a reasonable amount of time. As a result, the RCBSR cannot allow any single plaintiff to recover a disproportionate share of the limited funds available from the RCBSR and its insurance simply because that plaintiff's case proceeds to trial first. Through this bankruptcy case, the RCBSR seeks to ensure that fair, equitable, and reasonable recoveries are available to individuals with bona fide abuse claims through an expedited resolution mechanism.

35. In addition to the RCBSR's obligations to all of its creditors, the Diocese has a foundational and moral obligation to the Catholic faithful it serves, to the donors who have entrusted the Diocese with donations to serve the Diocese' missions, and to the larger communities which it serves, to continue the ministries of the Church in fulfillment of the Debtor's canonical and secular legal purposes. In order to fulfill these obligations, the RCBSR must survive.

36. I understand the Bankruptcy Court provides a forum and the Bankruptcy Code provides a mechanism whereby all the claims can be determined and paid on a fair and equitable basis and ensures that all claimants with similarly situated claims are essentially treated the same. The RCBSR requires the Bankruptcy Court's protection and the protection of the bankruptcy laws to make fair and equitable payment of the claims against it, including the survivors of abuse, trade creditors, the Parishes and others.

37. The RCBSR's goals in seeking chapter 11 relief are twofold: to protect and preserve the RCBSR's assets that are properly available for distribution to the RCBSR's creditors and ensure that whatever assets can be marshaled be distributed equitably to all creditors, not just a few; and to continue the work of the Church within the Diocese to the fullest extent possible using the resources dedicated to those purposes.

38. The RCBSR intends to negotiate a plan of reorganization as early as possible which will: (a) allocate the RCBSR's remaining assets fairly among the legitimate competing interests for such property; (b) provide a process to fully, fairly and expeditiously liquidate claims of Abuse survivors; and (c) permit the RCBSR to carry on the RCBSR's essential ministries and services so

the RCBSR can continue to meet the needs of the Non-Debtor Catholic Entities, parishioners, and others who rely on the RCBSR's ministry, education, and charitable outreach.

39.      An expeditious reorganization process is extremely important given the Debtor's limited resources and because it is a not-for-profit religious corporation.  The Diocese is dependent upon the charity of its faithful to sustain its very existence.  This bankruptcy may cast a shadow upon the RCBSR, the Parishes, and the various Non-Debtor Catholic Entities and their numerous ministries.  Some faithful may believe that, going forward, their charitable gifts to any Catholic entity will be diverted from their intended purpose and used to satisfy the claims of the Debtor's creditors rather than to fund the ongoing ministries of the Church that benefit the faithful and their community.  The Debtor in Possession will use its best efforts to dispel this misconception by communicating openly and often about the chapter 11 process.  However, I respectfully submit that the best way to alleviate any of these concerns is to address the insurmountable abuse claims in the bankruptcy forum and emerge from bankruptcy as soon as reasonably possible.

I declare under penalty of perjury that the foregoing it true and correct.  Executed on March 13, 2023, at Santa Rosa, California.

*/s/ Deacon Joe Oberting*
Deacon Joe Oberting

**FOLEY & LARDNER LLP**
Thomas F. Carlucci (CA Bar No. 135767)
Tel: (415) 984-9824; tcarlucci@foley.com
Shane J. Moses (CA Bar No. 250533)
Tel: (415) 438-6404; smoses@foley.com
Ann Marie Uetz (admitted *pro hac vice*)
Tel: (313) 234-7114; auetz@foley.com
Matthew D. Lee (admitted *pro hac vice*)
Tel: (608) 258-4203; mdlee@foley.com
Geoffrey S. Goodman (admitted *pro hac vice*)
Tel: (312) 832-4515; ggoodman@foley.com
Mark C. Moore (admitted *pro hac vice*)
Tel: (214) 999-4150; mmoore@foley.com
555 California Street, Suite 1700
San Francisco, CA 94104-1520

*Counsel for the Debtor*
*and Debtor in Possession*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| In re: | Case No. 23-40523 |
| THE ROMAN CATHOLIC BISHOP OF OAKLAND, a California corporation sole, | Chapter 11 |
| Debtor. | Judge: Hon. William J. Lafferty |

## THIRD AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION

4909-7915-2422.7

THE ROMAN CATHOLIC BISHOP OF OAKLAND, A CALIFORNIA CORPORATION SOLE, THE DEBTOR AND DEBTOR IN POSSESSION IN THE ABOVE-CAPTIONED CHAPTER 11 CASE (THE "DEBTOR" OR "RCBO") SEEKS CONFIRMATION OF THE *DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION* (THE "PLAN"). A COPY OF THE PLAN IS ATTACHED TO THIS DOCUMENT AS **EXHIBIT A**.

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT"), THE PLAN, THE PLAN SUPPLEMENT, THE ACCOMPANYING BALLOTS, AND RELATED MATERIALS ARE BEING FURNISHED BY THE DEBTOR, AS THE PLAN PROPONENT, PURSUANT TO SECTIONS 1125 AND 1126 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE") AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, IN CONNECTION WITH THE DEBTOR'S SOLICITATION OF VOTES TO ACCEPT THE PLAN.

THE PLAN PROVIDES FOR THE REORGANIZATION OF THE DEBTOR'S FINANCIAL AFFAIRS, FOR DISTRIBUTIONS TO CREDITORS HOLDING ALLOWED CLAIMS FROM THE DEBTOR'S ASSETS, THE ASSETS OF CONTRIBUTING NON-DEBTOR CATHOLIC ENTITIES, AND THE CONTRIBUTIONS OF SETTLING INSURERS, IF ANY, AND FOR THE CLAIMS AGAINST NON-SETTLING INSURERS TO BE ASSIGNED TO THE SURVIVORS' TRUST (AS DEFINED HEREIN). THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS AND INCLUDING THE "*RISK FACTORS TO BE CONSIDERED*" IN ARTICLE XVIII.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OF THE PLAN OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS DESCRIBED IN THE PLAN.

NO PERSON MAY GIVE ANY INFORMATION ON BEHALF OF THE DEBTOR REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN, OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, EXCEPT FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "COMMITTEE") CONSISTENT WITH ITS OBLIGATIONS ARISING UNDER 11 U.S.C. § 1103(c)(3). ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREIN, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

THIS DISCLOSURE STATEMENT IS DESIGNED TO PROVIDE ADEQUATE INFORMATION TO ENABLE HOLDERS OF IMPAIRED CLAIMS AGAINST THE DEBTOR (THAT ARE ENTITLED TO VOTE AS DESCRIBED HEREIN) TO MAKE AN INFORMED JUDGMENT ON WHETHER TO ACCEPT OR REJECT THE PLAN. ALL CREDITORS ARE

---

[1] Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meanings ascribed to them in the *Debtor's Third Amended Plan of Reorganization* [Docket No. 1830] (the "Plan").

ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN FILED CONTEMPORANEOUSLY HEREWITH, OTHER EXHIBITS ANNEXED HERETO, AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE BANKRUPTCY COURT PRIOR TO THE END OF THE SOLICITATION PERIOD FOR THE PLAN. NO MATERIALS OTHER THAN THE ACCOMPANYING MATERIALS ATTACHED HERETO OR REFERENCED HEREIN HAVE BEEN APPROVED BY THE BANKRUPTCY COURT OR THE PLAN PROPONENT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (I) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN REMAIN MATERIALLY ACCURATE, OR (II) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT, EXCEPT AS EXPRESSLY INDICATED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION, AND BELIEF. THE DEBTOR'S RESPECTIVE PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND ARE NOT RESPONSIBLE FOR ANY INACCURACIES THAT MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT OR THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION IS CORRECT AT ANY TIME SUBSEQUENT TO THIS DATE, AND THE DEBTOR UNDERTAKES NO DUTY TO UPDATE THE INFORMATION.

PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED, AND SHOULD BE AWARE THAT ACTUAL DISTRIBUTIONS MAY VARY FROM THE ESTIMATES CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE PLAN. NO REPRESENTATIONS ARE AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTOR, THE DEBTOR'S BUSINESS OPERATIONS, THE VALUE OF THE DEBTOR'S ASSETS, OR THE VALUES OF ANY BENEFITS OFFERED PURSUANT TO THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT OR OTHER DOCUMENT APPROVED FOR DISTRIBUTION BY THE BANKRUPTCY COURT. HOLDERS OF CLAIMS SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN, OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PERSON, OR BE DEEMED

CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR, ANY RELEASED PARTY, OR HOLDERS OF CLAIMS.

THIS DISCLOSURE STATEMENT IS FORWARD-LOOKING. FORWARD- LOOKING STATEMENTS ARE STATEMENTS OF EXPECTATIONS, BELIEFS, PLANS, OBJECTIVES, ASSUMPTIONS, PROJECTIONS, AND FUTURE EVENTS OF PERFORMANCE. AMONG OTHER THINGS, THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITH RESPECT TO ANTICIPATED FUTURE PERFORMANCE OF THE DEBTOR AND A TRUST TO BE CREATED FOR THE BENEFIT OF HOLDERS OF ABUSE CLAIMS, AS WELL AS ANTICIPATED FUTURE DETERMINATIONS OF CLAIMS AND DISTRIBUTIONS ON CLAIMS. THESE STATEMENTS, ESTIMATES, AND PROJECTIONS MAY OR MAY NOT PROVE TO BE CORRECT. ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE REFLECTED IN THESE FORWARD-LOOKING UNCERTAINTIES DUE TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, LEGAL, AND ECONOMIC RISKS, INCLUDING, AMONG OTHERS, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT. THE PLAN PROPONENT UNDERTAKES NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT. NEW FACTORS EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL FACTORS, NOR CAN THE IMPACT OF ALL FACTORS BE ASSESSED.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH THEIR OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

**THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION OF A KIND AND IN SUFFICIENT DETAIL TO ENABLE HOLDERS OF CLAIMS TO MAKE AN INFORMED JUDGMENT WITH RESPECT TO VOTING TO ACCEPT OR REJECT THE PLAN.** HOWEVER, THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION OR DETERMINATION BY THE BANKRUPTCY COURT AS TO THE MERITS OF THE PLAN. EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN (INCLUDING ALL EXHIBITS AND SCHEDULES TO THE PLAN AND DISCLOSURE STATEMENT) IN THEIR ENTIRETY BEFORE VOTING.

**TABLE OF CONTENTS**

Page

**ARTICLE I**
**EXECUTIVE SUMMARY** ...................................................................................... 1
    A.    Survivors' Trust Assets / Plan Contributions.................................................. 1
    B.    Comparison to Other Diocesan/Religious Order Cases.................................. 6
    C.    Plan Mechanics .............................................................................................. 6
    D.    Non-Monetary Commitment to Healing and Reconciliation.......................... 10

**ARTICLE II**
**GENERAL INFORMATION** ................................................................................. 10
    A.    Releases and Exculpations............................................................................. 10
    B.    Summary of Voting Procedures ..................................................................... 12
          1.    Vote Solicitation and Deadline ......................................................... 12
          2.    Importance of Your Vote ................................................................... 13
          3.    Third-Party Release Opt-Out for Abuse Claimants ......................... 13
    C.    Overview of Chapter 11 ................................................................................. 13
    D.    Summary of Classification of Claims ............................................................ 15
    E.    Disclosure Statement Enclosures................................................................... 17
          1.    Order Approving Disclosure Statement ............................................ 17
          2.    Notice of Confirmation Hearing........................................................ 17
          3.    Ballot ................................................................................................. 17

**ARTICLE III**
**QUESTIONS AND ANSWERS ABOUT THE DISCLOSURE STATEMENT AND**
**PLAN** .................................................................................................................... 17
    A.    What is Chapter 11?....................................................................................... 17
    B.    Why is the Debtor sending me this Disclosure Statement? ........................... 18
    C.    Am I entitled to vote on the Plan? ................................................................. 18
    D.    What is meant by "Confirmation" and "Effective Date"? ............................. 18
    E.    Does the Plan contain releases and permanent injunctions in favor of the Debtor
        and the Churches? ......................................................................................... 19
    F.    Does the Plan contain releases and permanent injunctions in favor of Third
        Parties? .......................................................................................................... 19
    G.    As the Holder of an Abuse Claim, will I be bound by the Third-Party Releases
        and Third-Party Permanent Injunctions? ..................................................... 19
    H.    As the Holder of any Claim other than an Abuse Claim, will I be bound by the
        Third-Party Releases and Third-Party Permanent Injunctions?..................... 20
    I.    What is required for the Unknown Abuse Claims Representative to Opt-Out of the
        Third-Party Releases and Third-Party Permanent Injunctions?..................... 20
    J.    Are there any Exculpation Provisions contained in the Plan? ....................... 20
    K.    Does the Plan contain Provisions Designed to Foster the Protection of Children
        from Sexual Abuse?....................................................................................... 20
    L.    What is the Effect of the Plan on the Debtor's Ongoing Religious and Charitable
        Endeavors?.................................................................................................... 20
    M.    Is the Debtor Preserving Estate Causes of Action under the Plan? ............... 20

**ARTICLE IV**
**THE DEBTOR AND ITS OPERATIONS**............................................................. 21
    A.    Organization and Central Mission of the Roman Catholic Church ............... 21
    B.    History of the Diocese of Oakland................................................................. 22
    C.    Governance, Mission-Service Activities, and Structure of the Diocese of Oakland ..... 22
    D.    The Debtor's Operations ............................................................................... 24

| | | |
|---|---|---|
| E. | Mission Alignment Process | 24 |
| F. | Affiliated Non-Debtor Catholic Entities | 25 |
| | 1. The Roman Catholic Welfare Corporation of Oakland | 25 |
| | 2. Lumen Christi Academies of the Roman Catholic Diocese of Oakland | 26 |
| | 3. The Roman Catholic Cemeteries of the Diocese of Oakland | 26 |
| | 4. The Oakland Parochial Fund, Inc | 26 |
| | 5. The Catholic Cathedral Corporation of the East Bay | 28 |
| | 6. The Oakland Society for the Propagation of the Faith | 28 |
| | 7. Catholic Charities of the Diocese of Oakland, Inc | 29 |
| | 8. Catholic Church Support Services (dba Catholic Management Services) | 29 |
| | 9. Furrer Properties Inc | 29 |
| | 10. Adventus | 29 |
| | 11. Catholic Foundation for the Diocese of Oakland | 30 |
| G. | The Debtor's Mission to Effect Reconciliation and Compensation | 30 |

**ARTICLE V**

**THE CHAPTER 11 CASE** ........................................................................................**32**

| | | |
|---|---|---|
| A. | Events Leading to the Chapter 11 Case | 32 |
| B. | Voluntary Petition | 33 |
| C. | First Day Relief | 33 |
| D. | Retention of Advisors for the Debtor | 34 |
| E. | The Committee | 34 |
| F. | Further Motions in the Chapter 11 Case | 35 |
| | 1. Exclusivity | 35 |
| | 2. Removal | 35 |
| | 3. Unexpired Leases of Nonresidential Real Property | 36 |
| G. | Mediation | 36 |
| H. | Bar Dates and Claims Process | 37 |
| | 1. Bar Dates | 37 |
| | 2. The Claims Review Process | 38 |
| I. | Litigation Regarding Insurance Coverage for Abuse Claims | 38 |
| J. | Original Debtor Plan and Disclosure Statement | 40 |
| K. | The Committee's Alternate Vision of Case Resolution | 41 |

**ARTICLE VI**

**SUMMARY OF THE PLAN** ....................................................................................**43**

| | | |
|---|---|---|
| A. | Classification of Claims Generally | 44 |
| B. | Classification and Treatment of Claims | 44 |
| | 1. Class 1 – Secured Claim of RCC | 44 |
| | 2. Class 2 – Priority Unsecured Claims | 45 |
| | 3. Class 3 – General Unsecured Claims | 45 |
| | 4. Class 4 – Abuse Claims | 45 |
| | 5. Class 5 - Unknown Abuse Claims | 46 |
| | 6. Class 6 – Non-Abuse Litigation Claims | 46 |
| | 7. Class 7A – Abuse Related Contribution Claims Related to Class 4 Claims | 46 |
| | 8. Class 7B – Abuse Related Contribution Claims Related to Class 5 Claims | 47 |
| C. | Unclassified Claims. | 47 |
| | 1. Administrative Claims | 47 |

**ARTICLE VII**

**SURVIVORS' TRUST** .............................................................................................**49**

| | | |
|---|---|---|
| A. | Survivors' Trust Liability for Abuse Claims. | 49 |
| B. | Role of the Survivors' Trust | 49 |
| C. | Appointment and Powers of the Survivors' Trustee | 50 |

**THIRD AMENDED DISCLOSURE STATEMENT FOR THIRD AMENDED PLAN OF REORGANIZATION**

|  |  | 1. | Survivors' Trustee as Fiduciary ............................................... | 50 |
|  |  | 2. | Liquidation of Survivors' Trust Assets ................................... | 50 |
|  |  | 3. | Protection of Survivors' Trust Assets .................................... | 50 |
|  |  | 4. | Bank Accounts of the Survivors' Trust .................................. | 50 |
|  |  | 5. | Insurance ................................................................................. | 50 |
|  |  | 6. | Taxes ....................................................................................... | 50 |
|  |  | 7. | Settlements With Non-Settling Insurers ................................ | 50 |
|  | D. | Survivors' Trust Advisory Committee............................................. | 51 |
|  | E. | Property and Funding of the Survivors' Trust ............................... | 51 |
|  |  | 1. | Debtor Cash Contribution ...................................................... | 52 |
|  |  | 2. | Contributions from Non-Debtor Catholic Entities ................ | 52 |
|  |  | 3. | Separate Contributions ........................................................... | 53 |
|  |  | 4. | Insurance Settlement Agreements.......................................... | 53 |
|  |  | 5. | Assignment of Assigned Insurance Interests......................... | 53 |
|  |  | 6. | Use of Survivors' Trust Assets.............................................. | 53 |
|  |  | 7. | No Insurer Reimbursement Obligation .................................. | 53 |
|  | F. | Unknown Abuse Claims Reserve ................................................... | 53 |
|  | G. | Treatment of Abuse Claims. .......................................................... | 54 |
|  |  | 1. | Immediate Payment Election.................................................. | 54 |
|  |  | 2. | Review and Scoring of Claims .............................................. | 54 |
|  |  | 3. | Initial Determination ............................................................. | 55 |
|  |  | 4. | Distributions to Trust Claimants from the Survivors' Trust ..... | 55 |
|  |  | 5. | Election of Distribution Option vs. Litigation Option............ | 56 |
|  |  | 6. | Post-Effective Date Insurance Settlement Agreements.......... | 57 |
|  | H. | Compensation and Reimbursement of Expenses to Survivors' Trustee and Survivors' Trust Professionals......................................................... | 58 |
|  | I. | Excess Survivors' Trust Assets...................................................... | 58 |
|  | J. | Indemnification of Debtor, Reorganized Debtor, and Contributing Non-Debtor Catholic Entities.......................................................... | 58 |
|  | K. | Modification of Survivors' Trust Documents................................. | 58 |

**ARTICLE VIII**
**SETTLING INSURERS**.............................................................................. **58**
|  | A. | No Insurance Settlement Agreements to Date ................................ | 58 |
|  | B. | Insurance Settlement Agreements.................................................. | 59 |
|  | C. | Sale Free and Clear of Interests of Settling Insurer Policies ........ | 59 |
|  | D. | Rights Under Insurance Settlement Agreements ............................ | 59 |
|  | E. | Contribution Claims of Settling Insurers ...................................... | 59 |
|  | F. | Timing ........................................................................................... | 59 |

**ARTICLE IX**
**MATTERS RELATING TO NON-SETTLING INSURERS**................................. **60**
|  | A. | Insurance Coverage for Abuse Claims .......................................... | 60 |
|  | B. | Preservation of the Rights of Non-Settling Insurers ..................... | 61 |
|  | C. | Scope of Plan Injunctions With Respect to Non-Settling Insurers ..... | 64 |
|  | D. | Non-Settling Insurers' Contribution Claims Against Settling Insurers ..... | 64 |
|  | E. | Cooperation with Non-Settling Insurers ........................................ | 65 |
|  | F. | Reductions In Non-Settling Insurers' Liability............................. | 65 |

**ARTICLE X**
**MEANS FOR IMPLEMENTATION OF THE PLAN**........................................... **65**
|  | A. | Revesting......................................................................................... | 66 |
|  | B. | Child Protection Measures. ........................................................... | 66 |
|  | C. | CCCEB Settlement ........................................................................ | 66 |

|  | D. | Treatment of Actions and Causes of Action. | 67 |
|  | E. | Continued Existence. | 68 |
|  | F. | The Survivors' Trust. | 68 |
|  | G. | Post-Effective Date Prosecution of Non-Abuse Litigation Claims. | 68 |
|  | H. | Bankruptcy Procedure and Transition. | 69 |
|  | I. | Post-Petition Deposits. | 69 |
|  | J. | Cancellation of Liens | 69 |
|  | K. | Other Actions. | 69 |
|  | L. | General Settlement. | 70 |
|  | M. | Closing of the Case. | 70 |

**ARTICLE XI**
**DISPUTED CLAIMS AND CLAIMS DISTRIBUTIONS** ........................ **70**
|  | A. | Single Claim. | 70 |
|  | B. | Objections to Claims | 70 |
|  | C. | Treatment of Disputed Claims | 71 |
|  | D. | Late Filed Claims. | 71 |
|  | E. | Claims Estimation | 71 |
|  | F. | No Distribution on Disallowed Claims. | 72 |
|  | G. | Timing of Distributions on Allowed Claims. | 72 |
|  | H. | Transfers of Claims. | 72 |
|  | I. | Prepayment of Claims. | 72 |
|  | J. | Delivery of Distributions. | 72 |
|  | K. | Unclaimed Distributions. | 72 |
|  | L. | No Interest on Claims. | 73 |
|  | M. | Provisions Governing Unimpaired Claims. | 73 |
|  | N. | Additional Terms Regarding Class 4 and Class 5 Claims. | 73 |

**ARTICLE XII**
**EFFECTIVE DATE.** ...................................................................... **73**
|  | A. | Conditions Precedent to Effective Date | 73 |
|  | B. | Waiver of Conditions Precedent to the Effective Date | 74 |
|  | C. | Revocation of the Plan. | 74 |

**ARTICLE XIII**
**EFFECTS OF PLAN CONFIRMATION AND EFFECTIVE DATE** ........ **74**
|  | A. | Binding Effect of Confirmation. | 74 |
|  | B. | Ratification. | 75 |
|  | C. | Discharge of Claims. | 75 |
|  | D. | Confirmation Injunction. | 75 |
|  | E. | Injunction Against Interference with the Plan. | 75 |
|  | F. | Exculpation | 75 |
|  | G. | Injunction Related to Exculpation. | 76 |
|  | H. | Releases by the Debtor. | 76 |
|  | I. | Releases by Abuse Claimants. | 77 |
|  | J. | Injunction Related to Releases. | 77 |
|  | K. | Channeling Injunction Preventing Prosecution of Channeled Claims Against Released Parties | 77 |
|  | L. | Provisions Relating to the Channeling Injunction. | 79 |
|  | M. | Effect of Channeling Injunction. | 79 |
|  | N. | Exclusion Regarding Non-Settling Insurers. | 79 |

**ARTICLE XIV**
**RETENTION OF JURISDICTION** ............................................... **80**

THIRD AMENDED DISCLOSURE STATEMENT FOR THIRD AMENDED PLAN OF REORGANIZATION

**ARTICLE XV**
**TAX CONSEQUENCES OF THE PLAN** ................................................................. 80
    A.    Federal Income Tax Consequences to Holders of Unsecured Claims ........................... 80
    B.    Federal Income Tax Consequences to the Debtor ....................................................... 81
    C.    Tax Consequences to the Survivors' Trust .................................................................. 81

**ARTICLE XVI**
**ALTERNATIVES TO THE PLAN** .......................................................................... 81
    A.    Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code ............................. 82
    B.    Dismissal of the Chapter 11 Case .............................................................................. 82
    C.    Chapter 7 Liquidation Not a Viable Alternative ........................................................ 82
    D.    Appointment of a Chapter 11 Trustee is Not a Viable Alternative............................... 82

**ARTICLE XVII**
**ACCEPTANCE AND CONFIRMATION OF THE PLAN** ...................................... 82
    A.    General Confirmation Requirements ........................................................................... 82
        1.    Parties in Interest Entitled to Vote ............................................................... 83
        2.    Classes Impaired Under the Plan................................................................... 83
        3.    Voting Procedures and Requirements ............................................................ 83
        4.    Ballots........................................................................................................... 83
    B.    Confirmation Hearing ................................................................................................ 84
    C.    Confirmation .............................................................................................................. 84
    D.    Acceptance of Plan ..................................................................................................... 84
    E.    Confirmation Without Acceptance of All Impaired Classes ........................................ 84
    F.    Best Interests Test ....................................................................................................... 85
    G.    Feasibility................................................................................................................... 86
    H.    Compliance with the Applicable Provisions of the Bankruptcy Code ......................... 86

**ARTICLE XVIII**
**RISK FACTORS TO BE CONSIDERED** ............................................................... 86
    A.    Risks Associated with the Insurance Assignment ....................................................... 86
    B.    Objection to Classifications of Claims ....................................................................... 88
    C.    Failure to Satisfy Voting Requirements...................................................................... 88
    D.    The Plan May Not Be Accepted or Confirmed............................................................ 88
    E.    The Debtor's Assumptions and Estimates May Prove Incorrect .................................. 88
    F.    Non-Confirmation or Delay in Confirmation of the Plan............................................ 88
    G.    Non-Consensual Confirmation ................................................................................... 89
    H.    Consent to Third-Party Releases ................................................................................ 89
    I.    Risk of Non-Occurrence of the Effective Date............................................................ 89
    J.    Non-Settling Insurers May Raise Objections to Confirmation..................................... 89
    K.    Post-Confirmation Litigation May Not Result in Additional Recovery ....................... 90
    L.    Confirmation of the Plan may be Delayed or Denied by the District Court................. 90

**ARTICLE XIX**
**BANKRUPTCY RULE 9019 REQUEST** ............................................................... 90

**ARTICLE XX**
**RECOMMENDATION AND CONCLUSION** ........................................................ 90

composed of bishops; the presbyterate, composed of priests ordained by bishops; and the diaconate, composed of deacons who assist bishops and priests in a variety of ministerial roles.

The mission of the Roman Catholic Church is to share God's love and mercy with all people. The Roman Catholic Church does this through its charitable operations, as well as in the countless churches where Catholics come together to worship across the world. The Roman Catholic Church also engages diplomatic institutions like the United Nations in defense of human dignity for all people and in pursuit of the common good.

**B.    History of the Diocese of Oakland**

The Holy See established the Diocese of Oakland in 1962 from the eastern territory of the Archdiocese of San Francisco.  The territory of the Debtor spans roughly 1,467 square miles and encompasses two counties, Alameda and Contra Costa. The Debtor is situated along the eastern shore of the San Francisco Bay and the Debtor estimates it serves nearly 550,000 resident Catholics and assists approximately 260,000 people through its ministry and charitable services.

On January 27, 1962, the Most Rev. Floyd Lawrence Begin, auxiliary bishop of the Debtor of Cleveland, Ohio, was named the first Bishop of Oakland.  His installation took place on April 28, 1962.  The Debtor has had four other bishops, with its incumbent and fifth bishop, Most Reverend Michael C. Barber, SJ ("Bishop Barber" or the "Bishop") having been appointed on May 25, 2013.

The charitable history of the Debtor is born out of missionary origins.  In 1772, Franciscan Friar Juan Crespi celebrated Mass with Spanish explorers next to a swamp in what would become downtown Oakland.  Almost 25 years after that first Mass, Franciscan Fermín de Francisco Lasuén de Arasqueta founded Mission San José.  The mission was the only parish on the coast opposite San Francisco for the next 64 years.  In 1861, the now amalgamated parish of St. Mary of the Immaculate Conception opened. In 1869, St. Paul's parish in San Pablo was the second to open in the present diocese and was the first parish in what is now Contra Costa County.

In 1840, the Holy See erected the "Diocese of the Two Californias" to recognize the growth of the provinces of Alta and Baja California.  In 1848, Alta California was ceded to the United States and the Holy See split the Diocese of the Two Californias into American and Mexican sections, and the American section was renamed the Diocese of Monterey.

In 1853, the Holy See established the Archdiocese of San Francisco from the northern territory of the Diocese of Monterey. The territory that would eventually become the Diocese of Oakland was, at that time, situated within the eastern part of the Archdiocese of San Francisco.

**C.    Governance, Mission-Service Activities, and Structure of the Diocese of Oakland**

The Debtor is a corporation sole organized under the laws of the State of California.  The Debtor conducts its civil affairs under the laws of the State of California and the United States of America, and in accordance with Canon Law.

None of the parish churches (the "Churches") within the diocese are separately incorporated entities under California law.  To the extent the Bishop holds goods belonging to a parish—including, for example, real and personal property—he does so in trust for the benefit of the applicable Church. However, because the Churches are not separately incorporated legal entities, as a matter of California law they are not separate from the Debtor, and they do not own or hold a legal or equitable interest in property separate from the Debtor.

Bishop Barber has led the Debtor since he was ordained to the episcopacy and installed as Bishop of Oakland on May 25, 2013.  Bishop Barber has been an ordained priest for almost 40 years and has

served as a missionary abroad, a professor of theology, a seminary spiritual director and, from 1991-2018, as a chaplain and officer in the U.S. Navy.

Bishop Barber is assisted in the management of the Debtor by both clergy and lay administrators and staff, including the Diocesan Chancellor, Vicar General and Chief Financial Officer. As of the Petition Date, the Debtor employed approximately 30 full-time and 42 part-time employees at the Debtor's central services office, which is also known as the "Chancery." The Chancery is located in downtown Oakland.

The diocese has 80 parishes and missions and is home to 159 diocesan priests, 160 religious priests, 35 extern priests, and 118 permanent deacons.

The Churches play a central role in the lives of Catholics living within the Debtor by administering key aspects of the Catholic Faith, including baptism, education, communion, Mass, confirmation, marriage, and bereavement, including last rites, funeral services and grief support. In this way, the Churches provide the critical connection between the Debtor and the faithful from the beginning of life to the end.

The Debtor serves one of the most ethnically diverse areas in the nation, where approximately 70% of residents of Alameda County and approximately 59% of residents of Contra Costa County identify as non-White. Alameda County, in particular, is home to more Asian residents than any other race or ethnicity. The Debtor runs ethnic pastoral centers that serve communities from Brazil, China, Eritrea, Ethiopia, Fiji, India, Indonesia, Kenya, Korea, Laos, Nigeria, Poland, Tonga and Vietnam. For some new arrivals in Alameda and Contra Costa counties, the Roman Catholic Church is their community focal point, a place they can find support and oftentimes necessary resources to begin their lives in the United States.

Sunday celebrations within the Churches are celebrated in approximately 17 languages, with the most common being English, Spanish, and Vietnamese. A number of Churches celebrate Mass using multiple languages.

The Debtor provides resources, programming, spiritual leadership, and other key services and support to local Catholics and the East Bay community at large, including substantial support for the poor and for minority communities. The ministry of the Debtor is therefore critical to not only the faithful within the diocese, but also to the public-at-large, including non-Catholics.

Most of the Churches in the diocese provide some sort of lay outreach to the poor in their local community, *e.g.*, St. Vincent de Paul, food pantries, temporary shelters and ministry to the sick. Lay associations have also formed to engage on issues of immigrant rights, economic development, peace building, and restorative justice.

Over one third of the Churches in the diocese are involved in some sort of grassroots faith-based community organizing. This collaboration is most evident in the Debtor's work for affordable and emergency housing and community organizing. In Contra Costa, eight Churches actively participate with the Interfaith Council of Contra Costa ("I4C"), which is an interfaith coalition of congregations joining together to promote social justice in their community. I4C member congregations also provide shelter and social services to homeless families on a rotating basis. For instance, Christ the King in Pleasant Hill provides shelter, food, and volunteer counselors to homeless families every winter. West Contra Costa County and South Alameda County have similar interfaith coalitions that involve many Churches.

Chaplains serve five hospitals in the diocese. The remaining hospitals without assigned chaplains are served by the Churches that include the hospitals within the geographic boundaries of their respective parish. Most of those have established programs involving laity who visit Catholic patients daily and who

Case: 23-40523    Doc# 1057    Filed: 04/18/25    Entered: 04/18/25 15:29:45    Page 50 of 75

DATED: April 3, 2025.                    Respectfully submitted,


                                         **THE ROMAN CATHOLIC BISHOP**
                                         **OF OAKLAND**


                              By:    _/s/ Attila Bardos_____
                                     Attila Bardos
                                     Chief Financial Officer


Presented by:
**FOLEY & LARDNER LLP**
Thomas F. Carlucci
Shane J. Moses
Ann Marie Uetz
Matthew D. Lee
Geoffrey S. Goodman
Mark C. Moore

_/s/Shane J. Moses_____
Shane J. Moses

_Counsel for the Debtor_
_and Debtor in Possession_

# EXHIBIT D

1
2
3
4
5

6 **THE DISTRICT COURT OF GUAM**

| | |
|---|---|
| 7 In re: | Bankruptcy Case No. 19-00010 |
| 8 ARCHBISHOP OF AGAÑA, | Chapter 11 |
| 9 a Corporation Sole, | |
| 10 Debtor. | |

11
12 OFFICIAL COMMITTEE OF
UNSECURED CREDITORS,

Adversary Proceeding
Case No. 19-00001

13
14 Plaintiff,
15 v.

**DECISION AND ORDER GRANTING THE COMMMITTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT UNDER BANKRUPTCY RULE 7056**

16 ARCHBISHOP OF AGAÑA,
17 Defendant.
18

19 CATHOLIC SCHOOLS AND PARISHES,
20 Defendant-Intervenor.
21

22
23     This court heard the Committee's Motion for Partial Summary Judgment Under

24 Bankruptcy Rule 7056, ECF No. 9, on April 16, 2021. After careful consideration and after

25 having reviewed the parties' briefs, relevant cases, and statutes; and having heard argument
26
27 from counsel on the matter, the court hereby **GRANTS** the Committee's motion for the

28 reasons stated herein.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

On January 16, 2019, the Archbishop of Agaña, a Corporation Sole ("Debtor"), filed a voluntary petition for relief under Chapter 11. Debtor listed certain properties under its Statement of Financial Affairs (exhibits 8, 9, and 10) as properties being held in trust for Parishes and Schools.

On April 6, 2019, the Official Committee of Unsecured Creditors ("Committee") filed a Complaint under Adversary Proceeding No. 19-00001. Compl., ECF No. 1. An Amended Complaint was filed thereafter, alleging that the real and personal properties held "in Trust for Parishes and Schools" and identified on Exhibit A to the Amended Complaint ("Disputed Property") are under Debtor's complete control and domination, and Debtor owns said Disputed Property. *See* Am. Compl. at ¶¶ 12 and 13, ECF No. 5.

On December 7, 2019, the instant motion for partial summary judgment was filed. *See* Mot., ECF No. 9. Therein, the Committee is asking this court to make a finding that the Parishes and Schools are not separate legal entities and thus cannot hold title to property or be the beneficiaries of a trust. *Id.* at 2.

According to the Committee, Debtor claims to hold tens of millions of dollars in assets in trust for other entities. Mem. in Support of Mot. at 4, ECF No. 10. Because those assets are held in trust, such assets are not available to pay the claims of survivors and other creditors in Debtor's bankruptcy case. *Id.* It is the Committee's position that these alleged third parties—the Parishes and Schools—are not separate entities from Debtor. *Id.* It argues that the third parties are divisions of Debtor because (i) the third parties operate as unincorporated divisions of Debtor—operating under Debtor's charter, reports to Debtor,

finances and operations are controlled by Debtor, and properties are titled to Debtor; (ii) Debtor chose not to incorporate its Parishes and Schools separately; and (iii) until the onset of the abuse crisis, Debtor has consistently argued and testified that parishes and schools were not legally distinct from their governing diocese. *Id.*

Debtor, on the other hand, asserts that it has always made its position clear through its bankruptcy schedules that it does not claim ownership of the Parishes and Schools' real and personal property. Debtor's Opp'n. at 5, ECF No. 34. Debtor argues that the Parishes and Schools are separate entities and that Debtor is simply holding the Disputed Property in trust and for the benefit of the Parishes and Schools. *Id.* at 5-6.

On January 27, 2020, a motion to intervene was filed by Interested Party Catholic Schools and Parishes ("Intervenor"). *See* Mot. to Intervene, ECF No. 20. The court granted the motion to intervene. *See* Order, ECF No. 50. Similar to Debtor's position, the Intervenor argues that the Parishes and Schools have a trust relationship with Debtor. Intervenor's Opp'n. at 2-3, ECF No. 59. It further argues that there are disputed material facts and raises an established theory of law, which would make summary judgment inappropriate at this time. *Id.* at 3.

The motion was originally set to be heard on May 15, 2020. However, the case was stayed for almost a year as the parties attempted to engage in settlement negotiations. The settlement negotiations were unsuccessful. On April 16, 2021, the court heard the motion and took it under advisement. The court now issues its decision.

## II.     SUMMARY JUDGMENT STANDARD

Pursuant to Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56 applies in

adversary proceedings.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the suit under the governing substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Thus, the evidence presented in opposition to summary judgment must be "enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp*., 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Servs. Co*., 391 U.S. 253, 288-89 (1968).

A shifting burden of proof governs motions for summary judgment under Rule 56. *In re Oracle Corp. Securities Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The party seeking summary judgment bears the initial burden of proving an absence of a genuine issue of material fact. *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Where, as here, the moving party will have the burden of proof at trial, "the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

If the moving party meets that burden, the burden then shifts to the nonmoving party to set forth "specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. "The mere existence of a scintilla of evidence . . . will be insufficient" and the nonmoving party "must do more than simply show that there is some metaphysical doubt as

1

2  to the material facts." *Id*. at 252; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

3  574, 586 (1986). Viewing the evidence in the light most favorable to the non-moving party,

4  "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-

5  moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

6

7  ### III.    DISCUSSION

8  #### a.  **Applicable Law**

9

10  This court will apply the neutral-principles approach. *See In re Roman Catholic

11  Archbishop of Portland*, 335 B.R. 842, 850 (Bankr. D. Or. 2005) (acknowledging that "the

12  First Amendment prohibits civil courts from resolving church property disputes on the basis

13  of religious doctrine and practice[,]" citing *Jones v. Wolf*). The neutral-principles approach

14  relies exclusively on "objective, well-established concepts of trust and property law . . . [and]

15  thereby promises to free civil courts completely from entanglement in questions of religious

16  doctrine, polity, and practice." *Jones v. Wolf*, 99 S.Ct. 3020, 3025 (1979).

17

18  In applying the "neutral principles of law" approach to settling a church property

19  dispute, state courts have looked to (1) language of the deeds, (2) the state statutes governing

20  the holding of church property, (3) the terms of the corporate charter; and (4) the governing

21  document/constitution of the religious institution concerning the ownership and control of

22  church property. *See generally Presbyterian Church v. Eastern Heights Church*, 225 Ga. 259

23  (1969); *Carnes v. Smith*, 236 Ga. 30, *cert. denied*, 429 U.S. 868 (1976); and *Maryland & Va.

24  Churches*, 396 U.S. 367 (1970).

25

26  In examining religious documents, the Supreme Court articulated the following:

27

28  > [A] civil court must take special care to scrutinize the document *in
> purely secular terms, and not to rely on religious precepts in*

> *determining whether the document indicates that the parties have intended to create a trust.* In addition, there may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property. If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body.

*Jones v. Wolf*, 99 S.Ct. at 3026 (emphasis added).

### b. Overview

Before delving into the parties' arguments, it is important to first lay out the relevant Guam law, Debtor's articles of incorporation, and the governing document or the constitution of Debtor's organization.

### 1. Guam's law governing corporation of a religious institution and holding of church property

The Guam Code Annotated provides for the incorporation of religious institutions. Pursuant to 18 G.C.A. § 10102, "[f]or the administration of the temporalities of any religious denomination, society, or church, and the management of the estates and properties thereof, *it shall be lawful for the bishop*, chief priest, or presiding elder of any such religious denomination, society, or church *to become a corporation sole* unless inconsistent with the rules, regulations, or discipline of his religious denomination, society, or church or forbidden by competent authority thereof." (emphasis added).

"In order to become a sole corporation, the bishop . . . must file with the Department of Revenue & Taxation articles of incorporation setting forth [among other things] . . . (a) That he is the bishop . . . and that he desires to become a corporation sole[;] (b) That the rules, regulations and discipline of his religious denomination . . . are not inconsistent with

his becoming a corporation sole[;] (c) That as such bishop, . . . he is charged with the administration of the temporalities and the management of the estates and properties of his religious denomination . . . within his territorial jurisdiction[.]" 18 G.C.A. § 10103.

"[S]uch *bishop* . . . shall become a corporation sole, and all temporalities, estates and properties of the religious denomination, society, or church theretofore administered or managed by him as such bishop . . . *shall be held in trust by him as a corporation sole* for the use, purpose, behoof, and sole benefit of his religious denomination, society, or church, including hospitals, schools, colleges, orphan asylums, parsonages, and cemeteries thereof." 18 G.C.A. § 10105 (emphasis added).

Because the bishop is *the* corporation sole, Guam law further provides rules on succession. *See* 18 G.C.A. § 10106 (the successor in office of any bishop—or the person authorized under church laws during a vacancy—shall have the same powers as a corporation sole).

Guam law also provides that "[a]ny corporation sole may purchase and hold real estate and personal property for its church, charitable, benevolent, or educational purpose, and may receive bequests or gifts for such purposes." 18 G.C.A. § 10107.

Under the same chapter 10 of Title 18 of the Guam Code Annotated, it provides incorporation of "any religious society or religious order, or any diocese, synod, or district organization of any church." *See* 18 G.C.A. §§ 10108, 10109, 10110, and 10111.

The Guam Code Annotated also provides that it is "lawful for all *religious associations*, of whatever sect or denomination, whether incorporated in Guam or in some other country, *or not incorporated at all*, to hold land in Guam upon which to build churches,

parsonages, educational or charitable institutions." 18 G.C.A. § 10112. This section is followed by a section on "nonincorporated associations" requiring that "[s]uch religious institutions, *if not incorporated*, shall hold the land in the name of three trustees for the use of such associations; the trustees shall be selected by the directing body in Guam for such associations, and vacancies occurring among the trustees by death, resignation, or other cause shall be filled in the same manner as the original selection." 18 G.C.A. § 10113 (emphasis added).

The Guam Business Corporation Act does not define the term "association."[1] However, it provides a definition for the term "entity," which "includes corporation and foreign corporation; not-for-profit corporation; profit and not-for-profit unincorporated association; business trust, estate, partnership, limited liability company, limited partnership, trust, and two or more persons having a joint or common economic interests; and state, United States, and foreign government." 18 G.C.A. § 28110.

### 2. Terms of Debtor's Amended Articles of Incorporation

The Amended Articles of Incorporation provides in part the following:

> SECOND: The *purpose of the corporation is to administer the temporalities, estates and properties, real, personal, or mixed, of the Holy Roman Catholic Church within the Archdiocese of Agaña,* except such property as title to which may be in a specific religious order, society, or association and administered by such.

> THIRD: The Archbishop of Agaña is the supreme ecclesiastical authority within the Archdiocese of Agaña, *exercising within the said Archdiocese the powers and*

---

[1] The Ninth Circuit defined "unincorporated association" as a "voluntary group of persons, without charter, formed by mutual consent for purpose of promoting common objective." *Southern California Darts Ass'n v. Zaffina,* 762 F.3d 921 (9th Cir. 2014).

*responsibilities so delegated to him* by the Supreme Roman Pontiff and, subject to any limitations hereinafter set forth restricting the acquisition and alienation of property, *is within the said Archdiocese charged with and given the responsibility, control, authority, title and disposition of and over all the temporalities, estates and properties, real, personal or mixed, of the Holy Roman Catholic Church and of the Archdiocese of Agaña*, except such property the title to which may be specifically held by some Order, Congregation or Community. . . .

Ex. A to Michael Decl., ECF No. 11-2 (emphasis added).

### 3. Governing document/constitution of the religious institution concerning the ownership and control of church property: Canon Law

The canon law is "the internal legal system of the Roman Catholic Church." Fox Aff. at 4, ECF No. 37.[2] The Parishes and Schools do not have their own separate internal legal system. A thorough secular review of the canon law[3] reveals the following:

A parish has a "juridic personality," Can. 515 § 3, and a "juridic person" owns the goods it acquires, Can. 531 & 1256. These sections may show an intent that a parish is a separate entity owning its own properties.

However, the court may find an intent for the parishes to be part of a diocese based

---

[2] Fox is an ordained Roman Catholic priest who analyzed the canon law for the court and offered his "canonical opinion." Fox Aff., ECF No. 37. Attached to his affidavit includes Exhibit C, an opinion from the Pontifical Council for the Interpretation of Legislative Texts, which Fox notes is the "official body designated to provide definitive interpretations of the Canon Law in the Roman Catholic Church." *Id.* at 7.

The Supreme Court has held that the court "must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts[.]" *Jones v. Wolf*, 99 S.Ct. at 3026. Accordingly, this court will not consider Fox's "canonical opinion" and Exhibit C to Fox's Affidavit; as well as the portions of Richards and Byrnes affidavit/declaration offering non-secular reading of the cannon law.

[3] *See* Ex. A to Fox's affidavit, ECF No. 37; and Ex. A to Byrnes' affidavit, ECF No. 36.

on the other sections of canon law. The canon law states that what constitutes a diocese are the parishes, Can. 374 § 1, and that the diocesan bishop represents his diocese in all its juridic affairs, Can. 393. In addition, an overwhelming section of the canon law—again, read purely from a secular view—provides that the diocese has control and authority over parishes.[4] Although the parish's care is entrusted to a pastor, the diocesan bishop has authority over that pastor, Can. 515, § 1.

### c. Analysis

The Committee argues that the Parishes and Schools are unincorporated divisions of the Debtor and are not separate entities from the Debtor. Mem. in Support of Mot. at 11, ECF No. 10. Both Debtor and Intervenor do not fully address corporation law and what constitutes a division of a corporation. *See* Debtor's Opp'n., ECF No. 34; and Intervenor's Opp'n., ECF No. 59. Rather, both conclusively assert without much analysis that the Parishes and Schools are unincorporated associations.

Because the question before this court is whether the Parishes and Schools are separate legal entities from the Debtor, the court will analyze what constitutes a division of a corporation.

### 1. The Parishes and Schools are not separately incorporated.

There is no evidence in this case that the Parishes and Schools are separately incorporated under Guam law. The undisputed fact is that no parish or school is

---

[4] *See e.g.*, Can. 515, § 2; Can. 516, § 2; Can. 517, § 2; Can. 520, § 1; Can. 524; Can. 531; Can. 533, § 3; Can. 536, § 1; Can. 536, § 2; Can. 538, § 1; Can. 538, § 3; Can. 539.

independently incorporated with the Guam Department of Revenue and Taxation.[5] The Parishes and Schools are fictitious names synonymous with the Debtor. *See* Ex. G to Michael Decl., ECF No. 11-4. This is also not a disputed fact.[6]

### 2. There is no Guam law that allows for unincorporated divisions to sue or be sued; and the Parishes and Schools lack property ownership.

The basic principle of corporate law is that corporations are independent legal "persons," who, like natural persons, may sue or be sued. 18 Am. Jur. 2d Corporations § 2. An unincorporated division of a corporation, therefore, lacks existence as a legal entity and the capacity to sue or be sued. *See In re Fed.-Mogul Glob. Inc.,* 411 B.R. 148, 163-64 (Bankr. D. Del. 2008); *United States v. ITT Blackburn Co., a Div. of ITT*, 824 F.2d 628, 631 (8th Cir. 1987) (an unincorporated division of a parent company lacks capacity to be sued).

"[W]here a party in question is neither an individual nor a corporation, capacity to be sued is determined with limited exceptions by 'the law of the state where the court is located.'" *Kaupthing ehf. v. Bricklayers & Trowel Trades Int'l Pension Fund Liquidation Portfolio*, 291 F. Supp. 3d 21, 28 (D.D.C. 2017) (citation omitted).

In the *Archbishop of Portland*, Oregon law authorizes religious corporations (including corporations sole) to sue and be sued, and to hold and dispose of property. 335 B.R. at 866. However, the debtor in that case was unable to cite any state law that would authorize unincorporated parishes to sue or be sued or to hold and dispose of real property.

---

[5] *See* Fact No. 38 of Movant's Concise Statement of Material Facts. ECF Nos. 11 at 5, and 42-1 at 6. Debtor and Intervenor do not dispute this fact. ECF Nos. 35 at 13, and 60 at 5.

[6] *See* Fact No. 36 of Movant's Concise Statement of Material Facts. ECF Nos. 11 at 5, and 42-1 at 6. Debtor does not dispute this. ECF No. 35 at 13. Intervenor can neither confirm nor dispute this fact. ECF No. 60 at 4.

*Id.* "Because the parishes are not separately incorporated, as they could be under Oregon religious corporations law, they cannot hold title to real property." *Id.* The court therefore concluded that the parishes are "not separate from, but are merely a part of debtor." *Id.*

Similar to the *Archbishop of Portland*, no Guam law exists that allows for unincorporated divisions to sue or be sued. Focusing its argument on the concept of "unincorporated association" rather than a "division," Debtor argues that "unincorporated associations can sue or be sued pursuant to Guam law," Debtor's Opp'n. at 9 & 14, ECF No. 34, relying upon a 1953 district court case and the statute cited therein, *see Brandt v. United States*, 110 F. Supp. 627, 630 (D. Guam 1953) (citing Guam Code of Civil Procedure § 338, now codified at 7 G.C.A. § 12115). Even assuming *arguendo* that the Parishes and Schools are unincorporated associations, Debtor's reliance on *Brandt* and the statutory provision is misplaced.

Pursuant to 7 G.C.A. § 12115,

> [w]hen two or more persons, associated in any business, transact such business under a common name … the associates may be sued by such common name, the summons in such cases being served on one or more of the associates; and the judgment in the action shall bind the joint property of all the associates, and the individual property of the party or parties served with process, in the same manner as if all had been named defendants and had been sued upon their joint liability.

As its text makes clear, this provision does not permit unincorporated associations to sue and be sued on their own behalf. Rather, it creates a procedural device by which "the associates" may be sued under the common name of the association, resulting in a judgment that is binding "in the same manner as if all [associates] had been named defendants and had been sued upon their joint liability." As the court noted in *Brandt*, "[t]his section was taken

from the California Code and was construed in *Jardine v. Superior Court*." *Brandt*, 110 F.

Supp. at 630. In *Jardine*, the California Supreme Court explained the background of this

statutory provision:

> For a long time the established rule was that in the absence of statute, an unincorporated association could not sue or be sued in its common name; all the members thereof had to appear in their own names as parties plaintiff or defendant. The basic reason was that the association was not, in the eyes of the law, a legal unit or entity, and had no legal capacity to become a party to an action. The difficulty was only one of procedure, and the objection was purely technical. The liabilities or rights of the members were in no way involved, and were not, in theory, impaired by the operation of the rule. They might have brought actions if they all joined as plaintiffs, and they might have been held to any liability imposed upon them by law, if sued and served individually. But where associations with large membership were involved, the operation of the rule frequently had inconvenient and unjust consequences, and various exceptions came to be recognized.…
>
> The many inconveniences of the rule were not wholly evaded by these exceptions, and statutes were widely adopted for the purpose of eliminating this procedural obstacle by permitting suits to be brought against the associates in the common or association name. In most instances, they did not give the association the right to appear as a *plaintiff*. The statutes dealt solely with the manner of bringing actions, and were not intended to effect any change in the substantive law. Members of associations had the same rights and were subject to the same liabilities as before, only now they could be sued by a less complicated and cumbersome process.

*Jardine v. Superior Court in & for Los Angeles Cty.*, 213 Cal. 301, 307-08 (1931) (internal citations omitted) (emphasis in original).

This background underscores what is already clear from the text of the statute.

Section 12115 does not effect any change in the substantive law, nor does it give

unincorporated associations the ability to bring suit in the name of the association. It merely eliminates one purely procedural hurdle that plaintiffs previously had to overcome when attempting to recover from the associates based on their joint liability. A suit brought under this section, although styled as one against the association's common name, is in substance a suit against the associates themselves.

The principle that an unincorporated division of a corporation lacks the legal capacity to sue or be sued is "supported by a pragmatic rational derived from the fact that a division owns no independent assets and is under the control of a larger organization." *Kaupthing ehf.*, 291 F. Supp. 3d at 28 (citation and internal quotes omitted).

Here, the Parishes and Schools at issue do not own independent assets. Debtor holds legal title to the Disputed Property. *See* Debtor's Am. Statement of Financial Affairs, Ex. 9 and 10, ECF No. 148 of Bankruptcy Case No. 19-00010.[7] Further, with the exception of one school,[8] all Parishes' and Schools' bank accounts are held in Debtor's name. *Id.*, Ex. 8, 9 and 10.

The issue of whether the Parishes and Schools are under the control of a larger organization will be discussed next.

### 3. Parishes and Schools are under the control of Debtor.

Courts have held that the control that an archdiocese exerts over its parishes and

---

[7] *See* Fact No. 40 of Movant's Concise Statement of Material Facts. ECF Nos. 11 at 5, and 42-1 at 6. Intervenor does not dispute this fact. *See* ECF No. 60 at 5. Debtor does not dispute the existence and contents of the cited documents, though Debtor notes that such properties are being held in trust for the Parishes and Schools. *See* ECF No. 35 at 14.

[8] The bank accounts of one school are held under that school's name. *See* Perez Decl. ¶ 7, ECF No. 32 at 4-5.

schools is a determining factor of whether they are separate from or the same as the archdiocese.

For example, in *F.E.L. Publications*, although the Seventh Circuit did not conduct an in-depth analysis of the relationship between the parishes and the Archdiocese of Chicago, the case is still instructive. The Seventh Circuit reviewed evidence of individual priests' "limited, authorized power to purchase," which supports the Archdiocese of Chicago's position that the parishes and the Archdiocese are one entity. *F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago*, 754 F.2d 216, 221 (7th Cir. 1985), *cert. denied* 474 U.S. 824 (1985).

In *E.E.O.C.*, the D.C. court conducted a much more in-depth analysis than *F.E.L. Publications. See E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 77 F. Supp. 2d 71 (D.D.C. 1999), *aff'd sub nom. E.E.O.C. v. St. Francis Xavier Sch.*, 254 F.3d 315 (D.C. Cir. 2000). The plaintiff in *E.E.O.C.* did not deny that the defendants are unincorporated division of a corporation. *Id.* at 74. Nonetheless, the court examined the relationship between the Archdiocese of Washington and the St. Francis Xavier Parish:

> The Archdiocese possesses traditional corporate attributes, such as the powers to contract, to acquire property, and to sue and be sued. The Archdiocese is made up of all the Catholic parishes and related facilities within its territorial jurisdiction, which encompasses the District of Columbia and five surrounding Maryland counties. Although the Canon Law of the Roman Catholic Church views each parish as a separate entity for religious purposes, the parishes are not separately incorporated under civil law.
>
> [The Parish is] . . . within the territorial jurisdiction of the Archdiocese. It operates independently of other parishes within the jurisdiction. The

Archdiocese owns all of the Parish's property—the Parish does not own any independent assets. . .

*The Archdiocese exerts varying degrees of control over different aspects of the Parish's operations.* As to financial matters, the Archdiocese maintains control over the Parish's budget by requiring the Parish to submit an annual financial report on all of its operations and to undergo periodic financial audits. Although the Archdiocese does not oversee the Parish's daily expenditures, Archdiocese approval is required for any expenditure exceeding $10,000. As to personnel matters, the Archdiocese appoints the pastor and, through the Archdiocese's personnel director, helps to determine the staffing of other priests assigned to work at the Parish. The Archdiocese also influences other Parish personnel decisions, such as the hiring of the School's teaching staff, by providing guidelines on appropriate hiring criteria.

*E.E.O.C.*, 77 F. Supp. 2d at 74-75 (citations omitted) (emphasis added). Clearly, the court examined whether the Parish was part of the larger Archdiocese by examining the relationship and the degree of control. Based on this, the court found that the Parish itself is part of the larger Archdiocese. *Id.* at 75.

Here, there is overwhelming evidence of the varying degrees of control that Debtor exerts over the Parishes and Schools. The Parishes and Schools are under the umbrella of the Debtor. *See* Ex. A to Michael Decl., ECF No. 11-2 at 2-3. Debtor is responsible for and has authority over all civil property within the Archdiocese, providing "oversight and support to parishes [and] schools[.]".[9] *See* Ex. I to Michael Decl., ECF No. 11-5 at 2. Debtor appoints the pastors who lead the parishes. In the absence of a pastor, Debtor assigns a parish

---

[9] *See* Fact No. 1 of Movant's Concise Statement of Material Facts. Intervenor does not dispute this fact. *See* ECF No. 60, at 1. Debtor does not dispute this fact but rather offers clarification that "Debtor would be responsible for making sure the management of the properties (Parishes and Schools) is effective)[,]" but that "these properties are managed and cared for by the pastors and principles." Richards Decl., ECF No. 38, at 2.

administrator. *See* Ex. H to Michael Decl., ECF No. 11-4 at 6. Debtor establishes the pay

schedule for all the priests, and Debtor supervises the priest or other chief administrator of

each parish. *See* Ex. H to Michael Decl., ECF No. 11-4 at 9; and Ex. E to Michael Decl.,

ECF No. 11-3 at 6. In addition, Debtor sets human resources policies that apply to all Parishes

and Schools.[10] *See* Ex. 14 to Second Michael Decl., ECF No. 43-1. The Debtor also regularly

evaluates parishes and schools, assessing their operations and providing recommendations

for improvement.[11] *See* Ex. O to Michael Decl., ECF No. 11-19 (examples of the evaluation

and recommendations). Debtor, along with its advisors as required by its cannon law, has the

power to close a parish or a school.[12]

      The Debtor plays a major role in the finances of the Parishes and Schools. Although

Debtor is not involved in the daily expenditures of the Parishes and Schools, Debtor's

approval is required for all financial transactions exceeding a certain amount. *See* Ex E to

Michael Decl., ECF No. 11-3 at 4-5; and Ex. 1 to Second Michael Decl., ECF No. 43 at 6.

Any lease agreements that binds the parish or the school must first be reviewed by the Debtor.

*See* Ex. H to Michael Decl., ECF No. 11-4 at 7; and Ex. I to Michael Decl., ECF No. 11-5 at

4. Each parish prepares an annual financial report for submission to the Debtor. *See* Ex. H to

---

[10] Debtor does not dispute this fact but merely provides a reason for why it is being done. *See* Richards Decl., ECF No. 38 at 10. Intervenor asserts that the applicability of this fact cannot be substantiated for all Parishes and Schools, ECF No. 60 at 4, but does not provide evidence to dispute the evidence provided by the Committee.

[11] Debtor does not dispute this fact but merely provides a reason for why it is being done. *See* Richards Decl., ECF No. 38 at 10. Intervenor is unable to dispute this fact as it can neither confirm nor deny it. ECF No. 60 at 4.

[12] Intervenor is silent on this fact. *See* ECF No. 60. Debtor does not dispute this fact but rather offers clarification that the Archbishop cannot "unilaterally" take such action, since per its canon law, the Archbishop is advised by its Presbyteral Council. *See* Richards Decl., ECF No. 38 at 8.

Michael Decl., ECF No. 11-4 at 7. The Parishes and Schools are also required to submit to the Debtor a monthly financial report.[13] *See* Ex. F to Michael Decl., ECF No. 11-3 at 8; and Ex. 1 to Second Michael Decl., ECF No. 43 at 5. Debtor has continuous access to bank account information of Parishes and Schools.[14] *See* Debtor's Am. Statement of Financial Affairs, Ex. 8, 9 and 10, ECF No. 148 of Bankruptcy Case No. 19-00010.

When deciding to embark on a major renovation or construction of a new facility, the Parishes and Schools are required to notify Debtor for any projects exceeding $15,000.00, and seek approval of Debtor for any projects exceeding $25,000.00. *See* Ex. H to Michael Decl., ECF No. 11-4 at 10. *See also* Ex. L to Michael Decl., ECF Nos. 11-6 to 11-17 (examples of Expenditure Approval Requests); Ex. R to Michael Decl., ECF No. 11-22 (sample of an approval letter from a parish to Debtor/its financial council); and Ex. P to Michael Decl., ECF No. 11-19 (example of a contract agreement with Debtor). Debtor is involved in the process, including having its finance officer provide an initial estimate of the parish's debt capacity. *See* Ex. H to Michael Decl., ECF No. 11-4 at 11.

The varying levels of control and involvement of Debtor in the Parishes' and Schools' operations make clear that the Parishes and Schools are part of the Debtor, and that they are one and the same.

---

[13] Debtor claims the monthly financial report is being done as a result of the bankruptcy filing. *See* Richards Decl., ECF No. 38 at 9. However, evidence shows otherwise, and the monthly financial reports have been in place prior to the bankruptcy filing. *See* Ex. 2 of Second Michael Decl., ECF No. 43 (examples of monthly financial reports for 2014-2015).

[14] Intervenor disputes that Debtor has access to *all* Parishes' and Schools' bank accounts. ECF No. 60 a6 3. However, Intervenor does not dispute that Debtor has access to *bank account information.*

1

2

3

### 4. Section 10112 of Title 18, Guam Code Annotated has no application in the instant case.

4

5

As discussed *supra*, one of the factors in determining whether an entity is an

6

unincorporated division of a corporation or a separate entity from the corporation is property

7

ownership. As noted, the Parishes and Schools holds no real property under their names.

8

Debtor and Intervenor argue that Guam law allows for an "unincorporated

9

association" to hold land in Guam, citing 18 G.C.A. § 10112. Debtor's Opp'n. at 8, 14; and

10

Intervenor's Opp'n. at 11, ECF No. 59.

11

12

Section 10112 provides in its entirety the following:

13

> It shall be lawful for all religious associations, of whatever sect or
> denomination, whether incorporated in Guam or in some other
> country, or not incorporated at all, to hold land in Guam upon
> which to build churches, parsonages, or educational or charitable
> institutions.

14

15

16

17

18 G.C.A. § 10112. This section is followed by a section on "nonincorporated associations"

18

requiring that "[s]uch religious institutions, *if not incorporated*, shall hold the land in the

19

name of three trustees for the use of such associations; the trustees shall be selected by the

20

directing body in Guam for such associations, and vacancies occurring among the trustees

21

by death, resignation, or other cause shall be filled in the same manner as the original

22

selection." 18 G.C.A. § 10113 (emphasis added).

23

24

Debtor is correct in that under Section 10112, "unincorporated associations" are

25

allowed to hold land in Guam. However, there are two problems with Debtor's argument.

26

First, as discussed *supra*, the Parishes and Schools are unincorporated divisions of the

27

Archdiocese of Agaña, not "nonincorporated associations."

28

Second, assuming *arguendo* that the Parishes and Schools are "nonincorporated associations," for them to hold land under Guam law, the land shall be held in the name of three trustees of said nonincorporated associations. 18 G.C.A. § 10113. There is no evidence that real property of the Parishes and Schools are being held in the name of three trustees.[15]

---

[15] Debtor and Intervenor raise the issue of the Debtor being a corporation sole and is therefore holding the properties in trust for the Parishes and Schools pursuant to 18 G.C.A. § 10105. *See* Debtor's Opp'n. at 7-9, ECF No. 34; and Intervenor's Opp'n. at 5. 10-11, ECF No. 59. Trust relationship is not a question before this court. However, because this issue is closely relevant to the discussion of Sections 10112 and 10113, the court will address this issue.

Section 10105 states in part,
> . . . all temporalities, estates and properties of the religious denomination, society, or church theretofore administered or managed by him as such bishop, chief priest, or presiding elder shall held in trust by him as a corporation sole for the use, purpose, behoof, and sole benefit of his religious denomination, society, or church, including hospitals, schools, colleges, orphan asylums, parsonages, and cemeteries thereof.

18 G.C.A. § 10105. A plain reading of the statute is that, the statute allows a natural person, the bishop, to hold all property in trust for his religious organization, the corporation sole. Unlike other types of corporations, a corporation sole does not have directors, shareholders, or officers. *Compare Chapter 2 of Title 18, Guam Code Annotated (Formation of Corporations).* This provides for a perpetual existence of the corporate body although the natural person holding the office, the bishop, has no perpetual existence. *See* 18 G.C.A. § 10106 (the successor in office of any bishop—or the person authorized under church laws during a vacancy—shall have the same powers as a corporation sole).

To understand the corporation sole statute, one must understand its historical context. In *Archbishop of Portland*, the bankruptcy judge explained,
> [R]eligious organizations experienced difficulties with how to continue operations of the organization during a vacancy in the office of the bishop or other church leader, and how to hold church property so that the church would retain ownership in perpetuity. *See, e.g.*, James B. O'Hara, *The Modern Corporation Sole*, 93 Dick. L.Rev. 23 (1988). Property that was given to or otherwise acquired by the religious organization would sometimes be held in fee simple by the parish priest. But that method of ownership was problematic because, upon the priest's death, the property might be claimed by the priest's heirs.[15] *Id.* at 29.

335 B.R. at 856. As a result, many states have adopted corporation sole as a type of corporation for religious organizations. *Id.*

Applying this historical context of corporation soles, this is where the "in trust" language comes from. The bishop, Byrnes, holds *all* the properties of the religious institution that he manages and administers, as a corporation sole. In the event Byrnes passes away or is sued in a personal capacity, his heirs or personal creditors are not able to take claim of the cathedral building or the chancery office, or any other properties of the religious institution. This is the most common sense reading of Section 10105.

The Parishes and Schools have not availed themselves of this Guam law.

Based on the foregoing, Section 101112 has no applicability in this case.

**d. The court's holding is limited to the question before it: whether the Parishes and Schools are separate legal entities; and it should not be construed as foreclosing the resulting trust argument.**

As stated above and as pointed out by the Committee in its Reply, ECF No. 42 at 1, the question before this court is very narrow: "Are the Parishes and Schools distinct legal entities or are they divisions of the Debtor?"

Debtor and Intervenor, however, address a completely different issue that is not currently before the court and that is, whether a resulting trust exist between Debtor and the Parishes and Schools. The court finds it necessary to tangentially address Debtor's and Intervenor's resulting trust argument to clarify the exact boundaries of today's decision.

The Committee asserts that a finding that Debtor and Intervenor are the same "legal entity" automatically precludes a possibility of a resulting trust. According to the Committee, "[t]his is true, of course, because property cannot be held in trust for someone or something

---

Section 10105 does not mean *all* the properties under Byrnes as a corporation sole are held in trust in the sense that the corporation sole holds only "bare legal title" to the property without any equitable interest under Bankruptcy Rule 541. If the court were to apply Debtor's and Intervenor's interpretation, there will *not* be any property belonging to the bankruptcy estate. But that is not the case here.

Despite the language in Section 10105 stating that *all* the properties ("*all* temporalities, estates and properties") under Byrnes are to be held in trust for the religious organization, the *undisputed* properties are currently part of the bankruptcy estate and Debtor is not disputing that.

If the court were to apply Debtor's and Intervenor's interpretation of Section 10105, the court will essentially be making a ruling that there will be no properties belonging in the bankruptcy estate. The court cannot say that some are being held in trust with only "bare legal title," while the others are not, when the text of the statute is clear that "all" properties are to be held in trust.

that does not exist in the first place." ECF No. 42 at 2:2-6.

The court is not so sure that this is "true, of course." A holding that the Intervenor has the same legal identity as Debtor is not necessarily a holding that the Intervenor is incapable of holding a unique, equitable interest in the Disputed Properties which may be excluded from the estate under 11 U.S.C. § 541(d). After all, a resulting trust is an equitable remedy that arises from specific facts and circumstances of a particular case.

In this case, it seems unremarkable to observe that the Intervenor has an interest in the Disputed Properties that is dissimilar in nature from Debtor's interest. While this may be a distinction without a difference for purposes of corporate law, it does not automatically foreclose the possibility of an equitable interest that may be protected by the equitable provisions of the Bankruptcy Code. This concept is reflected in the *Comm. of Tort Litigants v. Cath. Diocese of Spokane*, 364 B.R. 81 (E.D. Wash. 2006). The district court there held a triable fact existed regarding whether parishes had a protectable interest in property arising from a resulting trust, such that the property was excluded from the bankruptcy estate of the debtor-diocese.

The Committee called this case a "misguided anomaly" and faulted the opinion for not specifically analyzing whether the parishes were distinct from the debtor-diocese, and failing to consider "any of the established factors used to define and distinguish unincorporated divisions[.]" Mem. in Support of Mot. at 16, ECF No. 10. However, another possible interpretation is that the district court did not specifically analyze whether the parishes or debtor were the same entity because the issue was not determinative on whether the parishes could be the beneficiary of a resulting trust.

Though the court finds the *Spokane* to be particularly persuasive, the court realizes that delving into such matters without the benefit of argument and briefing on this specific issue would be inappropriate. Consequently, the court provides this discussion only to emphasize the limits of the court's holding. Whether a "resulting trust" exists is a separate and distinct issue from whether Debtor and Intervenor are the same entity, not only as a matter of procedure given the limited scope of the partial motion at bar, but also as a legal matter. Stated more simply, the court is declining to rule on the resulting trust argument solely because of the limited nature of the Committee's motion, and not because of a deficiency in the Debtor and Intervenor's legal argument.

## IV. CONCLUSION

The court hereby **ORDERS** the following:

(1) The Committee's Partial Motion for Summary Judgment is hereby **GRANTED**. The court finds that the Parishes and Schools are part of the Debtor and are unincorporated divisions of the Archdiocese of Agaña.

(2) The Clerk is directed to enter partial judgment for the Committee.

**SO ORDERED.**



**/s/ Frances M. Tydingco-Gatewood**
   **Chief Judge**
**Dated: Jul 16, 2021**