1  PAUL J. PASCUZZI, State Bar No. 148810
   JASON E. RIOS, State Bar No. 190086
2  THOMAS R. PHINNEY, State Bar No. 159435
   FELDERSTEIN FITZGERALD WILLOUGHBY
3     PASCUZZI & RIOS LLP
   500 Capitol Mall, Suite 2250
4  Sacramento, CA 95814
   Telephone:    (916) 329-7400
5  Facsimile:    (916) 329-7435
   Email:        ppascuzzi@ffwplaw.com
6                jrios@ffwplaw.com
                 tphinney@ffwplaw.com
7

8  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
9    A Limited Liability Partnership
     Including Professional Corporations
10   ORI KATZ, State Bar No. 209561            AMANDA L. COTTRELL, Cal. Bar No. 360215
     ALAN H. MARTIN, State Bar No. 132301      2200 Ross Avenue, 20th Floor
11   JEANNIE KIM, State Bar No. 270713         Dallas, Texas 75201
     Four Embarcadero Center, 17th Floor       Telephone:    (469) 391-7400
12   San Francisco, California 94111-4109      Facsimile:    (469) 391-7401
     Telephone:    (415) 434-9100              Email:        acottrell@sheppardmullin.com
13   Facsimile:    (415) 434-3947
     Email:        okatz@sheppardmullin.com
14                 amartin@sheppardmullin.com
                   jekim@sheppardmullin.com
15 Attorneys for The Roman Catholic Archbishop of
   San Francisco
16

17                        UNITED STATES BANKRUPTCY COURT

18              NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

19 In re                                        Case No. 23-30564

20 The Roman Catholic Archbishop of San         Chapter 11
   Francisco,
21                                              Adv No. 25-03021
            Debtor and
22          Debtor in Possession.              **THE ROMAN CATHOLIC ARCHBISHOP
                                               OF SAN FRANCISCO'S OPPOSITION TO
23                                             THE OFFICIAL COMMITTEE OF
                                               UNSECURED CREDITORS' MOTION FOR
24                                             PARTIAL SUMMARY JUDGMENT ON
                                               AFFIRMATIVE DEFENSES BASED ON
25 The Official Committee of Unsecured         CANON LAW**
   Creditors,
26                                             Judge:    Hon. Dennis Montali
            Plaintiff,                         Date:     January 15, 2026
27                                             Time:     1:30 p.m.
         v.                                    Place:    Zoom.Gov
28

| | |
|---|---|
| 1 | The Roman Catholic Archbishop of San Francisco; Parishes Listed in Exhibit A; |
| 2 | Holy Cross Catholic Cemeteries; Saint Mary Magdalene Catholic Cemetery; Mt. |
| 3 | Olivet Cemetery; Our Lady of Pillar Cemetery; Tomales Catholic Cemetery; |
| 4 | Archbishop Riordan High School; Sacred Heart Cathedral Preparatory; Marin |
| 5 | Catholic High School; Junipero Serra High School; Vallombrosa Retreat Center; and |
| 6 | Serra Clergy House, |
| 7 | Defendants, |

DEBTOR'S OPPOSITION TO COMMITTEE'S PARTIAL SUMMARY JUDGMENT MOTION

# TABLE OF CONTENTS

I.     SUMMARY OF THE ARGUMENT .................................................................. 1

II.    SUMMARY JUDGMENT STANDARDS AND DISPUTED FACT ISSUES.................. 4

    A.    The Committee Did Not Meet Its Burden on Any Claims Asserted as to the Debtor .................................................................................................................. 5

    B.    Material Issues of Disputed Fact Prevent Summary Judgment................................ 6

        1.    The Committee's Reliance on the Debtor's Articles of Incorporation Concedes the Applicability and Relevance of Canon Law ........................... 6

        2.    The Debtor Submitted Evidence Establishing Disputed Issues of Material Fact ........................................................................................................ 7

III.    ARGUMENT AND AUTHORITIES............................................................... 10

    A.    The United States Constitution Requires that Church Polity and Governing Rules be Respected in the Context of Civil Litigation ....................................................... 10

    B.    The United States Supreme Court Approves the Neutral Principles Approach in *Jones v. Wolf* ............................................................................................... 11

    C.    The California Legislature Enacts Corporations Code Section 9142 to Give Effect to Church Law Over Church Property ......................................................... 14

    D.    The California Supreme Court Concludes Church Canon Law is Enforceable under *Jones v. Wolf* and Section 9142................................................................. 14

    E.    California's Corporation Sole Statute Mandates the Integration of Religious Law Into the Governance of Ecclesiastical Corporations ................................................. 17

    F.    The California Unincorporated Association Statute Likewise Requires the Court to Examine Church Constitution, Canons, Rites or Regulations to Determine a Religious Property Dispute ......................................................................... 18

    G.    Using Neutral Principles to Apply the Roman Catholic Church Cannon Law, Parishes Are Separate Entities that Own Parish Property ........................................ 19

    H.    The Committee's Second Amended Complaint Pleads an Intra-Church Dispute Requiring the Court to Abstain From Deciding the Dispute................................... 23

    I.    The Committee's Evidentiary Objection Is Improper and Irredeemably Premature .................................................................................................................. 23

IV.    CONCLUSION........................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

Cases

*Addisu v. Fred Meyer, Inc.*
198 F.3d 1130 (9th Cir. 2000) ................................................................. 5

*Barnes v. Sea Haw. Rafting, LLC*
889 F.3d 517 (9th Cir. 2018) .................................................................. 4

*Barr v. United Methodist Church*
90 Cal. App. 3d 259 (Cal. Ct. App. 1979) ............................................. 18

*Berry v. Society of Saint Pius X*
69 Cal.App.4th 354 (Cal. Ct. App. 1999) .............................................. 15

*Bishop and Diocese of Colo. v. Mote*
716 P.2d 85 (Colo. 1986) ....................................................................... 2

*Carnes v. Smith*
222 S.E.2d 322 (Ga. 1976), *cert. denied*, 429 U.S. 868 (1976) ............. 13

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) ............................................................................... 4

*Church Mut. Ins. Co., S.I. v. GuideOne Specialty Mut. Ins. Co.*
72 Cal. App. 5th 1042 (Cal. Ct. App. 2021) ......................................... 18

*In re Church of St. James the Less*
888 A.2d 795 (Pa. 2005) ....................................................................... 13

*Comm. of Tort Litigants v. Cath. Diocese of Spokane*
364 B.R. 81 (E.D. Wash. 2006) ........................................................ 4, 17

*Daniel v. Wray*
580 S.E.2d 711 (N.C. 2003) .................................................................. 13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
509 U.S. 579 (1993) ..................................................................... 3, 24, 25

*Elosu v. Middlefork Ranch Inc.*
26 F.4th 1017 (9th Cir. 2022) ............................................................... 24

*In re Episcopal Church Cases*
45 Cal.4th 467 (Cal. 2009) ....................................................... 11, 14, 15

*Episcopal Diocese of Rochester v. Harnish*
11 N.Y.3d 340 (N.Y. 2008) ................................................................... 13

*Fed. Trade Comm'n v. BurnLounge, Inc.*
    753 F.3d 878 (9th Cir. 2014)................................................................ 25

*Fed. Trade Comm'n v. Qualcomm Inc.*
    No. 17-CV-00220-LHK, 2018 WL 6615050 (N.D. Cal. Dec. 17, 2018)............................. 25

*In re Flashcom, Inc. v. Communs Ventures III, LP (In re Flashcom, Inc.)*
    503 B.R. 99 (Bankr. C.D. Cal. 2013) ....................................................... 24

*Gee v. Nat'l Collegiate Athletic Assn.*
    107 Cal.App.5th 1233 (Cal. Ct. App. 2024), *reh'g denied* (Jan. 10, 2025), *review
    denied* (Apr. 23, 2025) .................................................................. 22

*Gigax v. Ralston Purina Co.*
    136 Cal.App.3d 591 (Cal. Ct. App. 1982)..................................................... 1

*Gonzalez v. Roman Catholic Archbishop of Manila*
    280 U.S. 1 (1929) ........................................................................ 11

*In re High-Tech Emple. Antitrust Litig.*
    No. 11-CV-02509-LHK 2014, 2014 WL 1351040 (N.D. Cal. April 4, 2014)........................ 24

*Holt v. Santa Clara County Sheriff's Benefit Ass'n*
    250 Cal.App.2d 925 (Cal. Ct. App. 1967)................................................... 19

*Hunter v. St. Vincent Med. Ctr. (In re Parkview Hospital)*
    211 B.R. 619............................................................................. 20

*Jones v. Wolf*
    443 U.S. 595 (1979) ...................................................... 2, 3, 10, 11, 12, 14, 19

*Kedroff v. St. Nicholas Cathedral*
    344 U.S. 94 (1952) ...................................................................... 12

*Lynch v. Spilman*
    67 Cal.2d 251 (Cal. 1967) ............................................................... 19

*Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*
    179 F.3d 1244 (9th Cir. 1999) ........................................................... 16

*Malloy v. Fong*
    37 Cal.2d 356 (Cal. 1951) ............................................................... 21

*Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg,
Inc.*
    396 U.S. 367 (1970) .................................................................. 12, 13

*Messick v. Novartis Pharms. Corp.*
    747 F.3d 1193 (9th Cir. 2014)............................................................ 25

*Miller v. International Church*
    225 Cal.App.2d 243 (Cal. Ct. App. 1964)...............................................................21

*New v. Kroeger*
    167 Cal.App.4th 800 (Cal. Ct. App. 2008) ........................................................15

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*
    210 F.3d 1099 (9th Cir. 2000)..............................................................................4

*Order of St. Benedict of New Jersey v. Steinhauser*
    234 U.S. 640 (1914) ............................................................................................16

*Protestant Episcopal Church in Diocese of New Jersey v. Graves*
    417 A.2d 19 (N.J. 1980) .................................................................................13, 15

*Rector, Wardens and Vestrymen of Trinity-St. Michael's Parish, Inc v. Episcopal Church*
    *in the Diocese of Connecticut*
    620 A.2d 1280 (Conn. 1993) ........................................................................10, 13

*In re Roman Catholic Archbishop of Portland in Oregon*
    335 B.R. 815 (Bankr. D. Or. 2005) .......................................................................4

*Roman Catholic Archbishop v. Superior Court*
    15 Cal.App.3d 405 (Cal. Ct. App. 1971)............................................................21

*Serbian Eastern Orthodox Church v. Milivojevich*
    426 U.S. 696 (1976) ......................................................................................11, 12

*Slaughter-Payne v. Shinseki*
    522 F. App'x 409 (9th Cir. 2013).........................................................................24

*Stevens v. Roman Catholic Bishop of Fresno*
    49 Cal.App.3d 877 (Cal. Ct. App. 1975).............................................................21

*Stilwell v. Smith & Nephew, Inc.*
    482 F.3d 1187 (9th Cir. 2007)..............................................................................25

*Synology Inc. v. Via Licensing Corp.*
    No. 22-CV-01405-TLT, 2023 WL 5276030 (N.D. Cal. Aug. 9, 2023) .................24

*U.S. v. Union Pacific R. Co.*
    565 F.Supp.2d 1136 (E.D. Cal. 2008) ..................................................................25

*United States Equal Emp. Opportunity Comm'n v. Placer ARC*
    147 F. Supp. 3d 1053 (E.D. Cal. 2015) ...............................................................24

*Vind v. Asamblea Apostolica, Christo Jesus*
    148 Cal.App.2d 597 (Cal. Ct. App. 1957)...........................................................21

*Vosburg v. Cnty. of Fresno*
  54 Cal.App.5th 439 (Cal. Ct. App. 2020) .......................................................................... 19

*Watson v. Jones*
  80 U.S. 679 (1871) ................................................................................. 2, 3, 11, 12, 14, 16

*Watts v. United States*
  703 F.2d 346 (9th Cir. 1983) ........................................................................................... 4

*Wendell v. GlaxoSmithKline LLC*
  858 F.3d 1227 (9th Cir. 2017) ......................................................................................... 24

*White v. Cox*
  17 Cal.App.3d 824 (Cal. Ct. App. 1971) ......................................................................... 19

*Zaragoza v. Cnty. of Riverside*
  No. 5:20-cv-01381-SSS-SPx, 2024 WL 663235 (C.D. Cal. Jan. 18, 2024) ....................... 25

Statutes

11 U.S.C. § 541 ........................................................................................................................... 1

Federal Rule of Evidence 401 ................................................................................................... 24

Federal Rule of Evidence 702 ............................................................................................ 23, 24

Cal. Bus. & Prof. Code § 17510.8 ........................................................................................... 20

Cal. Corp. Code § 6716 ............................................................................................................ 19

Cal. Corp. Code § 9142 .................................................................................................. 14, 15, 20

Cal. Corp. Code § 9230 ............................................................................................................ 20

Cal. Corp. Code § 9680 ............................................................................................................ 19

Cal. Corp. Code §§ 10000 *et seq.* .......................................................................................... 21

Cal. Corp. Code § 10002 .......................................................................................................... 17

Cal. Corp. Code § 10003 ..................................................................................................... 17, 18

Cal. Corp. Code §§ 18000 *et seq.* .......................................................................................... 18

Cal. Corp. Code § 18008 ....................................................................................................... 7, 22

Cal. Corp. Code § 18010 ....................................................................................................... 7, 22

Cal. Corp. Code § 18035 .................................................................................................. 7, 18, 21

Cal. Corp. Code § 18110 .......................................................................................................... 19

SMRH:4920-6829-1710.5                                    DEBTOR'S OPPOSITION TO COMMITTEE'S PARTIAL SUMMARY JUDGMENT MOTION

<u>Other Authorities</u>

U.S. Const. Amendments I, XIV ................................................................................ 1, 2, 10, 11, 12

Black's Law Dictionary 366 (8th ed. 1999) ...................................................................................... 17

SMRH:4920-6829-1710.5

Case No. 25-03021

DEBTOR'S OPPOSITION TO COMMITTEE'S PARTIAL SUMMARY JUDGMENT MOTION

# I. **SUMMARY OF THE ARGUMENT**

The Debtor before this Court is the Roman Catholic Archbishop of San Francisco, a corporation sole that serves as the civil embodiment of an ecclesiastical office. The Archbishop possesses certain enumerated powers and defined limitations under both civil and religious authority. According to this Court, the question this adversary proceeding must ultimately resolve is whether all operating Parishes in a certain territorial jurisdiction—and certain private catholic high schools or cemeteries—constitute "property of the Debtor's bankruptcy estate" under 11 U.S.C. § 541. However, the Committee's operative pleading does not identify any specific property and, instead, sues only for a "declaratory judgment" that such Parishes and other non-debtor defendants are so-called "operating divisions" of the Debtor.[1] As established herein, such inquiry will require an entity by entity, fact-intensive examination and this Court to engage carefully with California Corporations law, California trust principles, the Debtor's articles of incorporation, canon law, the Religion Clauses of the First Amendment, and other relevant evidence.

The Committee's motion (the "Motion") and the Court's November 6 scheduling conference statements suggest a religious institution forfeits the protections of its own governing law simply by invoking this Court's jurisdiction.[2] That proposition finds no support in law or logic. Canon law—the law of the Roman Catholic Church—is relevant to this proceeding to determine whether parishes are "operating divisions" because such term "confers no particular legal qualities on a specific corporate or unincorporated organization." *Gigax v. Ralston Purina Co*., 136 Cal. App. 3d 591, 601-02 (Cal. Ct. App. 1982). Under California law, the term "division" could be a "department" part of a single business enterprise "or it could be a totally separate entity." *Id.* Accordingly, the non-debtor defendants' governance is relevant. Canon law's relevance does not depend upon the Debtor's assertion; rather, civil law itself incorporates and recognizes canon law's authority. California corporation and trust law, First Amendment jurisprudence, and the Debtor's publicly recorded articles of incorporation all accord canon law independent legal significance.

---

[1] Such free-floating declaratory relief untethered to substantive claims are. *See* ECF Nos. 14, 37.

[2] "[T]o the extent that the toolbox gets depleted, that is to say, if canon law controls the outcome of this bankruptcy, then maybe the bankruptcy is ill conceived." (11/6/25 Tr., 18:13-15; Mot., p. 4).

SMRH:4920-6829-1710.5

Case No. 25-03021

DEBTOR'S OPPOSITION TO COMMITTEE'S PARTIAL SUMMARY JUDGMENT MOTION

Among the various First Amendment religion clause jurisprudence doctrines, the most directly applicable here is the doctrine of church autonomy. This principle traces its lineage to *Watson v. Jones*, 80 U.S. 679 (1871), and holds that the First Amendment operates as a structural limitation on governmental authority over core church functions, thereby maintaining the constitutional boundary between church and state. Principal among these protected functions—as the Committee acknowledges—is the right of a church to structure its own organization and define its own governance in accordance with its religious convictions.

Indeed, California law has long afforded religious corporations the autonomy to organize and govern themselves in accordance with religious law. Beginning with statutes enacted in the nineteenth century and continuing through present codifications, the California Legislature has repeatedly enshrined protections ensuring that religious corporations operate according to their faith traditions. These statutory provisions incorporate religious law into the governance framework of church corporations and authorize officers and directors, in discharging their fiduciary obligations, to rely upon guidance from religious authorities. Reflecting this tradition, the Debtor's articles of incorporation invoke the canons, rules, and usages of the Catholic Church on multiple occasions. Subsequent amendments to those articles reiterate these principles.

The Committee's reliance on the neutral principles doctrine is misplaced and overstated. The neutral principles doctrine "requires that the civil court to examine certain religious documents, such as a church constitution... in purely secular terms... in determining whether the document indicates that the parties have intended to create a trust." *Jones v. Wolf*, 443 U.S. 595, 604 (1979). If the deed, the corporate charter, or constitution of the general church incorporates religious concepts in the provisions relating to ownership of church property that would require the civil court to resolve a religious controversy, "then *the court must defer* to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Id.* (emphasis added); *see also Bishop and Diocese of Colo. v. Mote*, 716 P.2d 85, 101 (Colo. 1986) (noting that the doctrine and *Jones v. Wolf* "does not require the civil courts to shy away from those documents, or provisions in documents, that intertwine religious concepts with matters otherwise relevant to the issue of who controls the property. [T]he neutral principles analysis as sanctioned by the United States Supreme Court includes the

-2-

examination of church documents, i.e., the constitution *and canons* of the local and general church.") (emphasis added). And if evidence "incorporates religious concepts," and interpreting the evidence "would require the civil court to resolve a religious controversy, then the court *must defer* to the resolution of the doctrinal issue" by the church body. *Jones*, 443 U.S. at 604 (emphasis added); *(citing Serbian Eastern Orthodox Church v. Milivojevich*, 426 U.S. 696, 709 (1976)); *Watson*, 80 U.S. at 727.

Notwithstanding this legal framework, the Committee seeks a sweeping, preemptive *evidentiary* ruling misformulated as a "motion for partial summary judgment" that the Court must close its eyes to an entire category of evidence that speaks directly to how these 100+ parishes and other non-debtor schools or cemeteries were established, how they have operated for decades, and the nature of their relationships with one another and third parties. The Committee cites no relevant authority for this extraordinary evidentiary ruling at the commencement of a case or even under the claims pleaded here, because none exists.

The Motion and any implied evidentiary "objection" is also irredeemably premature. The parties have not yet designated expert witnesses. Discovery remains ongoing. No expert reports exist for the Court to evaluate. The Committee seeks what amounts to an advance *motion in limine*—a procedural vehicle that courts routinely discourage. Summary judgment procedures exist to resolve pure questions of law or undisputed facts, not to make pretrial evidentiary rulings on testimony that has not yet been proffered. The relevance and reliability of expert opinion testimony cannot be prejudged at the pleadings stage, and the Committee's attempt to predetermine these issues before fact discovery misconstrues both the nature of expert testimony and the proper sequence of pretrial proceedings. This is particularly true in a bench trial, where there is little need for the Court to serve as an extraordinarily early gatekeeper for itself. The Court's gatekeeping function under *Daubert* necessarily follows, rather than precedes, the development of the factual record.

Canon law expert opinion testimony is relevant to address the factual and legal issues as pleaded in the Committee's Second Amended Complaint for Declaratory Relief (ECF No. 53) (the "<u>SAC</u>"). For example, Count 1 alleges "An actual, substantial, and justiciable controversy exists between the Committee and the [Debtor, the Roman Catholic Archbishop of San Francisco]

concerning the status of the operating divisions and whether these operating divisions are unincorporated associations as the [Debtor] contends or, in fact, are merely unincorporated operating divisions of the [Debtor] that use [the Debtor's] property that is subject to the claims of the [Debtor's] creditors, including the Survivors." SAC, ¶ 79. Indeed, the SAC asserts the non-debtors are "divisions" or "operating divisions" 82 times. The Debtor denies these allegations. (ECF No. 64). The Debtor's position is consistent with other diocesan chapter 11 cases. For example, in *In re Roman Catholic Archbishop of Portland in Oregon*, 335 B.R. 815, 836, 839-840 (Bankr. D. Or. 2005), the court expressly recognized that issues relating to canon law and doctrinal interpretation were relevant and that such testimony required expert opinions and could not be elicited from lay witnesses. In short, canon law applies and is the bailiwick of properly designated testifying experts. *See also Comm. of Tort Litigants v. Cath. Diocese of Spokane*, 364 B.R. 81, 94-95 (E.D. Wash. 2006) (finding reversible error in the bankruptcy court's exclusion of affidavit testimony regarding canon law and instructing that the bankruptcy court "may consider Canon Law in making a determination of the parties' intent when purchasing real property, constructing churches and making improvements on the real property.").

## II.     <u>SUMMARY JUDGMENT STANDARDS AND DISPUTED FACT ISSUES</u>

On summary judgment, the Committee as moving party must produce "sufficient evidence on one or more essential elements of the claim" and if not "is no more entitled to a judgment . . . than is a plaintiff who has fully tried the case and who has neglected to offer evidence sufficient to support a finding on a material issue upon which [the Committee] bears the burden of proof"). *Watts v. United States*, 703 F.2d 346, 347 (9th Cir. 1983). This is "ordinarily a heavy burden" for the plaintiff. *Barnes v. Sea Haw. Rafting, LLC*, 889 F.3d 517, 538 (9th Cir. 2018). The Committee bears the initial burden of "producing evidence, or showing the absence of evidence, on the motion for summary judgment[.]" *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only if the moving party meets its initial burden of production does the burden shift to the non-moving party to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 327. "Reasonable doubts as to the existence of material factual issue are resolved against

SMRH:4920-6829-1710.5      DEBTOR'S OPPOSITION TO COMMITTEE'S PARTIAL SUMMARY JUDGMENT MOTION

the moving part[y] and inferences are drawn in the light most favorable to the nonmoving party." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## A. The Committee Did Not Meet Its Burden on Any Claims Asserted as to the Debtor

The Committee concedes (Mot., p. 9, ¶ 5) that the Debtor did not assert an affirmative defense to the SAC based on application of canon law. The only remaining possibility is that the Committee seeks partial summary judgment on one or more unspecified "elements" of its two SAC claims that the determination of the "question" of whether the non-debtor defendants "are part of" the Debtor precludes consideration of canon law. (Mot., p. 8). Determination of all or part of a claim– here declaratory relief for a determination that the non-debtor defendants are "operating divisions"– can only be obtained via summary judgment if the Committee produces competent evidence of one or more elements of each of its declaratory relief claims, that there are no material disputed facts and that the Committee is entitled to judgment on that element or claim as a matter of law. The Committee has not met any of these requirements.

The Motion is riddled with concessions, qualifications, and implicit admissions that genuine disputes of material fact preclude the very relief the Committee seeks. The Committee frames this Motion as presenting a "pure question of law" concerning whether canon law may be considered in determining the legal status of the non-debtor defendants. (Mot., p. 15). Yet the Motion repeatedly acknowledges disputed factual predicates that the Committee has made no effort to resolve or produce any evidence to meet their burden. (Mot., p. 9, ¶¶ 5-6) (admitting fact disputes). The Committee has thus established, through its own recitation of purportedly undisputed facts, that every defendant in this action disputes the Committee's core contention.

The Committee contends that this Court "may examine secular legal documents including applicable articles of incorporation, bylaws, and other governing documents; civil statutes; financial statements; corporate policies; relevant deeds; and representations to third parties regarding the nature of the corporate relationship between the Archdiocese and the Division Defendants." (Mot., p. 14). This is an acknowledgment that factual development is necessary. The Committee has not presented these documents to the Court. The Committee has not established through competent evidence what these documents say. The Committee has not demonstrated that the documents are

unambiguous or that they compel a single interpretation.

**B.    Material Issues of Disputed Fact Prevent Summary Judgment**

As Judge Montali observed at the November 6, 2025 hearing, "the question is a matter of fact." (11/6/25 Tr., 11:20). The Committee bears the burden of proof. (*Id.*, 36:14-15). And "if they can't prove it, they lose." (*Id.*, Tr. 37:9). The Committee's Motion does not prove anything. It assumes its conclusions, acknowledges contrary fact-based positions, and yet asks this Court to rule in its favor before the record is developed and without any factual evidence.

**1.    The Committee's Reliance on the Debtor's Articles of Incorporation Concedes the Applicability and Relevance of Canon Law**

The *only* fact evidence the Committee did submit unequivocally identifies canon law as an integral and requisite part of the very existence of The Roman Catholic Archbishop of San Francisco. (ECF No. 105 (Committee Decl., Ex. A (Debtor's Articles of Incorporation)). The Debtor's decision in 1854 to establish and maintain its existence under California civil law as a corporation sole, and as a corporation sole, undertake the administration and management of all property is based on canon law (the law of the Roman Catholic Church) because canon law required it. More than 170 years ago, the Archbishop filed a declaration with the California Secretary of State stating "whereas **the rules and regulations and discipline of the Roman Catholic Church** in the United States of America **require it for the administration of the temporalities of the said Roman Catholic Church** in the said Diocese of San Francisco, **and the management of the estate and property of said Church** . . . [has] [sic] incoperated as a Religious Corporation sole . . . ." (*Id.*, DEBTOR_10087, DEBTOR_10091 (emphasis added)). The Archbishop lodged a copy of his Papal Bull as proof of his appointment and election as the Archbishop of The Roman Catholic Church for the Diocese of San Francisco. (*Id.,* DEBTOR_010088, DEBTOR_010092).

The Debtor again confirmed canon law was the raison d'etre when the Debtor amended its Articles of Incorporation in 1962, to identify the geographical jurisdiction of the corporation sole, that it shall have perpetual existence, and that vacancy in the incumbency of the corporation sole "**is required** to be filled**, in accordance with the laws, rules and regulations of said Roman Catholic Church**, is by appointment by the Pope of Rome, who is the head of said Church." (*Id.*,

DEBTOR_010078-10086 (emphasis added)). In 1992, the Debtor added that the Debtor "**is organized and operated exclusively for religious purposes** within the meaning of Section 501(c)(3) of the Internal Revenue Code." (*Id.*, DEBTOR_010072-010074 (emphasis added)). Consistent with its governance by canon law and its sole religious purpose, the amended articles also state "[t]he **property of this corporation is irrevocably dedicated to religious purposes** and no part of the net income or assets of this corporation shall ever inure to the benefit of any private persons" and that if the corporation is dissolved or wound up, "its assets . . . shall be distributed to a nonprofit fund, foundation, or corporation which is organized and operated exclusively for religious purposes." (*Id.*).

        **2.**       **The Debtor Submitted Evidence Establishing Disputed Issues of Material Fact**

The Debtor has no obligation to submit any factual evidence in opposition because the Committee failed to meet their burden of production. Nonetheless, *infra* the Debtor identified and submitted evidence sufficient to establish disputed issues of material fact based on the SAC allegations bearing on (1) the necessity of canon law opinion testimony to resolve these fact issues when applying California Corporations, property, and trust law to address the Committee's theory the SAC states "property of the estate" claims; (2) canon law is inextricably intertwined and must be consulted and interpreted to determine whether the Debtor's relationship with the non-debtor defendants is one "exerting authority and control" over "divisions" as the SAC contends or whether it is a requirement of the hierarchical Church imposing its governing precepts, tenets and norms (canon law) on all its members from the Holy Pontiff to the Debtor (a corporation sole) to the non-debtor defendants to the Catholic faithful individuals; (3) canon law opinion testimony is necessary to determine the intent and actions of the non-debtor defendants under California Corporations Code § 18035 as unincorporated associations (a group of two or more persons joined by mutual consent for a common lawful purpose); (4) canon law is the governing principle and/or governing document of the non-debtor defendants as unincorporated associations under California Corporations Code §§ 18008 and 18010 (governing principles or other writing setting out the purpose or operation or rights and obligations of its members based on existing practices); and (5) canon law opinion testimony is required by non-party religious corporations' articles of

incorporation and bylaws to manage and administer all real and personal property to which the corporations hold legal title for the benefit of the non-debtor defendants. (*See* Summerhays Decl.).

The unresolved factual issues the Motion acknowledges are the same issues posed by the SAC to support declaratory relief claims *as to each defendant*. These fact-based allegations include that the Debtor "exerts authority and control" over the non-debtor defendants' operations even while acknowledging the Debtor has "delegated power over some functions" to the non-debtor defendants. (SAC, ¶ 32). For the parishes, the SAC alleges the Debtor "promulgates policies" relating to "financial reporting," parishes opening bank accounts, parishes accepting real estate gifts, parishes accepting endowments, and requiring endowments to be invested in a common pool. (SAC, ¶¶ 43-44). And that the Debtor "exerts control and authority" over financial reporting, sanctioned fundraising activities, bookkeeping standards, and licensing for parish facilities. (SAC, ¶ 49). Yet simultaneously, the Committee admits that parishes are "governed by that Parish's pastor" and are required to form their own parish financial council. (SAC, ¶¶ 32, 50). The Committee is bound by these allegations and its admission following thereon that the Committee disputes the parish defendants are "'separate' and operate as 'unincorporated associations' under California law . . . both as a **matter of fact** and based on applicable law." (SAC, ¶ 51 (emphasis added)).

For the high school defendants, the SAC likewise contends these defendants are subject to controls relating to financial reporting, bank accounts, real estate and endowment gifts set forth in ¶¶ 43-44. (SAC, ¶ 53). Concurrently though, the SAC acknowledges that the high school defendants are "not associated with any particular Parish" and they operate "under the supervision of the Department of Catholic Schools." (SAC, ¶¶ 52, 56). The Committee is bound by these allegations and its admission that the Committee disputes the high school defendants are "'independent' and operate as 'unincorporated associations' separate from" the Debtor and the Committee "both as a **matter of fact** and based on applicable law." (SAC, ¶ 59 (emphasis added)). For Vallombrosa, the Committee makes similar allegations as to policies and procedures but simultaneously notes the defendant maintains individual books and records. (SAC, ¶¶ 67-71). The Committee also disputes "both as a **matter of fact** and based on applicable law" that Vallombrosa "operates independently" and that legal title to its real property is held by the Debtor "in trust" for Vallombrosa. (SAC, ¶ 72).

The Committee makes similar allegations as to the cemetery defendants while simultaneously conceding they are "governed by bylaws," there is a "Director of Cemeteries" assigned to an advisory board, and the other five board members are appointed by majority vote. (SAC, ¶¶ 61-63). These allegations bind the Committee along with the admission that the Committee disputes these defendants are "operated as a 'separate unincorporated associations' through the Catholic Cemeteries Department "both as a **matter of fact** and based on applicable law." (SAC, ¶ 65 (emphasis added)).

The attached summary judgment declaration of Father Summerhays, J.C.L., explains that all members of the hierarchical Church, including the Debtor and the non-debtor defendants engage in and undertake these rights and obligations pursuant to canon law, which is the law that binds all Church members. (Summerhays Decl., ¶¶ 10-26). Canon law is not a belief system or worship guide but is a collection of rules, regulations and norms that govern all aspects of the Church: the internal political structure, the duties, responsibilities and qualifications for offices and positions, procedural and criminal laws for settling disputes and according due process. (¶¶ 10-13). Canon law applies to all members, at each level of the Church; it is not the *Debtor* purportedly exerting control or authority to gain a "corporate" advantage or as an analog to the corporate for-profit world, as the SAC suggests. Rather, canon law is imposed– as it has been for nearly 2,000 years– by the Church itself and the Church's leader, the Pope. (*Id.*).

The Debtor also submitted fact-based evidence that canon law governs the third-party religious non-profit corporations The Archdiocese of San Francisco Parish, School and Cemetery Juridic Persons Capital Assets Support Corporation ("CASC") and The Archdiocese of San Francisco Parish and School Juridic Persons Real Property Support Corporation ("RPSC") that the SAC (¶¶ 33-39) alleges hold legal title to all real and personal assets of each non-debtor defendant. CASC and RPSC were incorporated as a California nonprofit religious corporations, and their articles of incorporation state they are "organized exclusively for religious purposes within the meaning of . . . *the canon law* of the Roman Catholic Church" and their relationship with the Debtor, as the only member, is likewise governed "in accordance with the *canon law* of the Roman Catholic Church." (Summerhays Decl., ¶ 23, Exs.1,3, §§ III, IV, V, VIII (emphasis added)). CASC and RPSC

Case: 25-03021   Doc# 114   Filed: 12/16/25   Entered: 12/16/25 18:04:14   Page 17 of 34

"**shall be operated exclusively**" for the purpose of "advancing the mission of those **Parish, School and Cemetery Juridic Persons, duly established under the canon law** of the Roman Catholic Church." (*Id.*, § V (emphasis added)). The articles further provide that the "corporation shall not operate to support or benefit any organization other than [the Corporation Sole] for the purposes stated herein and in accordance with the canon law of the Roman Catholic Church." (*Id.*) "All corporate property" of both CASC and RPSC is "**irrevocably** dedicated to the purposes" set forth above "and will be owned and administered in accordance with the **provisions of the canon law of the Roman Catholic Church**." (*Id.*, § V (emphasis added)). Similarly, CASC's and RPSC's bylaws do not allow its Board of Directors to be compensated, and each director must "make a good faith determination" considering "the **Roman Catholic purposes** of This Corporation, and any **applicable religious tenets, canons, laws, policies, and authority of The Church**." (*Id.*, Exs. 2, 4, §§ 9.15, 9.16 (emphasis added)).

The Debtor's evidentiary showing is necessarily limited at the outset of the case, when discovery is ongoing, no fact witnesses have been deposed, and no expert witnesses have even been identified. Nonetheless, the necessity of understanding the scope, function, and application of canon law is apparent from the SAC allegations, the corporate governance documents for the Debtor, CASC, and RPSC, and as the governing principles (the reason and purpose) of each non-debtor defendant as an unincorporated association. The Motion must be denied on this ground alone.

## III.  ARGUMENT AND AUTHORITIES

### A.  The United States Constitution Requires that Church Polity and Governing Rules be Respected in the Context of Civil Litigation

Church property disputes implicate the First Amendment to the U.S. Constitution, which prohibits states from enacting "laws respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amends. I, XIV. The prohibition against deciding religious matters does not, however, preclude a civil court from resolving disputes over church property. *Jones, supra*, 443 U.S. at 602. To resolve such disputes while respecting constitutional principles, "the [First] Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by ... a hierarchical church organization." *Id.*

In *Watson v. Jones*, 80 U.S. 679, 727 (1871), the Supreme Court first held that, in accordance with the law generally applicable to voluntary associations, the polity and locus of authority established by a particular denomination would be dispositive in civil litigation involving an issue that the church itself had resolved, "[W]henever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them."

In *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 10-13 (1929), the plaintiff, who was a beneficiary of a testamentary trust, also claimed a right to be appointed chaplain of the chaplaincy set up by the will and a right to the surplus income accrued during a vacancy. The Archbishop of Manila refused to appoint plaintiff based on the Catholic Church's law and proposed the defense that the Philippine Courts had no jurisdiction. *Id*. Like in *Watson*, the Supreme Court ruled the Archbishop's decision was binding on that Court in its application to the facts at hand, reasoning that since the appointment was a canonical act it was the function of the Church to decide the qualifications of the chaplain and whether the individual met those qualifications. *Id.*, at 17-19.[3]

## B. The United States Supreme Court Approves the Neutral Principles Approach in *Jones v. Wolf*

"The United States Supreme Court has made two points clear: (1) how state courts resolve church property disputes is a matter of state law; but (2) the method a state chooses must not violate the First Amendment to the United States Constitution." *Episcopal Church Cases*, 45 Cal.4th 467, 478-79 (Cal. 2009). "The First Amendment does not dictate that a State must follow a particular method of resolving church property disputes." *Id.* at 479. "Indeed, 'a State may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.'" *Id.* (quoting *Jones v. Wolf*, 443 U.S. at 602).

---

[3] In *Serbian Eastern Orthodox Diocese v. Milivojevich*, the general Serbian Orthodox Church defrocked a sitting bishop and divided his diocese into three separate dioceses. 426 U.S. 696, 703-06 (1976). When the bishop sued for control of diocesan property, the Supreme Court held "civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity" on matters of "church discipline and the composition of the church hierarchy." *Id.* at 713, 717. This deference applies even when ecclesiastical decisions determine property control. *Id.* at 720.

In *Jones v. Wolf*, 443 U.S. 595, 602-03 (1979), the Supreme Court approved a "neutral principles of law" approach, under which state courts could examine the deeds to property, governing documents of the local church, governing instruments of the general church, and applicable state statutes to determine whether property held by a local church is held, and must be used, for the mission of the denomination. The Court continued to make clear, however, the First Amendment requires civil courts to respect a hierarchical church's determinations and rules, and to abstain "completely" from resolving "questions of religious doctrine, polity, and practice." *Id.*; *see also Serbian*, 426 U.S. at 710 (reversing a ruling that had refused to heed a denomination's determination affecting the control of property, because "[t]he [First] Amendment ... commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. This principle applies with equal force to church disputes over church polity and church administration."); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952) (religious organizations have the constitutional right "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine"). In *Jones*, the Court explained that under a "neutral principles" analysis:

> the outcome of a church property dispute is not foreordained. *At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property.* They can modify the deeds or the corporate charter to create a right of reversion or trust in favor of the general church. Alternatively, *the constitution of the general church can be made to recite an express trust in favor of the denominational church....* [T]he civil courts *will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.*

*Id.* at 606 (emphasis added).

The *Jones v. Wolf* Court itself considered evidence regarding deeds, *id.* at 597; mortgages and other evidence of borrowing, *id.*; corporate charters and constitutions, *id.* at 602 and 604; evidence of denominational affiliation, *id.* at 597-98; evidence of congregational voting and related quorum requirements, *id.* at 598; evidence of denominational polity, *id.*; evidence of membership by majority and minority members of the congregation, *id.*; and evidence regarding the investigation and finding of the regional Presbytery. *Id. Jones v. Wolf* drew support for its methodology from *Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367 (1970), which resolved a church property dispute by reviewing, *inter alia*, church charters

and denominational governing documents. *Id.* (referencing "upon provisions in the constitution of the General Eldership pertinent to the ownership and control of church property").

For example, in *Carnes v. Smith*, a case involving the United Methodist Church (UMC), a hierarchical church, the Georgia Supreme Court found that the following provisions in the UMC's "Book of Discipline" were conclusive evidence of a trust:

> "[T]itle to all real property now owned or hereafter acquired **by an unincorporated local church**, . . . shall be held by and/or conveyed to its duly elected trustees ... and their successors in office, . . . in trust, nevertheless, for the use and benefit of such local church and The United Methodist Church. Every instrument of conveyance or real estate shall contain the appropriate trust clause as set forth in the Discipline."

> * * *

> "*[T]he absence of a trust clause* ... in deeds and conveyances previously executed **shall in no way exclude a local church** or church agency from or relieve it of its connectional responsibility and accountability to The United Methodist Church; provided that the intent and desires of the founders . . . are shown by any or all of the following indications: (a) the conveyance of the property to the trustees of a local church or agency of any predecessor to The United Methodist Church; (b) the use of the name, customs, and polity of any predecessor to the United Methodist Church in such a way as to be thus known to the community as part of such denomination; (c) the acceptance of the pastorate of ministers appointed by a bishop or employed by the superintendent of the District or Annual Conference of any predecessor to The United Methodist Church."

> * * *

> "We therefore hold that an implied trust was intended by the [unincorporated local church] founders … based on the 'neutral principles of law' as set out above."

*Carnes v. Smith*, 222 S.E.2d 322, 328 (**Ga**. 1976), *cert. denied*, 429 U.S. 868, (1976); *see also Episcopal Diocese of Rochester v. Harnish*, 11 N.Y.3d 340, 351 (**N.Y.** 2008) ("We conclude that the Dennis Canons clearly establish an express trust in favor of the Rochester Diocese and the National Church...."); *Rector, Wardens and Vestrymen of Trinity-St. Michael's Parish, Inc v. Episcopal Church in the Diocese of Connecticut*, 620 A.2d 1280, 1284 (**Conn.** 1993) (holding that the deeds do not contain any words of trust but the 1979 Trust Canon "is an express trust provision"); *Protestant Episcopal Church in Diocese of New Jersey v. Graves*, 417 A.2d 19, 24 (**N.J.** 1980) (describing the 1979 Trust Canon as an "express trust provision"); *Daniel v. Wray*, 580 S.E.2d 711, 719 (**N.C.** 2003) (holding that even an "unrecorded" "Canon[] essentially established a deed of trust" and created an interest in property); *In re Church of St. James the Less*, 888 A.2d 795, 810 (**Pa.** 2005) ("St. James is bound by the express trust language in the Dennis Canon and therefore, its vestry and members are required to use its property for the benefit of the Diocese."). There is no

different result under California state law as established by the California Supreme Court in *In re Episcopal Church Cases*, 45 Cal.4th 467, 487 (**Cal.** 2009), in Section D below.

**C.     The California Legislature Enacts Corporations Code Section 9142 to Give Effect to Church Law Over Church Property**

Following *Jones*, the California legislature enacted the current version of Corporations Code Section 9142. This statute, like *Jones*, requires courts to give effect to a general church's rules with respect to control over local church property. The statute provides:

(c) No assets of a religious corporation are or shall be deemed to be impressed with any trust, express or implied, statutory or at common law unless one of the following applies: [¶] ...

(2) Unless, and only to the extent that, the articles or bylaws of the corporation, or *the governing instruments of a superior religious body or general church of which the corporation is a member, so expressly provide*. [¶]...

(d) Trusts created by paragraph (2) of subdivision (c) may be amended or dissolved by amendment from time to time to the articles, bylaws, or governing instruments creating the trusts...." *Id.* (emphasis added).

**D.     The California Supreme Court Concludes Church Canon Law is Enforceable under *Jones v. Wolf* and Section 9142**

In a landmark decision involving application of *Jones'* neutral principles approach to the Episcopal church, the California Supreme Court held Section 9142 applies in this context and the church's canon law was enforceable under *Jones* as well as Section 9142. *Episcopal Church Cases,* 45 Cal.4th 467 (Cal. 2009). The Supreme Court expressly understood that while record title was held by St. James Parish, it had promised in its articles of incorporation to be bound by the constitution and canons of the Episcopal Church. *Id.* at 485-86.

In *Episcopal Church Cases*, the California Supreme Court first determined that secular courts called on to resolve church property disputes should consider and be bound by canon law:

*Under the neutral-principles approach, the outcome of a church property dispute is not foreordained*. At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, *the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form*.

*Id.* at 487 (emphasis added).

The California Supreme Court then used this standard—expressly citing and discussing the canon law—to determine the issue of property ownership in the Episcopal Church context:

Thus, the high court's discussion in *Jones v. Wolf*, . . . , ***together with the Episcopal Church's adoption of Canon*** I.7.4 in response, strongly supports the conclusion that, once defendants left the general church, the property reverted to the general church. Moreover, ***Canon*** I.7.4 is consistent with earlier-enacted canons that, although not using the word "trust," impose substantial limitations on the local parish's use of church property and give the higher church authorities substantial authority over that property. For example, permitting a disaffiliating local church to take the property with it when it reaffiliates with a different church is inconsistent with the prohibition of ***Canon*** II.6, section 2, against encumbering or alienating local property without the previous consent of higher church authorities. Thus, a strong argument exists that ***Canon*** I.7.4 merely codified what had long been implicit.

*Id.* at 487-88 (emphasis added). The California Supreme Court reviewed Corporations Code section 9142 to "also support[]" the property ownership determination. *Id.*, at 488-89 (The court explained that "[s]ubdivision (c) of ... section [9142] permits the governing instruments of the general church to create an express trust in church property, which Canon I.7.4 does.").

Insofar as the Court or Committee suggest canon law must be disregarded under some tortured concept of federal preemption or choice of law question fundamentally misconceives California statutes and case law and the role canon law evidence plays in this proceeding. In *New v. Kroeger*, 167 Cal.App.4th 800 (Cal. Ct. App. 2008)[4], for example, the California Court of Appeal addressed that the Episcopal Church is a three-tier hierarchical church which requires adherence to its canon law. "At the highest level is the Episcopal Church itself, which is an unincorporated association operating on a national level in the United States" and issues canons and governing law, the second level are dioceses, and the third level is a vestry (congregation) which "may, but is not required to, form a nonprofit religious corporation for the purpose of holding the parish's assets." *Id.* at 808-09. The *New* Court found the trial court made a "***fundamental mistake***" applying neutral principles of law by believing it was constrained "***to rely solely on California corporations law in a vacuum, without reference to the articles of incorporation and bylaws of the Parish corporation, as well as the constitution and canons of the Episcopal Church and San Diego Diocese***." *Id.* at 820 (emphasis added); *see also Berry v. Society of Saint Pius X*, 69 Cal.App.4th 354, 371–72 (1999) ("A religious corporation … is something peculiar to itself …" "The legislature never means by granting or allowing such charters to change the ecclesiastical status of the congregation, but only

---

[4] The California Supreme Court originally granted review but, in the wake of *Episcopal Church Cases*, subsequently dismissed the petition and ordered the Court of Appeal's opinion republished. 202 P.3d 1089 (Ca. 2009).

1    to afford them a more advantageous civil status.").

2        The Committee's reliance on *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179

3    F.3d 1244 (9th Cir. 1999) does not support the proposition that the Court should exclude all expert

4    opinion testimony on canon law. *Maktab* involved a copyright dispute between a Muslim Sufi group

5    and secessionists (Kianfar). The Ninth Circuit recognized that if the hierarchy of the Sufi order were

6    not controverted, it would likely adjudicate the dispute through the *Watson* deference approach. *Id.*

7    at 1248-49 (The deference "approach is most easily employed when there is no dispute between the

8    parties concerning the hierarchical nature of the church...."). Because the Kianfars contested the

9    legitimacy of the group's successor, the Ninth Circuit, instead, utilized the neutral principles

10   methodology and determined that ownership rested in the Sufi order in whose name the copyrights

11   were registered. This conclusion was consistent with the "***tradition and practice of the Order***." *Id.*

12   at 1246 (emphasis added). A significant aspect of *Maktab's* holding that is consistent with the

13   Debtor's argument is that the bare title only determines ownership when such title evidence *is not*

14   *contrary* to a religious group's polity, canon law, corporate documents, or state law. *See Order of*

15   *St. Benedict of New Jersey v. Steinhauser*, 234 U.S. 640 (1914) (even though copyrights were

16   registered in name of deceased Benedictine priest, they were, by application of the organizing law

17   of a Benedictine monastery and the sixth century Rule of St. Benedict, owned by the religious order).

18       The Committee's selective reliance on bankruptcy diocesan decisions does not assist them

19   either. For example, the Committee's reliance on the *Guam* decision underscores rather than

20   resolves this problem. The Committee notes that in *Guam*, the district court "granted the

21   committee's motion for partial summary judgment" based on "its review of deeds, statutory law

22   governing property ownership, and diocesan documents regarding ownership and control of church

23   property." (Mot., p. 16-17). But the Committee has not submitted admissible, probative evidence

24   here. The *Guam* court had before it a developed factual record; this Court does not.

25       The Committee's quotation from *Portland II* is similarly revealing. The Committee recites

26   that "even debtor's own canon law expert acknowledges that being a separate juridic person under

27   canon law does not give that juridic person a civil identity." (Mot., p. 18). This statement

28   presupposes the *existence and admission* of expert testimony and a factual record concerning the

relationship between canonical and civil identity. No such record exists here.

The Committee's discussion of the *Spokane* reversal further undermines its position. The Committee acknowledges that the district court reversed summary judgment "with respect to the absence of a constructive or resulting trust, finding that there were questions of fact and directing the bankruptcy court to consider deeds and affidavits on the issue of the parties' intent to hold property in trust." (Mot., p. 19). Questions of intent are paradigmatic fact questions. The Committee's own Motion thus concedes that intent which necessarily implicates the purpose and understanding behind the organizational structures at issue presents triable issues.

**E.** **California's Corporation Sole Statute Mandates the Integration of Religious Law Into the Governance of Ecclesiastical Corporations**

An ecclesiastical corporation sole represents civil law's acknowledgment that a church office possesses distinct legal capacities and privileges. *See* Black's Law Dictionary 366 (8th ed. 1999) ("a continuous legal personality that is attributed to successive holders of certain []ecclesiastical positions"). More fundamentally, California's corporation sole framework safeguards the Archbishop's function as canonical steward because California's statutory scheme mandates the incorporation of canon law into corporate governance. California Corporations Code section 10002 provides that "the bishop, chief priest, presiding elder, or other presiding officer of a religious denomination, society, or church" may form a corporation sole "for the purpose of administering and managing the affairs, property, and temporalities thereof." The Legislature did not authorize religious leaders to form corporations sole in a vacuum; it conditioned such formation on compliance with religious law.

Section 10003 makes this integration explicit by requiring the articles of incorporation to state "that the officer forming the corporation is duly authorized by the rules, regulations, or discipline of the religious denomination, society, or church to take such action." Cal. Corp. Code § 10003(b). The statute further mandates disclosure of "the manner in which any vacancy occurring in the office of the bishop, chief priest, presiding elder, or other presiding officer is required to be filled by the rules, regulations, or constitution of the denomination, society, or church." Cal. Corp. Code § 10003(d). These provisions do not merely impose threshold requirements for formation;

they emb<br>ed religious law into the corporation's perpetual governance structure.

The Debtor corporation sole was incorporated in California in 1854 under statutory provisions requiring that the incorporating officer be "duly authorized by the rules, regulations, or discipline" of the Catholic Church. Cal. Corp. Code § 10003. This requirement means the person occupying the ecclesiastical office that becomes the corporation sole must hold that office in accordance with canon law. The statutory framework thus presupposes—and incorporates by reference—the entire canonical structure governing episcopal authority. As detailed above, the Debtor's articles of incorporation repeatedly and expressly are based upon canon law with respect to the Debtor's actions as a corporation sole, including all assets of the Church the Debtor manages and administers, which are irrevocably dedicated to religious purposes even should the Debtor cease to exist as a corporation sole.

**F.    The California Unincorporated Association Statute Likewise Requires the Court to Examine Church Constitution, Canons, Rites or Regulations to Determine a Religious Property Dispute**

California Corporations Code establishes a legal framework that recognizes unincorporated associations as distinct legal entities. Cal. Corp. Code §§ 18000 *et seq.* An unincorporated association is "an unincorporated group of two or more persons joined by mutual consent for a common lawful purpose, whether organized for profit or not." Cal. Corp. Code § 18035(a). The determination of whether an entity is an unincorporated association is based on whether the entity is comprised of "(1) a group whose members share a common purpose, and (2) who function under a common name under circumstances where fairness requires the group to be recognized as a legal entity." *Church Mut. Ins. Co., S.I. v. GuideOne Specialty Mut. Ins. Co.*, 72 Cal. App. 5th 1042, 1059-60 (Cal. Ct. App. 2021); *see also Barr v. United Methodist Church*, 90 Cal. App. 3d 259, 266-67 (Cal. Ct. App. 1979) (identifying religious organizations and churches as unincorporated associations). Mutual consent is a fact question. The Committee has presented no evidence of the absence of such consent.

Statutorily, "[California] unincorporated associations possess many characteristics of other legal entities and may (1) sue or be sued, (2) own and transfer an interest in real or personal property, (3) take property under a will, (4) register a trademark, (5) seek an injunction against a public

18

nuisance or unfair competition, or (6) engage in commerce." *Vosburg v. Cnty. of Fresno*, 54 Cal.App.5th 439, 452 (Cal. Ct. App. 2020); *see also White v. Cox*, 17 Cal.App.3d 824, 828 (Cal. Ct. App. 1971) (unincorporated association is separate legal entity in tort action by member). California law expressly provides that "[p]roperty acquired by or for an unincorporated association is property of the unincorporated association and not of the members individually." Cal. Corp. Code § 18110. Furthermore, California case law provides that, on dissolution, the remaining assets of an unincorporated association are disposed of according to *the association's governing documents* or, if the governing documents are silent as to the disposition of assets, are to be divided pro rata among the association's members. *Holt v. Santa Clara County Sheriff's Benefit Ass'n*, 250 Cal.App.2d 925, 932, (Cal. Ct. App. 1967); *see also Lynch v. Spilman*, 67 Cal.2d 251, 260 (Cal. 1967) ("property transferred to a corporation or other institution organized for a charitable purpose without a declaration of the use to which the property is to be put, is received and held by it 'in trust to carry out the objects for which the organization was created.'"); *accord* Cal. Corp. Code § 9680 and § 6716(a) ("all of a corporation's assets shall be disposed of on dissolution in conformity with its articles or bylaws subject to complying with the provisions of any trust under which such assets are held").[5]

### G.   Using Neutral Principles to Apply the Roman Catholic Church Cannon Law, Parishes Are Separate Entities that Own Parish Property

Canon law contains detailed rules and requirements to hold and administer parish property. (Summerhays Decl., ¶¶ 17-18, 21-22, 25 & Ex. 5). Canon law recognizes two categories of legal subjects: a "natural person," a baptized individual and a "juridic person," created by the canon law or decree with canonical rights and duties analogous to those of a natural person. (¶ 17 & Ex. 5). Juridic persons can acquire temporal goods. (¶ 21 & Ex. 5). Canon law recognizes the Archdiocese of San Francisco, the parishes, and schools as separate juridic persons. (¶¶ 16-19 & Ex. 5). The Debtor oversees a particular territory, and the parishes represent *territorial subdivisions* of that territory. (*Id.*) A parish is a community of the faithful, in a particular church, that is entrusted to a

---

[5] *See also Jones*, 443 U.S. at 603-04 ("Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members.").

pastor. (¶ 17 & Ex. 5). Canon law requires the pastor to provide pastoral care and to keep accurate records of the sacraments provided. (¶ 18 & Ex. 5). Similarly, the pastor is the direct administrator of parish property and must follow canon law, including by having a parish financial council, to ensure vigilant asset administration and safekeeping. (¶ 18 & Ex. 5). The Pope, as the Church leader, is the supreme indirect administrator and steward of all assets, and similarly, the Debtor administers the property of the corporation sole, just as the pastor does for his parish. (¶ 22 & Ex. 5). Each administrator of Church assets, including the Debtor, parish pastors, CASC, and RPSC, must ensure that the property of each juridic person maintains any restrictions imposed by a founder, donor, or other, that the property is "usefully set aside for the purposes" of the separate juridic person, such as a parish. (¶ 25 & Ex. 5).

This is in accord with California law. Donor-imposed restrictions on charitable contributions are legally binding. If donated assets are restricted pre-petition, those same restrictions will generally apply once the nonprofit files bankruptcy, and the Debtor (and its creditors) will be able to use those assets only in accordance with the donor's restriction. Similarly, if the income generated from the restricted funds is restricted to certain purposes, it will likewise be restricted in bankruptcy. *See* Cal. Corp. Code § 9142(c), *supra*; *see also* Cal. Bus. & Prof. Code § 17510.8 ("Notwithstanding any other provision of this article, there exists a fiduciary relationship between a charity or any person soliciting on behalf of a charity, and the person from whom a charitable contribution is being solicited. The acceptance of charitable contributions by a charity or any person soliciting on behalf of a charity establishes a charitable trust and a duty on the part of the charity and the person soliciting on behalf of the charity to use those charitable contributions for the declared charitable purposes for which they are sought."); Cal. Corp. Code § 9230(d) ("Where property has been solicited and received from the general public, based on a representation that it would be used for a specific charitable purpose other than general support of the corporation's activities, and has been used in a manner contrary to that specific charitable purpose for which the property was solicited, the Attorney General may institute an action to enforce the specific charitable purpose…"); *see, e.g.*, *Hunter v. St. Vincent Med. Ctr. (In re Parkview Hospital)*, 211 B.R. 619 (Bankr. N.D. Ohio 1997) (state attorney general moved for summary judgment to enforce charitable restrictions on donated

funds).

The Committee acknowledges that the Debtor contends "canon law is relevant to whether the [d]efendants operate as unincorporated associations under California law." (Mot., p. 20). The Committee's own description of the case underscores the magnitude of the factual undertaking it seeks to circumvent. The Committee quotes the Debtor's acknowledgment that determining these issues "requires substantial time and access to discovery materials" and could involve "the canonical status of over 100 non-debtor defendants, including parishes, schools, cemeteries, and other entities, each with their own structure and history." (Mot., p. 21). The Motion's treatment of unincorporated association status is particularly telling. The Committee asserts that "[r]eligious doctrine has no application under Corporations Code sections 10000 *et seq.* (applicable to the corporation sole) or 18000 (applicable to unincorporated associations) to determine whether the []Defendants are legally separate from the [Debtor] under civil law." (Mot., p. 20). But California Corporations Code section 18035 provides that an unincorporated association may be formed by "two or more persons" who have by "mutual consent" organized for a lawful purpose. Mutual consent is a fact question. The Committee has presented no evidence of the absence of such consent.

That fact-based inquiry requires expert opinion testimony on canon law. California courts have found that expert opinion testimony on canon law is relevant and necessary to determine fact questions and rejected arguments that canon law relates only to ecclesiastical relationships within the Church. *See, e.g., Stevens v. Roman Catholic Bishop of Fresno*, 49 Cal.App.3d 877 (Cal. Ct. App. 1975). In *Stevens*, the trial court properly admitted and relied upon canon law to assist in determining whether there was a principal-agent relationship between a French missionary priest and the Fresno Bishop in a wrongful death action due to an automobile collision. *Id.* at 880-81. Internal church governance, rules, and regulations have been found to be relevant to determine whether parties were in a principal-agent relationship. *See Malloy v. Fong*, 37 Cal.2d 356, 367-68 (Cal. 1951) (Presbyterian church organization); *Roman Catholic Archbishop v. Superior Court*, 15 Cal.App.3d 405, 409-10 (Cal. Ct. App. 1971) (expert testimony on canon law); *Miller v. International Church*, 225 Cal.App.2d 243, 244-46 (Cal. Ct. App. 1964) (church's corporate bylaws and Ministers' Code of Ethics); *Vind v. Asamblea Apostolica, Christo Jesus*, 148 Cal.App.2d 597,

600-01 (Cal. Ct. App. 1957) (expert testimony on bylaws and general church laws and rights).

Here, where the import of canon law is specifically tied to the statutory scheme protecting unincorporated associations, canon law cannot be precluded. California Corporations Code section 18010 defines "governing principles" of unincorporated associations which are either stated in the governing documents (a writing that governs the purpose of the association or the rights and obligations of its members) or it is based on "established practices" which are those "used by an unincorporated association without material change or exception during the most recent five years of its existence." Cal. Corp. Code §§ 18010, 18008. The non-debtor defendants' governing principles are canon law. California courts have considered the purpose and operation of an unincorporated association, based on its governing principles, in determining whether or not liability was appropriately assessed and the jury appropriately instructed. *See, e.g., Gee v. Nat'l Collegiate Athletic Assn.*, 107 Cal.App.5th 1233, 1255-57 (Cal. Ct. App. 2024), *reh'g denied* (Jan. 10, 2025), *review denied* (Apr. 23, 2025).

Plaintiff *Gee* brought a wrongful death lawsuit on behalf of her husband, a former USC football player alleging chronic traumatic encephalopathy (CTE) was a substantial factor in his death and that the National Collegiate Athletic Association (NCAA) failed to take reasonable steps to reduce his risk of contracting CTE. *Id.* at 1238-39. *Gee* chose to sue only the NCAA – an unincorporated association – and not USC. On appeal, plaintiff contended the trial court erred in not giving her requested jury instruction on joint venture liability that the NCAA as an unincorporated association "is responsible for the wrongful conduct of a member acting in furtherance of the unincorporated association." *Id.* at 1255-56. The trial court should have considered that the statutory scheme permits an unincorporated association "to create its own governing document and to state its own governing principles. (Corp. Code, §§ 18035, 18008, 18010)" and that includes determining the rights and liability of its members as to policy determinations. *Id.* The appellate court ultimately affirmed the jury verdict finding that the assumption of the risk doctrine applied and thus the jury instruction given did not prejudice plaintiff. *Id.*

**H.     The Committee's Second Amended Complaint Pleads an Intra-Church Dispute Requiring the Court to Abstain From Deciding the Dispute**

The Committee asserts that the SAC "does not raise an intrachurch dispute" otherwise this Court would be barred from reviewing any such dispute that involved "matters of faith, doctrine, church governance, and polity." (Mot., p. 15). This assertion is plainly false and contrary to the Committee's pleadings and posture. The Committee obtained derivative standing to prosecute the alleged claims in the SAC *on behalf of the Debtor*, the Archbishop. *See* Motion for Authority to Commence and Prosecute Litigation Against Diocesan Affiliates on Behalf of the Bankruptcy Estate (ECF No. 74); Tentative Ruling and Order granting the Committee's motion for derivative standing. (ECF Nos. 81, 88). The Committee, therefore, supposedly prosecutes these claims in the name of the Archbishop against parishes, schools, cemeteries, and other entities within the hierarchical Roman Catholic Church. There are no secular parties; this is an *intrachurch* dispute.

**I.     The Committee's Evidentiary Objection Is Improper and Irredeemably Premature[6]**

The Committee seeks summary adjudication of evidentiary issues that cannot properly be resolved at this stage of the litigation. No party has yet designated expert witnesses. No expert reports have been prepared or exchanged. Discovery remains ongoing with respect to the governance, operations, and status of more than one hundred non-debtor defendants, each with its own structure and history spanning decades if not centuries. The Committee asks this Court to rule that canon law evidence is categorically inadmissible before the Court has any idea what that evidence might be, what opinions any expert might offer, or how such testimony might relate to the disputed facts.  What the Committee has styled as a motion for partial summary judgment is in substance an advance motion *in limine*—and a premature and impermissible one at that.

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides that a witness qualified by knowledge, skill, experience, training, or education may testify in the form of an opinion if the expert's specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue, the testimony is based on sufficient facts or data, the testimony

---

[6] The Debtor incorporates by reference as if set forth verbatim herein the arguments and authorities previously raised in its Scheduling Conference Statement. (ECF No. 96).

Case: 25-03021   Doc# 114   Filed: 12/16/25   Entered: 12/16/25 18:04:14   Page 31 of
32

1 is the product of reliable principles and methods, and the expert has reliably applied those principles

2 and methods to the facts of the case. Fed. R. Evid. 702.

3 The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

4 579 (1993), and its progeny task trial courts with ensuring that expert testimony rests on a reliable

5 foundation and is relevant to the issues before the court. The Ninth Circuit has emphasized that Rule

6 702 establishes a liberal standard of admissibility, and doubts regarding the usefulness of expert

7 testimony are generally resolved in favor of admissibility. *In re High-Tech Emple. Antitrust Litig.*,

8 No. 11-CV-02509-LHK 2014, 2014 WL 1351040, *2 (N.D. Cal. April 4, 2014) (Rule 702

9 "mandates a liberal standard for the admissibility of expert testimony."); *In re Flashcom, Inc. v.*

10 *Communs Ventures III, LP (In re Flashcom, Inc.)*, 503 B.R. 99, 124 (Bankr. C.D. Cal. 2013)

11 ("[d]oubts about the usefulness of expert testimony should be resolved in favor of admissibility").

12 The threshold inquiry under Rule 702 is whether the proposed testimony will "assist the trier

13 of fact." This requirement incorporates the relevance standard of Federal Rule of Evidence 401,

14 which defines relevant evidence as evidence having any tendency to make a fact of consequence

15 more or less probable than it would be without the evidence. The Ninth Circuit has observed that

16 the bar for relevance under Rule 401 is deliberately low. *United States Equal Emp. Opportunity*

17 *Comm'n v. Placer ARC*, 147 F. Supp. 3d 1053, 1062 (E.D. Cal. 2015) (relevancy is not a strict test;

18 as the words in the rule suggest – "any tendency" – 401 is typically a low bar for admissibility);

19 *Slaughter-Payne v. Shinseki*, 522 F. App'x 409, 410 (9th Cir. 2013) (noting "the low bar for

20 relevancy under Federal Rule of Evidence 401."). Expert testimony satisfies this standard if the

21 expert is qualified and if the testimony is both relevant and reliable. *Synology Inc. v. Via Licensing*

22 *Corp.*, No. 22-CV-01405-TLT, 2023 WL 5276030, at *1 (N.D. Cal. Aug. 9, 2023) (citing *Daubert*,

23 509 U.S. at 597); *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1020 (9th Cir. 2022) (error for

24 court to exclude expert opinion by taking issue only with the expert's ultimate conclusions and

25 ignoring the relevancy and reliability of his underlying opinions – court exceeded gatekeeping role);

26 *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1233-34 (9th Cir. 2017) (*Daubert* factors are

27 "illustrative" and "the inquiry is flexible"; district court erred in applying the standard too narrowly

28

and by excluding the experts' testimony); *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1195 (9th Cir. 2014) (error to exclude relevant expert testimony).

The Ninth Circuit has rejected summary judgment motions as a means to eliminate expert testimony holding that the district courts "may not exclude expert testimony simply because the court can, at the time of summary judgment, determine that the testimony does not result in a triable issue of fact." *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007);[7] *see also U.S. v. Union Pacific R. Co.*, 565 F.Supp.2d 1136, 1150 n. 22 (E.D. Cal. 2008) ("Challenges to an expert's methodology and reliability are properly considered at the time of trial by motions *in limine....* Challenges to an expert's substantive opinions are the proper subject of cross-examination; such issues are not appropriate for resolution on summary judgment."); *Zaragoza v. Cnty. of Riverside*, No. 5:20-cv-01381-SSS-SPx, 2024 WL 663235, at *4, fn. 2 (C.D. Cal. Jan. 18, 2024) (motion *in limine* is proper vehicle to raise arguments about expert evidentiary challenges).

Where no jury is present, the risk that a factfinder will be misled by expert testimony is substantially diminished, and courts accordingly afford broader latitude in admitting such evidence. *See, e.g., Fed. Trade Comm'n v. BurnLounge, Inc.*, 753 F.3d 878, 888 (9th Cir. 2014) (explaining that in a bench trial, "there is less danger [than in a jury trial] that a trial court will be unduly impressed by the expert's testimony or opinion"); *Fed. Trade Comm'n v. Qualcomm Inc.*, No. 17-CV-00220-LHK, 2018 WL 6615050, at *2 (N.D. Cal. Dec. 17, 2018) ("[A]lthough the *Daubert* inquiry must still be performed, it is well established that the Court's gatekeeping duty is less pressing regarding a bench trial.").

## IV.     CONCLUSION

For the foregoing reasons, the Motion should be denied.

---

[7] *Stilwell* is notable because – unlike here – the parties had engaged in both fact and expert discovery and presented the expert testimony in the rejected summary judgment motion. *Id.* The impermissible nature of the Committee's Motion is even more evident because the expert testimony the Committee seeks to eliminate is an ephemeral abstraction at best.

| | |
|---|---|
| 1 | Dated: December 16, 2025 | FELDERSTEIN FITZGERALD WILLOUGHBY PASCUZZI & RIOS LLP |

Dated: December 16, 2025    FELDERSTEIN FITZGERALD WILLOUGHBY
                            PASCUZZI & RIOS LLP

By    _____
          */s/ Paul J. Pascuzzi*
          PAUL J. PASCUZZI
          JASON E. RIOS
          THOMAS R. PHINNEY

Attorneys for The Roman Catholic Archbishop of
San Francisco

Dated: December 16, 2025    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By    _____
          */s/ Ori Katz*
          ORI KATZ
          AMANDA L. COTTRELL

Attorneys for The Roman Catholic Archbishop of San
Francisco