**RJN 21**

**THE DISTRICT COURT OF GUAM**

| | |
|---|---|
| In re:<br><br>ARCHBISHOP OF AGAÑA,<br>a Corporation Sole,<br><br>          Debtor. | Bankruptcy Case No. 19-00010<br>Chapter 11 |
| OFFICIAL COMMITTEE OF<br>UNSECURED CREDITORS,<br><br>          Plaintiff,<br><br>          v.<br><br>ARCHBISHOP OF AGAÑA,<br><br>          Defendant. | Adversary Proceeding<br>Case No. 19-00001<br><br><br>**DECISION AND ORDER GRANTING THE COMMMITTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT UNDER BANKRUPTCY RULE 7056** |
| CATHOLIC SCHOOLS AND PARISHES,<br><br>          Defendant-Intervenor. | |

This court heard the Committee's Motion for Partial Summary Judgment Under Bankruptcy Rule 7056, ECF No. 9, on April 16, 2021. After careful consideration and after having reviewed the parties' briefs, relevant cases, and statutes; and having heard argument from counsel on the matter, the court hereby **GRANTS** the Committee's motion for the reasons stated herein.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

On January 16, 2019, the Archbishop of Agaña, a Corporation Sole ("Debtor"), filed a voluntary petition for relief under Chapter 11. Debtor listed certain properties under its Statement of Financial Affairs (exhibits 8, 9, and 10) as properties being held in trust for Parishes and Schools.

On April 6, 2019, the Official Committee of Unsecured Creditors ("Committee") filed a Complaint under Adversary Proceeding No. 19-00001. Compl., ECF No. 1. An Amended Complaint was filed thereafter, alleging that the real and personal properties held "in Trust for Parishes and Schools" and identified on Exhibit A to the Amended Complaint ("Disputed Property") are under Debtor's complete control and domination, and Debtor owns said Disputed Property. *See* Am. Compl. at ¶¶ 12 and 13, ECF No. 5.

On December 7, 2019, the instant motion for partial summary judgment was filed. *See* Mot., ECF No. 9. Therein, the Committee is asking this court to make a finding that the Parishes and Schools are not separate legal entities and thus cannot hold title to property or be the beneficiaries of a trust. *Id.* at 2.

According to the Committee, Debtor claims to hold tens of millions of dollars in assets in trust for other entities. Mem. in Support of Mot. at 4, ECF No. 10. Because those assets are held in trust, such assets are not available to pay the claims of survivors and other creditors in Debtor's bankruptcy case. *Id.* It is the Committee's position that these alleged third parties—the Parishes and Schools—are not separate entities from Debtor. *Id.* It argues that the third parties are divisions of Debtor because (i) the third parties operate as unincorporated divisions of Debtor—operating under Debtor's charter, reports to Debtor,

finances and operations are controlled by Debtor, and properties are titled to Debtor; (ii) Debtor chose not to incorporate its Parishes and Schools separately; and (iii) until the onset of the abuse crisis, Debtor has consistently argued and testified that parishes and schools were not legally distinct from their governing diocese. *Id.*

Debtor, on the other hand, asserts that it has always made its position clear through its bankruptcy schedules that it does not claim ownership of the Parishes and Schools' real and personal property. Debtor's Opp'n. at 5, ECF No. 34. Debtor argues that the Parishes and Schools are separate entities and that Debtor is simply holding the Disputed Property in trust and for the benefit of the Parishes and Schools. *Id.* at 5-6.

On January 27, 2020, a motion to intervene was filed by Interested Party Catholic Schools and Parishes ("Intervenor"). *See* Mot. to Intervene, ECF No. 20. The court granted the motion to intervene. *See* Order, ECF No. 50. Similar to Debtor's position, the Intervenor argues that the Parishes and Schools have a trust relationship with Debtor. Intervenor's Opp'n. at 2-3, ECF No. 59. It further argues that there are disputed material facts and raises an established theory of law, which would make summary judgment inappropriate at this time. *Id.* at 3.

The motion was originally set to be heard on May 15, 2020. However, the case was stayed for almost a year as the parties attempted to engage in settlement negotiations. The settlement negotiations were unsuccessful. On April 16, 2021, the court heard the motion and took it under advisement. The court now issues its decision.

## II.   SUMMARY JUDGMENT STANDARD

Pursuant to Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56 applies in

adversary proceedings.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the suit under the governing substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Thus, the evidence presented in opposition to summary judgment must be "enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Servs. Co.*, 391 U.S. 253, 288-89 (1968).

A shifting burden of proof governs motions for summary judgment under Rule 56. *In re Oracle Corp. Securities Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The party seeking summary judgment bears the initial burden of proving an absence of a genuine issue of material fact. *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Where, as here, the moving party will have the burden of proof at trial, "the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

If the moving party meets that burden, the burden then shifts to the nonmoving party to set forth "specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. "The mere existence of a scintilla of evidence . . . will be insufficient" and the nonmoving party "must do more than simply show that there is some metaphysical doubt as

to the material facts." *Id*. at 252; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Viewing the evidence in the light most favorable to the non-moving party, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

### III.    DISCUSSION

#### a.    Applicable Law

This court will apply the neutral-principles approach. *See In re Roman Catholic Archbishop of Portland*, 335 B.R. 842, 850 (Bankr. D. Or. 2005) (acknowledging that "the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice[,]" citing *Jones v. Wolf*). The neutral-principles approach relies exclusively on "objective, well-established concepts of trust and property law . . . [and] thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Jones v. Wolf*, 99 S.Ct. 3020, 3025 (1979).

In applying the "neutral principles of law" approach to settling a church property dispute, state courts have looked to (1) language of the deeds, (2) the state statutes governing the holding of church property, (3) the terms of the corporate charter; and (4) the governing document/constitution of the religious institution concerning the ownership and control of church property. *See generally Presbyterian Church v. Eastern Heights Church*, 225 Ga. 259 (1969); *Carnes v. Smith*, 236 Ga. 30, *cert. denied*, 429 U.S. 868 (1976); and *Maryland & Va. Churches*, 396 U.S. 367 (1970).

In examining religious documents, the Supreme Court articulated the following:

> [A] civil court must take special care to scrutinize the document *in*
> *purely secular terms, and not to rely on religious precepts in*

1

2
3      *determining whether the document indicates that the parties have*
       *intended to create a trust.* In addition, there may be cases where the
4      deed, the corporate charter, or the constitution of the general church
       incorporates religious concepts in the provisions relating to the
5      ownership of property. If in such a case the interpretation of the
       instruments of ownership would require the civil court to resolve a
6      religious controversy, then the court must defer to the resolution of the
       doctrinal issue by the authoritative ecclesiastical body.
7

8      *Jones v. Wolf*, 99 S.Ct. at 3026 (emphasis added).

9
                              **b.  Overview**
10
           Before delving into the parties' arguments, it is important to first lay out the relevant
11
       Guam law, Debtor's articles of incorporation, and the governing document or the constitution
12
13     of Debtor's organization.

14                      **1.  Guam's law governing corporation of a religious institution
                             and holding of church property**
15

16         The Guam Code Annotated provides for the incorporation of religious institutions.

17     Pursuant to 18 G.C.A. § 10102, "[f]or the administration of the temporalities of any religious

18     denomination, society, or church, and the management of the estates and properties thereof,

19
       *it shall be lawful for the bishop*, chief priest, or presiding elder of any such religious
20
21     denomination, society, or church *to become a corporation sole* unless inconsistent with the

22     rules, regulations, or discipline of his religious denomination, society, or church or forbidden

23     by competent authority thereof." (emphasis added).

24         "In order to become a sole corporation, the bishop . . . must file with the Department
25
       of Revenue & Taxation articles of incorporation setting forth [among other things] . . . (a)
26
27     That he is the bishop . . . and that he desires to become a corporation sole[;] (b) That the

28     rules, regulations and discipline of his religious denomination . . . are not inconsistent with

his becoming a corporation sole[;] (c) That as such bishop, . . . he is charged with the administration of the temporalities and the management of the estates and properties of his religious denomination . . . within his territorial jurisdiction[.]" 18 G.C.A. § 10103.

"[S]uch *bishop* . . . shall become a corporation sole, and all temporalities, estates and properties of the religious denomination, society, or church theretofore administered or managed by him as such bishop . . . *shall be held in trust by him as a corporation sole* for the use, purpose, behoof, and sole benefit of his religious denomination, society, or church, including hospitals, schools, colleges, orphan asylums, parsonages, and cemeteries thereof." 18 G.C.A. § 10105 (emphasis added).

Because the bishop is *the* corporation sole, Guam law further provides rules on succession. *See* 18 G.C.A. § 10106 (the successor in office of any bishop—or the person authorized under church laws during a vacancy—shall have the same powers as a corporation sole).

Guam law also provides that "[a]ny corporation sole may purchase and hold real estate and personal property for its church, charitable, benevolent, or educational purpose, and may receive bequests or gifts for such purposes." 18 G.C.A. § 10107.

Under the same chapter 10 of Title 18 of the Guam Code Annotated, it provides incorporation of "any religious society or religious order, or any diocese, synod, or district organization of any church." *See* 18 G.C.A. §§ 10108, 10109, 10110, and 10111.

The Guam Code Annotated also provides that it is "lawful for all *religious associations*, of whatever sect or denomination, whether incorporated in Guam or in some other country, *or not incorporated at all*, to hold land in Guam upon which to build churches,

parsonages, educational or charitable institutions." 18 G.C.A. § 10112. This section is followed by a section on "nonincorporated associations" requiring that "[s]uch religious institutions, *if not incorporated*, shall hold the land in the name of three trustees for the use of such associations; the trustees shall be selected by the directing body in Guam for such associations, and vacancies occurring among the trustees by death, resignation, or other cause shall be filled in the same manner as the original selection." 18 G.C.A. § 10113 (emphasis added).

The Guam Business Corporation Act does not define the term "association."[1] However, it provides a definition for the term "entity," which "includes corporation and foreign corporation; not-for-profit corporation; profit and not-for-profit unincorporated association; business trust, estate, partnership, limited liability company, limited partnership, trust, and two or more persons having a joint or common economic interests; and state, United States, and foreign government." 18 G.C.A. § 28110.

### 2. Terms of Debtor's Amended Articles of Incorporation

The Amended Articles of Incorporation provides in part the following:

> SECOND: The *purpose of the corporation is to administer the temporalities, estates and properties, real, personal, or mixed, of the Holy Roman Catholic Church within the Archdiocese of Agaña,* except such property as title to which may be in a specific religious order, society, or association and administered by such.

> THIRD: The Archbishop of Agaña is the supreme ecclesiastical authority within the Archdiocese of Agaña, *exercising within the said Archdiocese the powers and*

---

[1] The Ninth Circuit defined "unincorporated association" as a "voluntary group of persons, without charter, formed by mutual consent for purpose of promoting common objective." *Southern California Darts Ass'n v. Zaffina*, 762 F.3d 921 (9th Cir. 2014).

*responsibilities so delegated to him* by the Supreme Roman Pontiff and, subject to any limitations hereinafter set forth restricting the acquisition and alienation of property, *is within the said Archdiocese charged with and given the responsibility, control, authority, title and disposition of and over all the temporalities, estates and properties, real, personal or mixed, of the Holy Roman Catholic Church and of the Archdiocese of Agaña*, except such property the title to which may be specifically held by some Order, Congregation or Community. . . .

Ex. A to Michael Decl., ECF No. 11-2 (emphasis added).

> ### 3. Governing document/constitution of the religious institution concerning the ownership and control of church property: Canon Law

The canon law is "the internal legal system of the Roman Catholic Church." Fox Aff. at 4, ECF No. 37.[2] The Parishes and Schools do not have their own separate internal legal system. A thorough secular review of the canon law[3] reveals the following:

A parish has a "juridic personality," Can. 515 § 3, and a "juridic person" owns the goods it acquires, Can. 531 & 1256. These sections may show an intent that a parish is a separate entity owning its own properties.

However, the court may find an intent for the parishes to be part of a diocese based

---

[2] Fox is an ordained Roman Catholic priest who analyzed the canon law for the court and offered his "canonical opinion." Fox Aff., ECF No. 37. Attached to his affidavit includes Exhibit C, an opinion from the Pontifical Council for the Interpretation of Legislative Texts, which Fox notes is the "official body designated to provide definitive interpretations of the Canon Law in the Roman Catholic Church." *Id.* at 7.

The Supreme Court has held that the court "must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts[.]" *Jones v. Wolf*, 99 S.Ct. at 3026. Accordingly, this court will not consider Fox's "canonical opinion" and Exhibit C to Fox's Affidavit; as well as the portions of Richards and Byrnes affidavit/declaration offering non-secular reading of the cannon law.

[3] *See* Ex. A to Fox's affidavit, ECF No. 37; and Ex. A to Byrnes' affidavit, ECF No. 36.

on the other sections of canon law. The canon law states that what constitutes a diocese are the parishes, Can. 374 § 1, and that the diocesan bishop represents his diocese in all its juridic affairs, Can. 393. In addition, an overwhelming section of the canon law—again, read purely from a secular view—provides that the diocese has control and authority over parishes.[4] Although the parish's care is entrusted to a pastor, the diocesan bishop has authority over that pastor, Can. 515, § 1.

### c. Analysis

The Committee argues that the Parishes and Schools are unincorporated divisions of the Debtor and are not separate entities from the Debtor. Mem. in Support of Mot. at 11, ECF No. 10. Both Debtor and Intervenor do not fully address corporation law and what constitutes a division of a corporation. *See* Debtor's Opp'n., ECF No. 34; and Intervenor's Opp'n., ECF No. 59. Rather, both conclusively assert without much analysis that the Parishes and Schools are unincorporated associations.

Because the question before this court is whether the Parishes and Schools are separate legal entities from the Debtor, the court will analyze what constitutes a division of a corporation.

### 1. The Parishes and Schools are not separately incorporated.

There is no evidence in this case that the Parishes and Schools are separately incorporated under Guam law. The undisputed fact is that no parish or school is

---

[4] *See e.g.*, Can. 515, § 2; Can. 516, § 2; Can. 517, § 2; Can. 520, § 1; Can. 524; Can. 531; Can. 533, § 3; Can. 536, § 1; Can. 536, § 2; Can. 538, § 1; Can. 538, § 3; Can. 539.

independently incorporated with the Guam Department of Revenue and Taxation.[5] The Parishes and Schools are fictitious names synonymous with the Debtor. *See* Ex. G to Michael Decl., ECF No. 11-4. This is also not a disputed fact.[6]

### 2. There is no Guam law that allows for unincorporated divisions to sue or be sued; and the Parishes and Schools lack property ownership.

The basic principle of corporate law is that corporations are independent legal "persons," who, like natural persons, may sue or be sued. 18 Am. Jur. 2d Corporations § 2. An unincorporated division of a corporation, therefore, lacks existence as a legal entity and the capacity to sue or be sued. *See In re Fed.-Mogul Glob. Inc.,* 411 B.R. 148, 163-64 (Bankr. D. Del. 2008); *United States v. ITT Blackburn Co., a Div. of ITT*, 824 F.2d 628, 631 (8th Cir. 1987) (an unincorporated division of a parent company lacks capacity to be sued).

"[W]here a party in question is neither an individual nor a corporation, capacity to be sued is determined with limited exceptions by 'the law of the state where the court is located.'" *Kaupthing ehf. v. Bricklayers & Trowel Trades Int'l Pension Fund Liquidation Portfolio*, 291 F. Supp. 3d 21, 28 (D.D.C. 2017) (citation omitted).

In the *Archbishop of Portland*, Oregon law authorizes religious corporations (including corporations sole) to sue and be sued, and to hold and dispose of property. 335 B.R. at 866. However, the debtor in that case was unable to cite any state law that would authorize unincorporated parishes to sue or be sued or to hold and dispose of real property.

---

[5] *See* Fact No. 38 of Movant's Concise Statement of Material Facts. ECF Nos. 11 at 5, and 42-1 at 6. Debtor and Intervenor do not dispute this fact. ECF Nos. 35 at 13, and 60 at 5.

[6] *See* Fact No. 36 of Movant's Concise Statement of Material Facts. ECF Nos. 11 at 5, and 42-1 at 6. Debtor does not dispute this. ECF No. 35 at 13. Intervenor can neither confirm nor dispute this fact. ECF No. 60 at 4.

*Id.* "Because the parishes are not separately incorporated, as they could be under Oregon religious corporations law, they cannot hold title to real property." *Id.* The court therefore concluded that the parishes are "not separate from, but are merely a part of debtor." *Id.*

Similar to the *Archbishop of Portland*, no Guam law exists that allows for unincorporated divisions to sue or be sued. Focusing its argument on the concept of "unincorporated association" rather than a "division," Debtor argues that "unincorporated associations can sue or be sued pursuant to Guam law," Debtor's Opp'n. at 9 & 14, ECF No. 34, relying upon a 1953 district court case and the statute cited therein, *see Brandt v. United States*, 110 F. Supp. 627, 630 (D. Guam 1953) (citing Guam Code of Civil Procedure § 338, now codified at 7 G.C.A. § 12115). Even assuming *arguendo* that the Parishes and Schools are unincorporated associations, Debtor's reliance on *Brandt* and the statutory provision is misplaced.

Pursuant to 7 G.C.A. § 12115,

> [w]hen two or more persons, associated in any business, transact such business under a common name … the associates may be sued by such common name, the summons in such cases being served on one or more of the associates; and the judgment in the action shall bind the joint property of all the associates, and the individual property of the party or parties served with process, in the same manner as if all had been named defendants and had been sued upon their joint liability.

As its text makes clear, this provision does not permit unincorporated associations to sue and be sued on their own behalf. Rather, it creates a procedural device by which "the associates" may be sued under the common name of the association, resulting in a judgment that is binding "in the same manner as if all [associates] had been named defendants and had been sued upon their joint liability." As the court noted in *Brandt*, "[t]his section was taken

from the California Code and was construed in *Jardine v. Superior Court*." *Brandt*, 110 F.

Supp. at 630. In *Jardine*, the California Supreme Court explained the background of this

statutory provision:

> For a long time the established rule was that in the absence of statute, an unincorporated association could not sue or be sued in its common name; all the members thereof had to appear in their own names as parties plaintiff or defendant. The basic reason was that the association was not, in the eyes of the law, a legal unit or entity, and had no legal capacity to become a party to an action. The difficulty was only one of procedure, and the objection was purely technical. The liabilities or rights of the members were in no way involved, and were not, in theory, impaired by the operation of the rule. They might have brought actions if they all joined as plaintiffs, and they might have been held to any liability imposed upon them by law, if sued and served individually. But where associations with large membership were involved, the operation of the rule frequently had inconvenient and unjust consequences, and various exceptions came to be recognized.…
>
> The many inconveniences of the rule were not wholly evaded by these exceptions, and statutes were widely adopted for the purpose of eliminating this procedural obstacle by permitting suits to be brought against the associates in the common or association name. In most instances, they did not give the association the right to appear as a *plaintiff*. The statutes dealt solely with the manner of bringing actions, and were not intended to effect any change in the substantive law. Members of associations had the same rights and were subject to the same liabilities as before, only now they could be sued by a less complicated and cumbersome process.

*Jardine v. Superior Court in & for Los Angeles Cty.*, 213 Cal. 301, 307-08 (1931) (internal

citations omitted) (emphasis in original).

  This background underscores what is already clear from the text of the statute.

Section 12115 does not effect any change in the substantive law, nor does it give

unincorporated associations the ability to bring suit in the name of the association. It merely eliminates one purely procedural hurdle that plaintiffs previously had to overcome when attempting to recover from the associates based on their joint liability. A suit brought under this section, although styled as one against the association's common name, is in substance a suit against the associates themselves.

The principle that an unincorporated division of a corporation lacks the legal capacity to sue or be sued is "supported by a pragmatic rational derived from the fact that a division owns no independent assets and is under the control of a larger organization." *Kaupthing ehf.*, 291 F. Supp. 3d at 28 (citation and internal quotes omitted).

Here, the Parishes and Schools at issue do not own independent assets. Debtor holds legal title to the Disputed Property. *See* Debtor's Am. Statement of Financial Affairs, Ex. 9 and 10, ECF No. 148 of Bankruptcy Case No. 19-00010.[7] Further, with the exception of one school,[8] all Parishes' and Schools' bank accounts are held in Debtor's name. *Id.*, Ex. 8, 9 and 10.

The issue of whether the Parishes and Schools are under the control of a larger organization will be discussed next.

### 3. Parishes and Schools are under the control of Debtor.

Courts have held that the control that an archdiocese exerts over its parishes and

---

[7] *See* Fact No. 40 of Movant's Concise Statement of Material Facts. ECF Nos. 11 at 5, and 42-1 at 6. Intervenor does not dispute this fact. *See* ECF No. 60 at 5. Debtor does not dispute the existence and contents of the cited documents, though Debtor notes that such properties are being held in trust for the Parishes and Schools. *See* ECF No. 35 at 14.

[8] The bank accounts of one school are held under that school's name. *See* Perez Decl. ¶ 7, ECF No. 32 at 4-5.

schools is a determining factor of whether they are separate from or the same as the archdiocese.

For example, in *F.E.L. Publications*, although the Seventh Circuit did not conduct an in-depth analysis of the relationship between the parishes and the Archdiocese of Chicago, the case is still instructive. The Seventh Circuit reviewed evidence of individual priests' "limited, authorized power to purchase," which supports the Archdiocese of Chicago's position that the parishes and the Archdiocese are one entity. *F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago*, 754 F.2d 216, 221 (7th Cir. 1985), *cert. denied* 474 U.S. 824 (1985).

In *E.E.O.C.*, the D.C. court conducted a much more in-depth analysis than *F.E.L. Publications. See E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 77 F. Supp. 2d 71 (D.D.C. 1999), *aff'd sub nom. E.E.O.C. v. St. Francis Xavier Sch.*, 254 F.3d 315 (D.C. Cir. 2000). The plaintiff in *E.E.O.C.* did not deny that the defendants are unincorporated division of a corporation. *Id.* at 74. Nonetheless, the court examined the relationship between the Archdiocese of Washington and the St. Francis Xavier Parish:

> The Archdiocese possesses traditional corporate attributes, such as the powers to contract, to acquire property, and to sue and be sued. The Archdiocese is made up of all the Catholic parishes and related facilities within its territorial jurisdiction, which encompasses the District of Columbia and five surrounding Maryland counties. Although the Canon Law of the Roman Catholic Church views each parish as a separate entity for religious purposes, the parishes are not separately incorporated under civil law.
>
> [The Parish is] . . . within the territorial jurisdiction of the Archdiocese. It operates independently of other parishes within the jurisdiction. The

Archdiocese owns all of the Parish's property—the Parish does not own any independent assets. . .

*The Archdiocese exerts varying degrees of control over different aspects of the Parish's operations.* As to financial matters, the Archdiocese maintains control over the Parish's budget by requiring the Parish to submit an annual financial report on all of its operations and to undergo periodic financial audits. Although the Archdiocese does not oversee the Parish's daily expenditures, Archdiocese approval is required for any expenditure exceeding $10,000. As to personnel matters, the Archdiocese appoints the pastor and, through the Archdiocese's personnel director, helps to determine the staffing of other priests assigned to work at the Parish. The Archdiocese also influences other Parish personnel decisions, such as the hiring of the School's teaching staff, by providing guidelines on appropriate hiring criteria.

*E.E.O.C.*, 77 F. Supp. 2d at 74-75 (citations omitted) (emphasis added). Clearly, the court examined whether the Parish was part of the larger Archdiocese by examining the relationship and the degree of control. Based on this, the court found that the Parish itself is part of the larger Archdiocese. *Id.* at 75.

Here, there is overwhelming evidence of the varying degrees of control that Debtor exerts over the Parishes and Schools. The Parishes and Schools are under the umbrella of the Debtor. *See* Ex. A to Michael Decl., ECF No. 11-2 at 2-3. Debtor is responsible for and has authority over all civil property within the Archdiocese, providing "oversight and support to parishes [and] schools[.]".[9] *See* Ex. I to Michael Decl., ECF No. 11-5 at 2. Debtor appoints the pastors who lead the parishes. In the absence of a pastor, Debtor assigns a parish

---

[9] *See* Fact No. 1 of Movant's Concise Statement of Material Facts. Intervenor does not dispute this fact. *See* ECF No. 60, at 1. Debtor does not dispute this fact but rather offers clarification that "Debtor would be responsible for making sure the management of the properties (Parishes and Schools) is effective)[,]" but that "these properties are managed and cared for by the pastors and principles." Richards Decl., ECF No. 38, at 2.

administrator. *See* Ex. H to Michael Decl., ECF No. 11-4 at 6. Debtor establishes the pay

schedule for all the priests, and Debtor supervises the priest or other chief administrator of

each parish. *See* Ex. H to Michael Decl., ECF No. 11-4 at 9; and Ex. E to Michael Decl.,

ECF No. 11-3 at 6. In addition, Debtor sets human resources policies that apply to all Parishes

and Schools.[10] *See* Ex. 14 to Second Michael Decl., ECF No. 43-1. The Debtor also regularly

evaluates parishes and schools, assessing their operations and providing recommendations

for improvement.[11] *See* Ex. O to Michael Decl., ECF No. 11-19 (examples of the evaluation

and recommendations). Debtor, along with its advisors as required by its cannon law, has the

power to close a parish or a school.[12]

The Debtor plays a major role in the finances of the Parishes and Schools. Although

Debtor is not involved in the daily expenditures of the Parishes and Schools, Debtor's

approval is required for all financial transactions exceeding a certain amount. *See* Ex E to

Michael Decl., ECF No. 11-3 at 4-5; and Ex. 1 to Second Michael Decl., ECF No. 43 at 6.

Any lease agreements that binds the parish or the school must first be reviewed by the Debtor.

*See* Ex. H to Michael Decl., ECF No. 11-4 at 7; and Ex. I to Michael Decl., ECF No. 11-5 at

4. Each parish prepares an annual financial report for submission to the Debtor. *See* Ex. H to

---

[10] Debtor does not dispute this fact but merely provides a reason for why it is being done. *See* Richards Decl., ECF No. 38 at 10. Intervenor asserts that the applicability of this fact cannot be substantiated for all Parishes and Schools, ECF No. 60 at 4, but does not provide evidence to dispute the evidence provided by the Committee.

[11] Debtor does not dispute this fact but merely provides a reason for why it is being done. *See* Richards Decl., ECF No. 38 at 10. Intervenor is unable to dispute this fact as it can neither confirm nor deny it. ECF No. 60 at 4.

[12] Intervenor is silent on this fact. *See* ECF No. 60. Debtor does not dispute this fact but rather offers clarification that the Archbishop cannot "unilaterally" take such action, since per its canon law, the Archbishop is advised by its Presbyteral Council. *See* Richards Decl., ECF No. 38 at 8.

Michael Decl., ECF No. 11-4 at 7. The Parishes and Schools are also required to submit to the Debtor a monthly financial report.[13] *See* Ex. F to Michael Decl., ECF No. 11-3 at 8; and Ex. 1 to Second Michael Decl., ECF No. 43 at 5. Debtor has continuous access to bank account information of Parishes and Schools.[14] *See* Debtor's Am. Statement of Financial Affairs, Ex. 8, 9 and 10, ECF No. 148 of Bankruptcy Case No. 19-00010.

When deciding to embark on a major renovation or construction of a new facility, the Parishes and Schools are required to notify Debtor for any projects exceeding $15,000.00, and seek approval of Debtor for any projects exceeding $25,000.00. *See* Ex. H to Michael Decl., ECF No. 11-4 at 10. *See also* Ex. L to Michael Decl., ECF Nos. 11-6 to 11-17 (examples of Expenditure Approval Requests); Ex. R to Michael Decl., ECF No. 11-22 (sample of an approval letter from a parish to Debtor/its financial council); and Ex. P to Michael Decl., ECF No. 11-19 (example of a contract agreement with Debtor). Debtor is involved in the process, including having its finance officer provide an initial estimate of the parish's debt capacity. *See* Ex. H to Michael Decl., ECF No. 11-4 at 11.

The varying levels of control and involvement of Debtor in the Parishes' and Schools' operations make clear that the Parishes and Schools are part of the Debtor, and that they are one and the same.

---

[13] Debtor claims the monthly financial report is being done as a result of the bankruptcy filing. *See* Richards Decl., ECF No. 38 at 9. However, evidence shows otherwise, and the monthly financial reports have been in place prior to the bankruptcy filing. *See* Ex. 2 of Second Michael Decl., ECF No. 43 (examples of monthly financial reports for 2014-2015).

[14] Intervenor disputes that Debtor has access to *all* Parishes' and Schools' bank accounts. ECF No. 60 a6 3. However, Intervenor does not dispute that Debtor has access to *bank account information*.

**4. Section 10112 of Title 18, Guam Code Annotated has no application in the instant case.**

As discussed *supra*, one of the factors in determining whether an entity is an unincorporated division of a corporation or a separate entity from the corporation is property ownership. As noted, the Parishes and Schools holds no real property under their names.

Debtor and Intervenor argue that Guam law allows for an "unincorporated association" to hold land in Guam, citing 18 G.C.A. § 10112. Debtor's Opp'n. at 8, 14; and Intervenor's Opp'n. at 11, ECF No. 59.

Section 10112 provides in its entirety the following:

> It shall be lawful for all religious associations, of whatever sect or denomination, whether incorporated in Guam or in some other country, or not incorporated at all, to hold land in Guam upon which to build churches, parsonages, or educational or charitable institutions.

18 G.C.A. § 10112. This section is followed by a section on "nonincorporated associations" requiring that "[s]uch religious institutions, *if not incorporated*, shall hold the land in the name of three trustees for the use of such associations; the trustees shall be selected by the directing body in Guam for such associations, and vacancies occurring among the trustees by death, resignation, or other cause shall be filled in the same manner as the original selection." 18 G.C.A. § 10113 (emphasis added).

Debtor is correct in that under Section 10112, "unincorporated associations" are allowed to hold land in Guam. However, there are two problems with Debtor's argument. First, as discussed *supra*, the Parishes and Schools are unincorporated divisions of the Archdiocese of Agaña, not "nonincorporated associations."

Second, assuming *arguendo* that the Parishes and Schools are "nonincorporated associations," for them to hold land under Guam law, the land shall be held in the name of three trustees of said nonincorporated associations. 18 G.C.A. § 10113. There is no evidence that real property of the Parishes and Schools are being held in the name of three trustees.[15]

---

[15] Debtor and Intervenor raise the issue of the Debtor being a corporation sole and is therefore holding the properties in trust for the Parishes and Schools pursuant to 18 G.C.A. § 10105. *See* Debtor's Opp'n. at 7-9, ECF No. 34; and Intervenor's Opp'n. at 5. 10-11, ECF No. 59. Trust relationship is not a question before this court. However, because this issue is closely relevant to the discussion of Sections 10112 and 10113, the court will address this issue.

> Section 10105 states in part,
>> . . . all temporalities, estates and properties of the religious denomination, society, or church theretofore administered or managed by him as such bishop, chief priest, or presiding elder shall held in trust by him as a corporation sole for the use, purpose, behoof, and sole benefit of his religious denomination, society, or church, including hospitals, schools, colleges, orphan asylums, parsonages, and cemeteries thereof.

18 G.C.A. § 10105. A plain reading of the statute is that, the statute allows a natural person, the bishop, to hold all property in trust for his religious organization, the corporation sole. Unlike other types of corporations, a corporation sole does not have directors, shareholders, or officers. *Compare Chapter 2 of Title 18, Guam Code Annotated (Formation of Corporations).* This provides for a perpetual existence of the corporate body although the natural person holding the office, the bishop, has no perpetual existence. *See* 18 G.C.A. § 10106 (the successor in office of any bishop—or the person authorized under church laws during a vacancy—shall have the same powers as a corporation sole).

> To understand the corporation sole statute, one must understand its historical context. In *Archbishop of Portland*, the bankruptcy judge explained,
>> [R]eligious organizations experienced difficulties with how to continue operations of the organization during a vacancy in the office of the bishop or other church leader, and how to hold church property so that the church would retain ownership in perpetuity. *See, e.g.*, James B. O'Hara, *The Modern Corporation Sole*, 93 Dick. L.Rev. 23 (1988). Property that was given to or otherwise acquired by the religious organization would sometimes be held in fee simple by the parish priest. But that method of ownership was problematic because, upon the priest's death, the property might be claimed by the priest's heirs.[15] *Id.* at 29.

335 B.R. at 856. As a result, many states have adopted corporation sole as a type of corporation for religious organizations. *Id.*

> Applying this historical context of corporation soles, this is where the "in trust" language comes from. The bishop, Byrnes, holds *all* the properties of the religious institution that he manages and administers, as a corporation sole. In the event Byrnes passes away or is sued in a personal capacity, his heirs or personal creditors are not able to take claim of the cathedral building or the chancery office, or any other properties of the religious institution. This is the most common sense reading of Section 10105.

The Parishes and Schools have not availed themselves of this Guam law.

Based on the foregoing, Section 101112 has no applicability in this case.

> **d. The court's holding is limited to the question before it: whether the Parishes and Schools are separate legal entities; and it should not be construed as foreclosing the resulting trust argument.**

As stated above and as pointed out by the Committee in its Reply, ECF No. 42 at 1, the question before this court is very narrow: "Are the Parishes and Schools distinct legal entities or are they divisions of the Debtor?"

Debtor and Intervenor, however, address a completely different issue that is not currently before the court and that is, whether a resulting trust exist between Debtor and the Parishes and Schools. The court finds it necessary to tangentially address Debtor's and Intervenor's resulting trust argument to clarify the exact boundaries of today's decision.

The Committee asserts that a finding that Debtor and Intervenor are the same "legal entity" automatically precludes a possibility of a resulting trust. According to the Committee, "[t]his is true, of course, because property cannot be held in trust for someone or something

---

Section 10105 does not mean *all* the properties under Byrnes as a corporation sole are held in trust in the sense that the corporation sole holds only "bare legal title" to the property without any equitable interest under Bankruptcy Rule 541. If the court were to apply Debtor's and Intervenor's interpretation, there will *not* be any property belonging to the bankruptcy estate. But that is not the case here.

Despite the language in Section 10105 stating that *all* the properties ("*all* temporalities, estates and properties") under Byrnes are to be held in trust for the religious organization, the *undisputed* properties are currently part of the bankruptcy estate and Debtor is not disputing that.

If the court were to apply Debtor's and Intervenor's interpretation of Section 10105, the court will essentially be making a ruling that there will be no properties belonging in the bankruptcy estate. The court cannot say that some are being held in trust with only "bare legal title," while the others are not, when the text of the statute is clear that "all" properties are to be held in trust.

that does not exist in the first place." ECF No. 42 at 2:2-6.

The court is not so sure that this is "true, of course." A holding that the Intervenor has the same legal identity as Debtor is not necessarily a holding that the Intervenor is incapable of holding a unique, equitable interest in the Disputed Properties which may be excluded from the estate under 11 U.S.C. § 541(d). After all, a resulting trust is an equitable remedy that arises from specific facts and circumstances of a particular case.

In this case, it seems unremarkable to observe that the Intervenor has an interest in the Disputed Properties that is dissimilar in nature from Debtor's interest. While this may be a distinction without a difference for purposes of corporate law, it does not automatically foreclose the possibility of an equitable interest that may be protected by the equitable provisions of the Bankruptcy Code. This concept is reflected in the *Comm. of Tort Litigants v. Cath. Diocese of Spokane*, 364 B.R. 81 (E.D. Wash. 2006). The district court there held a triable fact existed regarding whether parishes had a protectable interest in property arising from a resulting trust, such that the property was excluded from the bankruptcy estate of the debtor-diocese.

The Committee called this case a "misguided anomaly" and faulted the opinion for not specifically analyzing whether the parishes were distinct from the debtor-diocese, and failing to consider "any of the established factors used to define and distinguish unincorporated divisions[.]" Mem. in Support of Mot. at 16, ECF No. 10. However, another possible interpretation is that the district court did not specifically analyze whether the parishes or debtor were the same entity because the issue was not determinative on whether the parishes could be the beneficiary of a resulting trust.

Though the court finds the *Spokane* to be particularly persuasive, the court realizes that delving into such matters without the benefit of argument and briefing on this specific issue would be inappropriate. Consequently, the court provides this discussion only to emphasize the limits of the court's holding. Whether a "resulting trust" exists is a separate and distinct issue from whether Debtor and Intervenor are the same entity, not only as a matter of procedure given the limited scope of the partial motion at bar, but also as a legal matter. Stated more simply, the court is declining to rule on the resulting trust argument solely because of the limited nature of the Committee's motion, and not because of a deficiency in the Debtor and Intervenor's legal argument.

## IV.    CONCLUSION

The court hereby **ORDERS** the following:

(1) The Committee's Partial Motion for Summary Judgment is hereby **GRANTED**. The court finds that the Parishes and Schools are part of the Debtor and are unincorporated divisions of the Archdiocese of Agaña.

(2) The Clerk is directed to enter partial judgment for the Committee.

**SO ORDERED.**



**/s/ Frances M. Tydingco-Gatewood**
   **Chief Judge**
**Dated: Jul 16, 2021**